

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TRADING TECHNOLOGIES )
INTERNATIONAL, INC., )
  )
  Plaintiff, )
  )
vs. ) No. 05 C 4811
  )
CQG, INC., and CQGT, LLC, )
  )
  Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Trading Technologies, Inc. ("TT") filed suit against several independent software vendors alleging infringement of two patents covering software designed for futures trading. In April 2007, the defendant in this suit, CQG, Inc. ("CQG"), moved for summary judgment on the issue of non-infringement. On July 17, 2008, the court issued an order entering and continuing the motion for summary judgment and staying the case during the pendency of the appeal in TT's case against two other defendants, eSpeed and Ecco. TT was also granted the right to collect certain raw data from CQG in the interim, but we left the task of finalizing the details of such an arrangement to the parties, which they have been unable to do. CQG now asks the court to reconsider, or in the alternative to clarify the terms of its July 17, 2008, order. We decline to reconsider our earlier order, but offer the parties the following clarification.

CQG argues that disclosure of raw transaction data to TT would cause irreparable harm because the raw data includes such sensitive information as the identity of the trader, the size of the transaction, the type of transaction, and the interface used to place a trade.

Some of this information, such as the identification of customer accounts and customer trading activities cannot be disclosed without consent of third parties. Furthermore, the data is maintained in an extensive data base that is not transferable. Finally, CQG argues that the raw data is proprietary and sensitive information that informs business strategy and issues such as pricing, marketing, and products offering decisions.

The court's intent was never to give TT carte blanche access to CQG's proprietary business information. However, TT is entitled to suitable information so that it can be assured that it will be able to calculate an accurate damages amount in the event that it is successful in this case. The damages calculation will require TT to create a transaction count. What information TT needs to accomplish this we cannot say with specificity because it is the parties who know the specifics about what data exists and what data they need.

In an attempt to spur the parties to some sort of resolution, we offer the following two suggestions. First, CQG could provide TT with a sample raw data file populated with dummy information as a representation of the type of information that CQG maintains. TT could then assure itself that the appropriate information is available for it to create a transaction count if that becomes necessary. Second, TT could identify the information it requires to create a transaction count and the parties could utilize the services of a third party aggregator to collect that information from CQG's data base. At the appropriate time, the aggregator would report to TT only that transaction information to which it is entitled. These two methods are by no means the only possible solutions to this dilemma. We once again leave it to the parties, who are better equipped than the court, to determine the best method to accomplish the goal we have laid out today.

The only remaining question is that of timing. Our earlier order stated that "TT may

have access to the raw data on a regular basis." Our intent was to assure TT that the appropriate data continued to be available in the event the eSpeed appeal remains unresolved for a lengthy period of time. Once the parties have resolved the previous issue and satisfied themselves that CQG maintains the data required to create an accurate transaction count, we believe a periodic written assurance from CQG that the agreed-upon information is being maintained – either by it or a third party – will be sufficient to allay any concern on the part of TT.

Pursuant to our above clarification, the parties are directed to meet and confer in an attempt to reach an agreement on the method by which the appropriate information will be maintained. The parties shall report their progress at a status hearing on March 26, 2009. A joint written explanation of the parties' agreement may be submitted to the court in lieu of the scheduled status hearing.

                                                                                          _____
                                                                                          JAMES B. MORAN
                                                                                          Senior Judge, U. S. District Court

February 17, 2009.