IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Trading Technologies International, Inc. | ) | Civil Action No. 05-4811 |
| Plaintiff, | ) ) ) | Judge Sharon Johnson Coleman |
| v. | ) ) | Magistrate Sidney I. Schenkier |
| CQG, Inc. and CQGT, LLC | ) ) ) | |
| Defendants. | ) ) | |

### TT'S MOTION TO COMPEL DEPOSITION TESTIMONY

TT moves this Court for an order to compel CQG to 1) provide a properly-prepared 30(b)(6) witness in the United States to testify regarding certain product functionality topics for at least a full 7 hours[1], and 2) produce Mr. Alexey Korepanov, a CQG Project Manager and developer who CQG asserts is responsible for changes made to CQG's products, in the United States or another agreeable location.

CQG objects to providing a new product functionality 30(b)(6) witness in the United States for a full 7 hours, and objects to providing a witness on the timetable previously ordered by this Court. CQG initially designated Anthony Stavros for deposition in Chicago. Mr. Stavros was wholly unprepared to discuss any of the 30(b)(6) functionality topics in December, and his deposition was suspended due to his inability to answer questions. CQG then decided to offer a different designee, Maxim Katin, in Kiev, Ukraine. CQG contends that TT should be limited by

---

[1] TT has corresponded with CQG regarding deficiencies with the testimony its witnesses have provided for several of the 30(b)(6) topics. Ex. A. With respect to the topics for which CQG previously designated Ms. Spampinato and Messrs. Giffen, Vancil, and Leubbering, TT will bring a separate motion if the parties cannot resolve the issues after the conferral.

any time it previously used with Anthony Stavros, who is no longer CQG's corporate witness on these topics. CQG's position is untenable because Mr. Stavros was unable to provide any information responsive to most of the 30(b)(6) designated to him. CQG's arguments are also untenable given their position now that no one in the United States is equipped to testify regarding such topics and also given the sheer number of different versions of products released by CQG since TT's patents issued in July/August of 2004. CQG's failure to provide such testimony directly impedes TT's ability to prepare its final infringement contentions, due February 28, 2013.

Additionally, CQG has objected to producing a Russian-based employee, Mr. Alexey Korepanov, for a personal deposition outside of Russia. Judge Moran previously dealt with a similar situation in the coordinated proceedings, and ruled that foreign-based employees of party GL Trade were to be brought to the United States for their depositions. Ex. B, Case No. 04-5312, Dkt. 498. This rule should be applied here, especially given that evidence, including documents, deposition testimony, and CQG's own assertions during settlement discussions, suggests that Mr. Korepanov is a central figure with respect to many of the relevant features and changes in CQG's software.

Specifically, documents and representations from CQG's prior counsel indicate that Mr. Korepanov, who resides in Samara, Russia, removed alleged recentering features from certain of CQG's accused products while this litigation was stayed. These alleged recentering features form the basis of many of CQG's non-infringement positions and were the basis of CQG's request for Judge Moran to stay the case. No witness to date has been able to testify about the changes to these features, and CQG has offered no explanation for why these changes were made. Yet CQG objects to producing Mr. Korepanov at all, citing lengthy visa procedures to

bring a Russian citizen to the United States. Instead, the best CQG would offer was a videoconference deposition of Mr. Korepanov in Russia (which TT does not believe is any less illegal than a deposition with the attorneys physically present in Russia). TT has offered several compromise locations (e.g., Barbados, Thailand, Hong Kong) where the visa issues would not arise, and where a U.S. style deposition is not prohibited, in an attempt to find a mutually agreeable location for the deposition. CQG has rejected every single one.

For these reasons, the Court should order CQG to produce one or more 30(b)(6) witnesses in either Denver or Chicago to testify regarding the topics pertaining to product functionality for at least the full 7 hours, and produce Mr. Alexey Korepanov for a personal deposition in the United States or other mutually agreeable location.[2]

I.  **FACTUAL BACKGROUND**

TT has already been before this Court on multiple occasions regarding the 30(b)(6) notices at issue here, first served by TT on June 26, 2012. Exs. C and D. On August 30, 2012, TT filed a motion to compel dates and witness designations for the 30(b)(6) depositions after not receiving dates or objections to its 2 month-old notices. Dkt. 330.[3] TT received objections later the same day after filing its motion, (Exhibits E and F), and received dates for the depositions in late September/early October just before TT's motion was scheduled to be heard. Ex. G. The

---

[2] CQG has recently suggested that it intends to count each 30(b)(6) witness that it tenders as a separate deposition to be counted against TT's limit. CQG's position is incorrect. "A deposition under Rule 30(b)(6) should be treated as a single deposition for purposes of the ten deposition limit provided under Rule 30 even though more than one person may be designated to testify." FED. R. CIV. P. 30, Notes of Advisory Committee on Rules - 1993 Amendment; *see also*, *ADT Security Servs., Inc. v. Pinnacle Security, LLC*, Case No. 10-cv-7467, 2012 WL 1597383, at *3 (N.D. Ill. May 7, 2012). Although the depositions of Messrs. Katin and Korepanov would not put TT over its current limit of 10 depositions, even by CQG's count, TT intends to seek both a clarification on this issue and leave to take in excess of 10 depositions before Judge Coleman.

[3] At the time, TT's final infringement contentions were due on September 28, 2012.

3

Court thus denied TT's motion to compel as moot, based on the representations of the parties in open court. Dkt. 333.

On September 17, 2012, CQG filed its motion for a 5-month extension of the Case Management Schedule. Dkt. 334. The motion was subsequently granted by Judge Coleman on September 21, 2012 and the parties agreed to reschedule the impending depositions. Dkt. 339. TT reminded CQG of the need for 30(b)(6) dates on October 1, 2012, but did not receive any substantive response. Ex. H. The parties conferred on this and other topics on October 10 and again on November 6, 2012, but CQG provided no substantive response.

On November 9, 2012, CQG provided dates for four of its six designees, with depositions to be held in Chicago and Denver during the second and third weeks of December, respectively. Ex. I. TT accepted the proposed dates, (Exhibit J), but moved to compel on November 14, 2012, seeking the withdrawal of CQG's improper objections and seeking definitive dates for all of CQG's 30(b)(6) deponents. Dkt. 358.[4] At the November 20, 2012 hearing before this court, TT's motion was continued pending a review of issues that had been mooted by CQG's ongoing production and correspondence. Dkt. 391 at 4:6-14. On November 29, 2012, CQG indicated that it was withdrawing one of its unscheduled 30(b)(6) witnesses, Mike Glista, and would redistribute his topics among the other designees. Ex. K. CQG also confirmed for the first time a final date for the 30(b)(6) deposition of Mr. Anthony Stavros. Ex. L.

At the hearing on December 3, 2012, TT's motion to compel 30(b)(6) testimony was denied as moot based on the dates provided by CQG, and further because CQG indicated in open court that it was "not going to limit the overall testimony that it provides in response to the

---

[4] Initially, TT's motion incorrectly stated that no 30(b)(6) dates had been set. TT subsequently withdrew this statement and the portion of the motion with respect to the four confirmed dates, but maintained the motion with respect to the remaining two. Ex. S, 11/21/12 Carden letter to Schenkier.

4

30(b)(6) categories based on objections other than privilege." Ex. DD, Dec. 3, 2012 Schenkier Hrg. Tr. at 20:7-18. Later that day, CQG provided an amended topic list for each of its corporate designees, indicating Mr. Stavros as the witness that would be prepared to testify regarding most topics directed to the functionality of CQG's products. Ex. M. Based on this information, TT proceeded with the deposition of Mr. Stavros on December 12, 2012 at counsel's offices in Chicago.

Yet after two hours and seventeen minutes, it became clear that Mr. Stavros was unprepared to testify to the full scope of topics designated to him, and the parties agreed to suspend his deposition until a date in January when he could be better prepared and after CQG provided interrogatory answers regarding product functionality. Ex. N, Stavros Dep. Tr. at 107:4-108:17. Most of the time at the Stavros deposition was spent on questions pertaining to background and establishing that he was unprepared to testify to the designated topics. The agreement to suspend until January was confirmed at a conferral the following day. At the same conferral, TT attempted to provide further guidance as to specific issues it would address when the deposition resumed, in an effort to avoid future problems with the deposition. Although TT at no time suggested it would limit its questions to the issues discussed at the conferral, CQG has now refused to provide any testimony beyond the issues discussed at the conferral.[5] Thereafter, TT did not receive any proposed dates for the continuation of Mr. Stavros's deposition, and on January 2, 2013 began reminding CQG of the need for a date. Ex. O.

At the status hearing on January 10, 2013, the parties discussed the pending continuation of Mr. Stavros's deposition, and CQG indicated that it was planning to provide a witness by the

---

[5] CQG has consistently attempted to twist TT's attempts to assist CQG in its document production and preparation for testimony into limitations on TT's requests. Such an approach will preclude TT from considering such proposals in the future and will unnecessarily add to the motion practice before this Court.

first of February, 2013. Dkt. 392 at 4:18-21. CQG also stated for the first time that it might tender another witness in addition to Mr. Stavros to testify to the designated topics. *Id*. at 4:10-15. The Court then ordered CQG to provide a date in the first half of February for the completion of Mr. Stavros's deposition. *Id*. at 5:8-11.

On January 21, 2013, CQG notified TT for the first time that it intended to produce a new witness, Mr. Maxim Katin, in place of Mr. Stavros, and that his deposition would take place at the U.S. Embassy in Kiev, Ukraine. Ex. P. Moreover, the deposition would not be held until February 22, 2013—six days before TT's final infringement contentions are due. *Id*. CQG's letter further stated that Mr. Katin's deposition would be limited in scope to only those issues discussed at the parties' conferral on December 13, 2012, and that the deposition would be limited to the time remaining in Mr. Stavros's original deposition before it was terminated by the parties. *Id*. TT responded on January 23, 2013, stating that CQG's proposal was unacceptable for numerous reasons. Ex. Q. The parties conferred on this topic on January 28, 2013, and although CQG stated that it would consider TT's suggestion for compromise,[6] it would not commit to producing Mr. Katin for its party deposition in any location other than Kiev. Exs. R, S.

Concurrently with the discussions regarding the 30(b)(6) continuation, the parties have discussed the personal deposition of one of CQG's employees, Mr. Alexey Korepanov. On January 2, 2013, TT served on CQG a notice for the deposition of Mr. Korepanov, Ex. T. Mr. Korepanov was the Project Manager for the DOMTrader, which is at issue in this case. Ex. AA, Kwan Dep. Tr. at 28:6-13. Furthermore, testimony and documents indicate that Mr. Korepanov is responsible for programming many of the infringing components of CQG's software and for

---

[6] TT has proposed coordinating the depositions of Mr. Katin and Mr. Korepanov in London.

6

removing features from certain versions that CQG is relying on for some of its non-infringement arguments. CQG objected to the deposition based on Mr. Korepanov's location in Russia and the associated visa issues he would face in traveling to the United States. The parties exchanged several emails on the topic. Ex. U. In the email exchange, TT provided CQG with Judge Moran's order from coordinated discovery proceedings in the *eSpeed* case wherein he established procedures for taking the depositions of party witnesses located abroad. Ex. B.

On January 14, 2013, TT proposed that Mr. Korepanov's deposition proceed in Barbados, as that would not implicate the U.S./Russia visa issues, but CQG again objected to producing Mr. Korepanov for deposition, allegedly based on the travel burden it would impose on Mr. Korepanov. Exs. V, W. TT replied on January 21, 2013 suggesting alternative, closer locations (Thailand or Hong Kong) to ease any burden on Mr. Korepanov. Ex. X. The parties conferred on this topic on January 28, 2013, and although CQG stated that it would consider TT's suggestion for compromise,[7] CQG has again recently stated that it does not intend to produce Mr. Korepanov for deposition. Ex. R, S.

Accordingly, TT hereby certifies that it has complied with Local Rule 37.2, via the correspondence outline above and the parties' January 28, 2013 in-person conferral.

## II. ARGUMENT

### A. CQG Must Produce a 30(b)(6) Witness in the United States Regarding Topics About Product Functionality for At Least 7 Hours

There is a strong presumption that a corporate defendant's 30(b)(6) witness(es) should be deposed in the same location as the corporation's principal place of business. In CQG's case, this is Denver, Colorado. CQG's recent suggestion that TT travel to the Ukraine to depose a new

---

[7] TT has proposed coordinating the depositions of Mr. Katin and Mr. Korepanov in London.

7

30(b)(6) witness, who will complete the testimony of a previously unprepared witnesses, for less than 7 hours, is unacceptable.

### 1. CQG Must Produce Its 30(b)(6) Witness In the United States

CQG contends that TT must travel to the Ukraine to depose Mr. Maxim Katin if it is to obtain testimony on the 30(b)(6) topics for which it previously designated Mr. Stavros in Chicago.  However, "[t]he law is clear that a corporation's principal place of business is presumed to be the appropriate place for its deposition pursuant to Rule 30(b)(6)." *In re Subpoena To Huawei Tech's Co., Ltd.*, 720 F. Supp. 2d 969, 978 (N.D. Ill. 2010).  CQG admits that its principal place of business in Denver, Colorado.  Dkt. 309 at p. 1.  For this reason alone, the Ukraine or any other foreign location is an unacceptable venue for any 30(b)(6) witness of CQG.

Moreover, for both the 30(b)(6) deposition and that of Mr. Korepanov, the Court should command that they take place in the United States without limitations.  When faced with a similar situation in the coordinated proceedings, Judge Moran ruled that party witnesses with respect to Defendant GL should take place in the United States, with non-party witnesses to be coordinated either in New York or London where possible. Ex. B.  Like here, GL had initially offered a 30(b)(6) witness in the U.S. (New York), and then rescheduled the deposition date and moved it to Paris.  Ex. Y, March 23, 2007 Moran Hrg. Tr., at 17:15-23, 18:9-20:1.  Similarly, eSpeed had stated that it wanted to depose another GL employee (based in Tokyo) in Paris, and the Court responded that such witnesses should be made available in New York.  *Id*. at 21:9-22:11.  By contrast, for non-parties, Judge Moran had noted "if they aren't GL employees, nobody can force them to go to New York" and thus recommended the parties try to bring them

to New York or London where possible. *Id*. at 20:21-22. That parties be required to bring their employees to the United States for deposition is the law of the case and should be followed here.

Mr. Katin's proposed deposition is a replacement for the deposition of Mr. Stavros, which was held in Chicago by mutual agreement of the parties. TT began Mr. Stavros's deposition on December 12, 2012, but was forced to suspend its questioning due to his inability to provide testimony within the scope of the notices. Ex. N at 107:4-108:17. TT again attempted to limit the need for additional testimony by going to CQG counsel's office the following day to discuss very specific functionality it believed was at issue in the infringement analysis, and asking for an informal discussion with CQG personnel on those issues followed by either a stipulation or an abbreviated 30(b)(6).[8] CQG now attempts to apply the discussion at the conferral as a limitation of the scope of any resumed deposition, despite the fact that TT never agreed to any limitations. Ex. P at p. 2.

As noted, CQG agreed to provide a new date for the resumption of the deposition in January after it had responded to TT's interrogatories regarding product functionality. Ex. N at 107:4-108:17. In the weeks that followed the parties' discussion regarding the Stavros deposition, CQG led TT to believe that Mr. Stavros's deposition would continue in Chicago, including a discussion to that effect before this Court. Dkt. 392 at 4:18-21. At no point did CQG suggest an entirely new witness or an overseas venue. Only on January 21, 2013, ten days ago, did CQG first notify TT of its intent to change designees to Mr. Katin, relocate the deposition to the Ukraine, and push the deposition to the last week in February. Ex P.

CQG claims that it is necessary for TT to depose Mr. Katin on the 30(b)(6) topics regarding product functionality because "no CQG employees in the United States are uniquely

---

[8] CQG did not agree to any such discussion until the past week.

9

situated to know the requested information." Ex. S at p. 1. Rule 30(b)(6) does not require that CQG provide the most knowledgeable witness in the company, only that it properly prepare a witness, which it alleged it could do with Mr. Stavros. CQG's assertion that only Russian employees have the requisite knowledge seems hard to believe for a company with over 450 employees, and also raises the obvious question of why CQG designated Mr. Stavros in the first place. Whatever the reason, the result is the familiar delay that TT has faced at every turn in discovery. TT's final infringement contentions are now due in less than one month, and it still does not have 30(b)(6) testimony from CQG on a something as fundamental as the functionality of its products.

Therefore, CQG should be required to produce Mr. Katin (or another witness) in either Chicago or Denver before February 21, 2013 to continue the deposition of Mr. Stavros and testify to the full scope of the associated 30(b)(6) notice topics.[9] If CQG is unable to produce Mr. Katin within this timeframe, it should provide an alternative witness or witnesses who are capable of providing the requested information.[10]

### 2. TT is Entitled to Depose CQG's Replacement Witness for at Least the Full Seven Hours

CQG further argues that TT's deposition of Mr. Katin must be shortened by the time TT spent questioning Mr. Stavros, and thus Mr. Katin may be deposed for only four hours and forty-three minutes. This cannot be the case. At the December deposition of Mr. Stavros, TT spent the majority of its time with Mr. Stavros inquiring into his background, identifying the very few things he had done and reviewed in preparing for his testimony, and establishing his complete

---

[9] CQG earlier proposed that it may be able to bring Mr. Katin to London on an expedited visa. However, TT would only be amenable to such a proposal if CQG also brought at least Mr. Korepanov to London for the same trip.

[10] Even if CQG provides Mr. Katin in the United States on the timetable TT proposes, TT may need additional time to complete its final infringement contentions.

lack of knowledge as to the topics for which he had been designated. *See, e.g.*, Ex. N, at 5:18-9:4; 21:15-22:3; 38:5-10; 43:10-24; 46:4-23; 49:19-50:24; 53:5-20; 60:9-61:5; 64:20-65:2; 67:23-68:11; 73:11-22; 86:5-12; 99:14-101:20; 103:16-104:7; 105:5-14; *Cf.* Ex. A to Ex. M, Stavros topics at pp. 7-10 (indicated in bold and italics). For example, although CQG placed no limitations on which versions of its software he would testify regarding, Mr. Stavros testified that he had only evaluated the "most widely distributed versions" of products from 7x3 to the present out of all 280 versions of publicly distributed software, and did nothing to investigate any other version. Ex. N at 9:9-12, 10:5-15, 73:11-22. When questioned regarding the functionality of the versions of software he claimed to have reviewed, Mr. Stavros stated that he could not answer the questions without resorting to either his "notes" (videos he took of the software but did not bring to the deposition) or having TT load every single version of the software and demonstrate it to him. *Id.* at 101:15-102:12; 103:16-104:11; 105:8:17-107:13.

Practically speaking, TT must repeat all of its questioning from the Stavros deposition with Mr. Katin. Both the continuation of the deposition due to Mr. Stavros's lack of preparation and the later change in witnesses are CQG's own doing. TT should not bear the burden of CQG's failure to prepare a witness or to identify the correct witness. Rather, any repetition in questioning or extra time spent by CQG's 30(b)(6) witnesses in a deposition is the responsibility of CQG. And given the number of products and the quantity of changes to features now identified by CQG in its interrogatories, seven hours is the minimum amount of time required for TT to be able to conduct its questioning regarding these topics. TT will attempt to complete the deposition within seven hours, but if more time is need and CQG refuses, TT will ask for leave for additional time.

### 3. CQG May Not Object to the Scope of TT's 30(b)(6) Notice Topics

TT is entitled to question Mr. Katin, or an alternate witness that CQG may designate, on the full scope each topic previously designated for Mr. Stavros. CQG now argues that the topics for the continuation of Mr. Stavros's deposition are somehow limited by defense counsel's objections to scope, and further limited to the agenda prepared by TT when the parties conferred on December 13, 2012, after having to suspend the deposition due to Mr. Stavros' lack of preparation. This is incorrect. First, CQG waived any scope and burden objections when it represented to this Court that it would not limit the 30(b)(6) depositions based on any objections other than privilege. Ex. DD at 20:7-17. Second, TT proposed the conferral and prepared an agenda as a way to provide additional focus for the completion of the 30(b)(6) deposition. Ex. N at 109:8-11 (TT stating that "We think the notice is clear already; but in any event, we'd love to meet with you and make sure we're all on the same page about what we expect [Mr. Stavros] to answer."). TT never agreed that the agenda it prepared would be limiting as to the scope of the deposition, and the deposition should not be so limited.

### B. CQG Must Produce Mr. Korepanov for Deposition in a Mutually Agreeable Location

As noted, CQG should also produce Mr. Korepanov for a deposition in Denver, Chicago, or other agreeable location based on the law of the case. In the consolidated discovery proceedings, Judge Moran entered an order providing for the deposition of party employees living abroad at a mutually agreeable location in the United States, i.e., New York. Ex. B. TT believes a similar set of guidelines is necessary in this case, especially since entire divisions of CQG's company are located abroad. Indeed, "all of CQG's employees responsible for source code are located in either Eastern Europe or Russia." Ex. S at p. 1. Because CQG now asserts it

cannot fully prepare any domestic witnesses to testify to this type of technical, corporate knowledge, a system must be put into place for TT to have access to it.

The discovery TT has obtained points to Mr. Korepanov being one of the CQG employees who has been intimately involved with accused software. Indeed, based on CQG's document production, TT has identified Mr. Korepanov as the programmer responsible for the source code that governs the infringing behavior of numerous versions of CQG's products. Ex. Z. During Marcus Kwan's 30(b)(6) deposition, he identified Mr. Korepanov as the Project Manager of the DOMTrader project and the "primary point of contact for the projects we were working on together." Ex. AA at 28:6-13. Ms. Spampinato also identified him as part of an ongoing source code analysis in response to TT's requests, and as someone she contacted to help CQG prepare its interrogatory responses. Ex. BB at 35:23-36:14; 146:15-23. Further, prior counsel for CQG identified Mr. Korepanov during settlement discussions as someone knowledgeable about changes made to the DOMTrader, and went so far as to provide to TT (and this Court) certain defects and suggestions corrected by Mr. Korepanov in the source code that "may have resulted in the identified change [to repositioning]". Ex. CC at p. 2-3. Finally, because CQG's 30(b)(6) witnesses to date have been unprepared to answer questions regarding the process for making changes to CQG's products and the reasons that certain changes were made, there is an even greater need for Mr. Korepanov's testimony. Based on all of the above, CQG cannot properly contest the relevance of Mr. Korepanov's testimony in this case.

TT understands that it cannot legally take Mr. Korepanov's deposition in his home country of Russia, and CQG has indicated that the process for Mr. Korepanov to obtain a visa to come to the United States would take a minimum of six weeks. Ex. W. While TT believes this Court should order Mr. Korepanov to travel to the United States, TT at a minimum proposes that

Mr. Korepanov be required to travel to a location that does not have as rigorous of a visa process.[11]  Yet CQG continues to maintain its objection to producing Mr. Korepanov based on the alleged burden it would cause him and CQG.  However, any burden must be weighed against the anticipated importance of the witness's testimony, which in this case, is likely substantial.

### III. CONCLUSION

In light of the foregoing, TT respectfully requests that this Court compel Defendants to (1) produce a 30(b)(6) witness in either Denver or Chicago for at least a seven-hour deposition to testify to all topics previously designated to Mr. Stavros, and (2) produce Mr. Korepanov for deposition in the United States or other mutually agreeable location.

Respectfully submitted,

Date: January 31, 2013

By: s/ Brandon J. Kennedy
Leif R. Sigmond, Jr. (ID No. 6204980)
(sigmond@mbhb.com)
Matthew J. Sampson (ID No. 6207606)
(sampson@mbhb.com)
S. Richard Carden (ID No. 6269504)
(carden@mbhb.com)
Jennifer M. Kurcz (ID No. 6279893)
(kurcz@mbhb.com)
Andrea K. Orth (ID No. 6301900)
(orth@mbhb.com)
Brandon J. Kennedy (ID No. 6306310)
(kennedy@mbhb.com)
**McDonnell Boehnen Hulbert & Berghoff LLP**
300 South Wacker Drive
Chicago, Illinois 60606
Tel.: (312) 913-0001
Fax: (312) 913-0002

---

[11] TT recently offered to take the deposition of Mr. Korepanov in various locations such as in the Asia Pacific region (e.g., Hong Kong, Thailand), and the Barbados—all of which a Russian citizen may travel to without obtaining a visa and which permit depositions of willing witnesses—but CQG rejected all proposals.  TT then offered to go to London, a proposal to which CQG also rejected.

Steven F. Borsand (ID No. 6206597)
(Steve.Borsand@tradingtechnologies.com)
**Trading Technologies International, Inc**.
222 South Riverside
Suite 1100
Chicago, IL 60606
Tel: (312) 476-1000
Fax: (312) 476-1182

**Attorneys for Plaintiff,**
**TRADING TECHNOLOGIES**
**INTERNATIONAL, INC.**

15

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing MOTION TO COMPEL DEPOSITION TESTIMONY was served on January 31, 2013 as follows:

***Via Filing Via this Court's CM-ECF System, which caused a copy to be served on all registered users and Via E-mail:***

***Counsel for CQG, Inc., and CQGT, LLC:***

Adam G. Kelly
Loeb & Loeb LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
akelly@loeb.com

Johnnet Simone Jones
Loeb & Loeb LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
sjones@loeb.com

William Joshua Voller
Loeb & Loeb LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
wvoller@loeb.com

s/ Brandon J. Kennedy