UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRADING TECHNOLOGIES, INTERNATIONAL, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| CQG, Inc. and CQGT, LLC, | ) ) |
| Defendants. | ) ) |

Case No. 05 C 4811

District Judge Sharon Johnson Coleman

Magistrate Judge Sidney I. Schenkier

## MEMORANDUM OPINION AND ORDER

Plaintiff Trading Technologies, International, Inc. ("TT") has filed a motion seeking leave to serve Rule 45 document and deposition subpoenas on (1) attorney Nina Wang and her law firm, who were trial counsel for defendants CQG, Inc. and CQGT, LLC (collectively, "CQG") from 2006 to 2012; and (2) a third-party, Peter Hwang, who practices astrology and who has given litigation and other advice to CQG based on astrological considerations (doc. # 488). The motion has been fully briefed (*see* docs. ## 529, 544).

With respect to Ms. Wang, TT seeks documents and testimony "relating to her communications with CQG about the operation of the accused products and infringement issues as they relate to the claim term 'static'" (doc. # 488: TT's Mot. at 1). TT contends that this information is "relevant" to its claims of CQG's willfulness and indirect infringement, and that "[t]o the extent that the discovery sought might otherwise have been subject to the attorney-client or work product privilege, that privilege has been waived" (*Id.*). For the reasons set forth below, we deny TT's motion insofar as it seeks discovery from Ms. Wang or her firm.

The request as to Mr. Hwang stands on a different footing. In an earlier order, we ruled that no privilege attaches to communications between Mr. Mather (defendants' founder and

principal shareholder) and Mr. Hwang (doc. # 550: 11/04/2013 Order, at 6). We therefore required CQG to produce communications with Mr. Hwang. In this motion, TT seeks leave to serve a subpoena on Mr. Hwang for documents and a deposition (TT's Mot. at 30-31 and Ex. 46). We grant that part of the motion, but limit the scope of the subpoena as explained below.

## I.

We first address the timing of TT's motion. CQG argues that TT's motion for discovery comes too late, because discovery closed on September 20, 2013, but TT did not file the instant motion until October 12, 2013 (doc. # 529: CQG's Resp. at 2-3). CQG relies on Federal Rule of Civil Procedure 6(b),[1] and *Brosted v. Unum Life Ins. Co. of Am.*, 421 F.3d 459 (7th Cir 2005), which affirmed the district court judge's denial of the plaintiff's motion to extend the time for discovery. In *Brosted*, the Seventh Circuit explained that because the motion for an extension was not filed until a month after the discovery deadline had passed, Rule 6(b)(2) -- now Rule 6(b)(1)(B) -- applied, which permits a court to grant the motion for good cause if the moving party failed to comply with the discovery deadline because of "excusable neglect." *Brosted*, 421 F.3d at 464. In *Brosted*, the moving party did not show that excusable neglect existed. *Id.*

To establish excusable neglect, the moving party must demonstrate that its failure to meet the discovery deadline was due to neglect -- *i.e.*, "a simple, faultless omission to act, or because of carelessness," and that the failure to act was excusable in light of all relevant circumstances, including "the danger of prejudice to the non-moving party, the length of the delay and its impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Zingerman v. Freeman Decorating Co.*, 99 Fed. App'x 70, 72 (7th Cir. 2004) (internal quotations and citations omitted).

---

[1] CQG also argues that Federal Rule of Civil Procedure 16(b)(4) applies, which states that a discovery scheduling order may be modified "only for good cause and with the judge's consent." As TT's motion comes after the discovery deadline has already passed, we apply Rule 6(b)(1)(B).

2

TT contends that it has demonstrated good cause for filing its motion because CQG did not complete its production of discovery relevant to the instant motion until fact discovery was almost closed (doc. # 544: TT's Reply at 2-3). CQG, on the other hand, contends that TT had the discovery it needed to file its motion since at least August 2013, and thus any neglect on TT's part was not excusable (CQG's Resp. at 3). The parties also trade accusations of bad faith in delaying filing the motion and producing certain discovery underlying it (*see* CQG's Resp. at 4; TT's Reply at 2-3). These arguments largely rehash the "barbs and accusations on the question of why so much discovery took place so late" that the parties briefed on an earlier motion filed by TT to take discovery after the cut-off date (11/04/2013 Order, at 1).

Although this is TT's third motion to take additional discovery after the close of discovery, the filing of this motion should have come as no surprise to CQG. TT has made multiple representations to CQG and this Court of its intent to move for discovery into certain communications CQG had with Ms. Wang. CQG's argument that TT had enough discovery to file its motion since August 2013 is unpersuasive because discovery closed soon after that date, and the instant motion was filed a short time later. And, as to Mr. Hwang, we considered (and granted) a separate, contemporaneously-filed motion by TT to require CQG to produce communications with him over the assertion by defendant of privilege (11/04/2013 Order at 4-6). Thus, we find the timing of the current motion is no bar to TT's request to seek information directly from Mr. Hwang.

"[M]agistrate and district courts enjoy extremely broad discretion in controlling discovery." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013). We use our discretion under Rule 6(b) and our inherent broad discretion in discovery matters to consider the entirety of TT's motion despite it having been filed after the close of discovery. *See Zingerman*,

3

99 Fed. App'x at 72 (it was within the district court's discretion to grant an extension of discovery deadline under Rule 6(b)).

## II.

We briefly describe the evidence (and the parties' conflicting interpretations of it) relevant to this motion.

As early as 2006, CQG represented to TT, its trial counsel Ms. Wang, and the district court that CQG's product -- futures trading software (with hundreds of versions) -- did not have "static" functionality, a claim term in a TT patent relating to users' ability to keep price displays frozen on their screen (TT's Mot. at 1). Rather, CQG represented that its software displayed prices automatically (and automatically repositioned displayed prices), and thus, price displays could not be controlled by users. TT claims that in 2010, after observing CQG's software, TT discovered that from 2004 to 2010, one version of CQG's software had the ability to become static if a user completely disabled the CQG "market window" (*Id.* at 12-13). Further, TT asserts that an entry from an April 2006 CQG spreadsheet shows that CQG was aware of this functionality at that time (*Id.* at 9-13). TT claims that from 2004 to 2005 and from 2009 to 2010, another version of CQG's software made the price appear static even when the market window functionality was not disabled (*Id.* at 10-12). TT contends that CQG also knew of this functionality, but failed to inform the district court (*Id.*). TT also claims that a "price hold" option in one version of CQG's software falls under the claim term "static" (*Id.* at 10-11).

TT contends that CQG intentionally concealed the static functionality of its products to Ms. Wang, TT, and the district court in order to fraudulently procure a stay in this case from 2007 to 2012, during the pendency of the "*eSpeed*" appeal, another patent infringement suit brought by TT. TT argues that it would not have agreed to a stay in the case if it had known that

4

CQG had been misrepresenting the functionality of its product as similar to the eSpeed product (*i.e.*, not static). CQG acknowledges that some of the statements it made in support of its summary judgment briefing in 2007 and, in the alternative, in support of a stay in the case were inaccurate. However, CQG maintains that its management made these statements to the best of its knowledge at the time, and that CQG promptly cured any inadvertent misstatements upon discovering them (CQG's Resp. at 9). Both parties point to emails from 2010 and 2011 between CQG employees as purportedly demonstrating CQG's intent, or lack thereof, to defraud. These emails describe the static functionality of the CQG product as a "defect" that CQG fixed upon its discovery (*see* TT's Mot., Exs. 29, 33). TT accuses the CQG employees of misleading Ms. Wang to believe the static functionality was an "unintended result" or "glitch" to further CQG's fraud on TT and the district court (TT's Mot. at 14 (citing Ex. 28: 11/15/2010 Wang email)).

### III.

TT makes several arguments in support of its motion to take discovery from Ms. Wang and her law firm that this Court has already ruled on and found to be without merit. As TT has offered no new evidence in support of these contentions, we uphold our previous rulings on these arguments.

*First*, TT repeats its contention that the information it seeks from Ms. Wang is relevant to its claims of infringement and willfulness. As this Court explained on the record, however, "if the product reads on the claims, it infringes. If it doesn't read on the claims, it doesn't. And whether counsel knew about what those properties were at certain times doesn't change what the product actually does" (doc. # 431: 06/07/2013 Tr. at 4-5). The same is true for a claim of indirect infringement, for which TT also suggests that discovery from Ms. Wang would be relevant. Indirect infringement requires a party to prove not only infringement, but also that a

5

party knowingly induced others to commit the acts of infringement. *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308-09 (Fed. Cir. 2012). Thus, we reiterate that the discovery TT seeks is irrelevant to the question of infringement.

Moreover, we are skeptical that the discovery TT seeks -- regarding what CQG told Ms. Wang about the software functionality -- would do much to advance the ball on the question of willfulness. At the outset, we note the Federal Circuit's observation that "[b]ecause willful infringement in the main must find its basis in prelitigation conduct, communications with trial counsel have little, if any, relevance . . ." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007). The conduct alleged here that TT seeks to explore occurred several years after this suit was filed. And, to the extent that communications between CQG and Ms. Wang have any arguable relevance as to willfulness, we are not convinced that what CQG told Ms. Wang about the software functionality would shed any more light on CQG's state of mind than what already has been assembled through discovery.

TT attached to its motion numerous emails from Ms. Wang showing that until October 2010, when TT contacted her regarding the software's functionality, Ms. Wang understood that CQG's software did not have static functionality (*see* TT's Mot., Exs. 23-25, 28). Ms. Wang has agreed that she did not know of the static functionality before then, and TT does not question that Ms. Wang was indeed unaware of that functionality. Furthermore, CQG acknowledges that at various times up to 2010, certain versions of CQG's software in fact had static functionality under certain conditions, and CQG has admitted telling Ms. Wang that CQG's software did not have static functionality. Fundamentally, what the parties differ about is the reason that CQG did not inform Ms. Wang of that functionality: TT attributes it to a knowing effort to deceive TT, while CQG states that it was the result of CQG itself being unaware of that functionality.

6

Discovery into Ms. Wang's communications with CQG is not reasonably calculated to shed light on that difference of opinion.

We also note that TT acknowledges that it had an alternative way to obtain the information it seeks concerning CQG's state of mind without piercing the attorney-client privilege. In its motion, TT stated that it "could resume the depositions of certain CQG witnesses for the purpose of exploring [these] communications," but claims "it would be more productive to seek this information directly from Ms. Wang" because her testimony "would be more forthcoming, objective, and accurate" (TT's Mot. at 23 n.6). That speculation provides no sound explanation for why TT did not explore this issue with those CQG witnesses earlier during the ample period allowed for discovery. We will not reopen discovery to allow TT to do now what it could have done long ago.

*Second*, in its motion, TT states that "*[t]o the extent* that the discovery sought might otherwise have been subject to the attorney-client or work product privilege," that privilege has been waived (TT's Mot. at 1 (emphasis added)). This statement appears to ignore this Court's ruling on the record that the discovery sought from Ms. Wang and her law firm is subject to the attorney-client privilege.[2] While TT's counsel argued repeatedly at the June 2013 hearing that TT was seeking "pure facts" about what CQG told Ms. Wang about how the product operated, we explained that regardless of the factual nature of the information given to Ms. Wang, communications that parties in patent infringement cases have with their trial counsel regarding product functionality – even factual information given so that the attorney may answer

---

[2] TT also claims that CQG waived the work product privilege (TT's Mot. at 1). However, as we explained during an earlier hearing (and as TT agreed), the work product privilege is not at issue here (06/07/2013 Tr. at 13). *See*, *e.g.*, *Avgoustis v. Shinseki*, 639 F.3d 1340, 1344 (Fed. Cir. 2011) (the work-product doctrine protects attorney materials prepared in anticipation of litigation, while the attorney-client privilege applies to confidential attorney-client communications).

7

interrogatories – are within the scope of the counsel's legal representation and are protected by the attorney-client privilege (06/07/2013 Tr. at 3, 7-8, 12-13, 16-17).

## IV.

We now turn to TT's primary argument in support of its motion to take discovery from Ms. Wang: that CQG waived the attorney-client privilege as to communications it had with Ms. Wang regarding the "static" functionality of its products. TT argues that waiver occurred because: (1) the "crime-fraud exception" applies; and (2) CQG's conduct rises to the level of "chicanery" that justifies extending the advice of counsel waiver to litigation counsel (TT's Mot. at 22-28). In considering these contentions, we heed the Federal Circuit's admonition that piercing the attorney-client privilege is an "extreme remedy," *Unigene Labs. v. Apotex, Inc.*, 655 F.3d 1352, 1359 (Fed. Cir. 2011), which trial courts should not order without "careful consideration" due to "the fundamental values sought to be preserved by the attorney-client privilege," *Quantum Corp. v. Tandon Corp.*, 940 F.2d 642, 643-44 (Fed. Cir. 1991).

### A.

Most of TT's argument is devoted to its contention that the "crime-fraud exception" applies to communications CQG had with Ms. Wang regarding product functionality. The Federal Circuit has held that in order to permit the piercing of the attorney-client privilege under the crime-fraud exception, a party must establish that the communications at issue were used to commit common law fraud. *Unigene Labs.*, 655 F.3d at 1358. "A finding of common law fraud in the patent context must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance." *Id.* at 1358-59 (internal quotations omitted).[3] To

---

[3] TT also discusses the standard for negligent misrepresentation (TT's Mot. at 22), but, by definition, fraud is an intentional tort, and negligence cannot support a finding that the crime-fraud exception applies. *See Unigene Labs.*, 655 F.3d at 1358-59.

establish common law fraud, the accusing party generally must show: "(1) a representation of material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation." *Id.* at 1359. We conclude that TT has failed to establish the crime fraud exception, because TT has not demonstrated clear evidence of deceptive intent, justifiable reliance, or injury.

### 1.

TT argues that the evidence it has developed adequately shows that CQG had the intent to deceive or, at least, was reckless in failing to understand how its products operated with respect to TT's patents (TT's Mot. at 26). TT suggests it is implausible that CQG was unaware of the properties of its own software – in particular, one property that allegedly would infringe. On the other hand, CQG suggests that it is understandable that at the time of the statements, which preceded the ramping up of the intense investigation of the discovery process, its management and counsel were not aware of this functionality in a few of some 500 versions of the accused software.

In our judgment, the emails and logs attached by TT as exhibits do not constitute "clear evidence" of scienter, as is required to warrant the "extreme remedy" of allowing TT to see CQG's privileged communications with its trial counsel. TT has accused hundreds of versions of CQG's software of infringement, and CQG has spent thousands of hours investigating source code for each version (CQG's Resp. at 9). While new versions have arisen since discovery in the case was stayed (TT's Mot. at 27), it was not a simple matter even in 2007 for CQG to discover a functionality made possible only by disabling the software's "market window" under certain

trading conditions. Indeed, TT says it took eighteen months for it to discover the specific ways that CQG's product's functionality could infringe (TT's Reply at 9). Whether this record shows intent or inadvertence may be a matter that the trial judge will allow a jury to decide, if she finds it relevant to willfulness; but this record does not persuade us that the matter is so clear as to justify waiver of the privilege.

**2.**

Even assuming TT could show that CQG's representations were intentionally or recklessly false, TT has not shown that it justifiably relied on any of the alleged misrepresentations. The reliance inquiry for common law fraud involves two questions: whether the party actually relied on the misrepresentations (*i.e.*, did the alleged misrepresentations actually induce the party to act), and whether that reliance was justifiable. *Archdiocese of Milw. v. Doe*, 743 F.3d 1101, 1106 (7th Cir. 2014). CQG argues that TT has not shown either actual or justifiable reliance. We agree.

TT describes the effect of CQG's statements that its software lacked static functionality as having "contributed to the stay in this case, the extended settlement negotiations, and a near-agreement between the parties to dismiss this litigation" (TT's Mot. at 23-24). TT claims that the alleged misrepresentations CQG made to the district court and in support of its 2007 motion for summary judgment for non-infringement "contributed" to the stay, because TT would not have agreed to a stay if it had known of the static functionality of CQG's software, and the district judge would not have ordered the stay if he had known that CQG's products had this functionality (*Id.* at 27; TT's Reply at 5-8). CQG counters that the sole basis for the district court granting the stay was the pendency of the *eSpeed* appeal, not the representations CQG made to the district court or in its summary judgment papers (CQG's Resp. at 7).

We find that CQG has the better of this argument. In issuing the stay, the district judge stated that TT "should not be required to respond to CQG's summary judgment motion absent the discovery it needs to adequately [confirm or deny that CQG's products infringe TT's patents], and we decline to permit such extensive discovery to take place at this juncture. . . . Since the parties have been unable to come to an agreement, we determine that the best course is to simply enter and continue CQG's motion [for summary judgment] and stay the case pending the outcome of eSpeed's appeal" (doc. # 168: 07/17/2008 Order, at 2-3). This statement by the district judge does not support TT's contentions that CQG's representations actually induced the district judge or TT to support a stay in the case. To the contrary, the order appears to have contemplated that TT would have a chance to vet any representations by CQG about the software through discovery, but only after the conclusion of the *eSpeed* appeal.

Furthermore, there is no merit to TT's allegation that CQG's alleged misrepresentations induced TT to participate in extended settlement negotiations or a near-agreement between the parties to dismiss this litigation. As the emails TT attached to its motion demonstrate, TT first figured out that some of CQG's software may have static functionality as early as October 2010 (*see* TT's Ex. 23). It was not until three months later, on January 21, 2011, that this case was first referred to this Court for settlement discussions (doc. # 218). Thereafter, for a period of 14 months, until March 19, 2002, this Court directly participated in multiple settlement negotiations between the parties and held many status conferences with the parties to discuss the progress of their settlement negotiations outside the presence of the Court. The Court terminated its involvement in the settlement talks on March 19, 2012, when it was determined that settlement could not be reached despite the parties' lengthy and dedicated efforts (doc. # 282). TT cannot legitimately claim that it was actually induced by CQG's alleged misrepresentations to

11

participate in settlement negotiations, extending throughout 2011 and into 2012, when TT knew about the static functionality in CQG's software as of late 2010.

In addition, TT's "justifiable" reliance argument is internally contradictory. Under Illinois law, which the parties agree applies (*see* TT's Mot. at 21; CQG's Resp. at 6), "[i]n order to determine whether there was justifiable reliance on the part of a plaintiff, it is necessary to consider all of the facts within a plaintiff's actual knowledge as well as those that he could have discovered by the exercise of ordinary prudence." *Kopley Grp. V., L.P. v. Sheridan Edgewater Props., Ltd.*, 876 N.E.2d 218, 229 (Ill. App. 2007) (internal citations and quotations omitted). "In other words, a plaintiff may not close his eyes and then claim that he has been deceived by others." *Johnson v. Waterfront Servs. Co.*, 909 N.E.2d 342, 350 (Ill. App. 2009). Although justifiable reliance is usually a question of fact, "where it is apparent from the undisputed facts that only one conclusion can be drawn, the question becomes one for the court." *Kopley*, 876 N.E.2d at 229.

TT maintains that it was entitled to rely on CQG's representations of functionality until the stay of discovery was lifted in 2012 (*see* TT's Mot. at 8). However, court transcripts from seven years ago confirm that TT has always asserted the need to verify the truth and completeness of CQG's statements as to the functionality of its software. TT cannot show that it was justified in relying on CQG's statements on the one hand, yet contend that it never trusted CQG's statements on the other hand. Moreover, TT has had access to CQG's software to verify CQG's representations of product functionality since 2007 (*see* 07/17/2008 Order, at 2). "If ample opportunity existed to discover the truth, then reliance is not justified." *Kopley*, 876 N.E.2d at 229. TT had years of opportunity to observe CQG's software; nevertheless, TT waited until 2010 to explore the functionality of CQG's software. While TT argues that making these

observations was "no simple task," as the static functionality could only be observed under certain unpredictable market conditions (TT's Mot. at 13), the same could be said for CQG's observations of the existence of static functionality in the hundreds of versions of its software.[4]

At bottom, TT's submissions suggest, but do not establish, either CQG's intent in making the alleged misrepresentations or TT's actual or justifiable reliance on them. And, without reliance, there is no proof of damage from any incorrect statements by CQG about its product functionality. Thus, TT has not made the requisite showing of common law fraud to justify the application of the crime-fraud exception to the attorney-client privilege.

## B.

In aid of its defense against TT's claim of willful infringement, CQG has elected to produce pre-lawsuit advice of its opinion counsel, Kevin LeMond, that CQG's software did not infringe TT's patents. Under *Seagate*, that election waived CQG's attorney-client privilege as to all other communications relating to the same subject matter, except for communications with trial counsel. *Seagate*, 497 F.3d at 1372-73. However, TT argues that CQG's actions constituted the type of "chicanery" which, under *Seagate*, could lead to the waiver of CQG's attorney-client privilege with Ms. Wang. *Id.* at 1374. In earlier oral rulings on May 22 and August 7, 2013, we denied TT's efforts to obtain privileged communications based on this argument. TT nevertheless raises these arguments again, claiming that discovery since that time has shown the merit of this argument. For the reasons below, we disagree.

---

[4] The fact that CQG gave TT its software in 2007 also casts further doubt upon TT's allegation that CQG intentionally misrepresented the functionality of its software. TT long has demonstrated its willingness to seek to explore every possible avenue for obtaining information in the discovery process. It thus would have been foolhardy for CQG to intentionally tell TT that its products did not have static functionality if CQG knew otherwise, while at the same time giving TT the software that would allow TT to learn the truth. While we never can exclude the possibility that one might intentionally engage in such foolish (and self-destructive) actions, that is not the only explanation supported by the record.

In *Seagate*, the Federal Circuit reaffirmed its commitment to upholding "the oldest of the privileges for confidential communications known to the common law," and refused to extend the waiver of the attorney-client privilege in cases where a defendant asserts an advice of counsel defense against willful infringement to communications with post-litigation, trial counsel. *Seagate*, 497 F.3d at 1372-74. The Federal Circuit found "the interests weighing against extending waiver to trial counsel . . . compelling" in light of the "inefficiency," "unfairness," and "demoralizing" effect waiver would have. *Id.* at 1374. The appeals court concluded that "[i]n most cases, the demands of our adversarial system of justice will far outweigh any benefits of extending waiver to trial counsel." *Id.* Moreover, the court explained that "[b]ecause willful infringement in the main must find its basis in prelitigation conduct, communications of trial counsel have little, if any, relevance warranting their disclosure, and this further supports generally shielding trial counsel from the waiver stemming from an advice of counsel defense to willfulness." *Id.*

At the end of its analysis discussing the need to protect attorney-client communications with trial counsel in patent litigation, the Federal Circuit noted briefly that despite the general rule that the advice of counsel defense does not waive the attorney-client privilege with trial counsel, "trial courts remain free to exercise their discretion in unique circumstances to extend waiver to trial counsel, such as if a party or counsel engages in chicanery." *Seagate*, 497 F.3d at 1375. TT has latched onto this caveat to argue, without any supporting case law, that CQG's alleged conduct rises to the level of "chicanery" that would support extending the advice of counsel waiver to communications CQG had with Ms. Wang, its post-litigation trial counsel (TT's Mot. at 20, 24, 26; TT's Reply at 14). This argument is without merit.

14

*First*, we find the *Seagate* analysis wholly inapplicable to TT's claim here. *Seagate* addressed whether the waiver of attorney-client privilege that results from a party's production of opinions of counsel in order to defend against a claim of willful infringement extends to post-suit communications with trial counsel on that same subject matter. However, TT does not seek communications between CQG and Ms. Wang on that subject matter. Rather, it seeks information concerning what CQG told (or withheld from) Ms. Wang about the functionality of certain software, and about CQG's decision to dismiss her as trial counsel (TT's Mot., Ex. 45). TT does not suggest that anything about the communications that it seeks would relate in any way to Mr. LeMond's pre-suit opinion or whether CQG reasonably could rely on it. Indeed, we have no doubt that TT would seek the same production from Ms. Wang even had CQG never offered the opinions of Mr. LeMond in defense of the willfulness claim.

We do not read *Seagate* as intending to create a roving exception to the privilege inherent in communications between a defendant and its trial counsel, which a plaintiff can invoke any time it claims the opponent engaged in "chicanery." In a few post-*Seagate* decisions, judges have used their discretion to address "unique circumstances" to extend the waiver to trial counsel who also served as opinion counsel – and, then, only with respect to the subject matter of the opinion. *See Alloc, Inc. v. Pergo, LLC*, No. 00 C 0999, 2010 WL 3808977, at *5-6 (E.D. Wis. Sept. 23, 2010) (collecting cases). TT claims no such relationship between opinion counsel (Mr. LeMond) and trial counsel (Ms. Wang). And, TT's argument about the information CQG provided to Ms. Wang, to TT, or to the district court does not relate to the subject matter of Mr. LeMond's opinion of non-infringement. We reject TT's attempt to untether the *Seagate*

discussion from the specific issue that *Seagate* addressed: whether the waiver of privilege in communications with *opinion* counsel would result in the waiver of privilege with *trial* counsel.[5]

*Second*, even if the *Seagate* analysis were relevant here, TT has failed to show a sufficient basis to invoke the "chicanery" exception. The *Seagate* opinion did not elaborate on what might constitute "chicanery." But we measure that term against the backdrop of the *Seagate* analysis, which explained that the "interests weighing against extending waiver to trial counsel are compelling," 497 F.3d at 1373, and that as a result, courts have the discretion to extend the waiver to communications with trial counsel only in "unique circumstances." *Id.* at 1375. As we have explained in connection with our discussion of the crime-fraud argument, TT has failed to establish that the incorrect information CQG provided about the functionality of certain of its software was the product of misrepresentations that were intentional or reckless. Thus, the record submitted by TT does not demonstrate "chicanery" or other unique circumstances that persuade this Court that it should exercise discretion to take the extreme measure of allowing TT access to privileged communications between CQG and Ms. Wang.

## V.

TT's requests for discovery as to Mr. Hwang require a different analysis entirely. As we noted above, the Court has already ruled that no privilege attaches to communications between CQG employees and Mr. Hwang (*see* 11/04/2013 Order, at 6). In that order, we denied TT's request that CQG be required to produce "all documents related to Mr. Hwang," and instead, held that TT was entitled to the communications between CQG and Mr. Hwang concerning the

---

[5] We note that even if CQG communicated information to Ms. Wang that cast doubt on or contradicted Mr. LeMond's opinion (and there is no argument or evidence that this was the case), that alone would be insufficient to entitle TT to those communications. *Seagate* rejected a line of decisions – such as this Court's ruling in *Beneficial Franchise Co., Inc. v. Bank One, N.A.*, 205 F.R.D. 212, 218 (N.D. Ill. 2001) – holding that producing opinions of counsel would waive the privilege for those communications with trial counsel "contradicting or casting doubt on the opinions asserted." *Seagate*, 497 F.3d at 1372-73. Thus, under *Seagate*, a plaintiff is not entitled to a defendant's communications with trial counsel merely because those communications might contradict the earlier advice of opinion counsel.

claims or defenses in this litigation, and we ordered CQG to search its electronic and paper files to ensure that all such documents were produced (*Id.*).

In the current motion, TT seeks permission to take discovery directly from Mr. Hwang regarding "any relevant issue" (TT's Mot. at 29-30). We agree that TT is entitled to take discovery directly from Mr. Hwang; however, TT's requests are again overbroad. TT's proposed subpoena to Mr. Hwang requests, in part, "[a]ny and all documents and things referring or relating to TT . . .," and "[a]ny and all documents referring or relating to the operation of any CQG product . . ." (TT's Mot., Ex. 46). As we previously held, the discovery sought from Mr. Hwang is limited to documents and testimony concerning the claims or defenses in the current litigation. This additional discovery will not affect any schedules set by the trial judge.

## CONCLUSION

For the foregoing reasons, TT's motion (doc. # 488) is denied as to Ms. Wang, and granted in part as to Mr. Hwang. TT is given leave to serve a document and deposition subpoena on Mr. Hwang, consistent with this Court's ruling. We deny both parties' requests for costs and fees associated with this motion.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: May 9, 2014