**REDACTED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Trading Technologies International, Inc., | |
| Plaintiff, | Civil Action No. 05-CV-4811 |
| v. | Judge Sharon Johnson Coleman |
| CQG, Inc. and CQGT, LLC, | Magistrate Judge Sidney I. Schenkier |
| Defendants. | |

**CQG'S OPENING BRIEF REGARDING THE PATENT-INELIGIBILITY /**
**INVALIDITY OF THE TT PATENTS-IN-SUIT UNDER 35 U.S.C. § 101**

**REDACTED**

**TABLE OF CONTENTS**

I.      Statement of Facts ................................................................................................ 2

II.      Legal Standard .................................................................................................... 3

III.      The Asserted Patents Recite Patent-Ineligible Subject Matter Under 35 U.S.C. § 101 ..... 4

     A.   Analysis Of Representative Claims Is Appropriate ...................................................... 4

     B.   Claims Reciting An Abstract Idea Are Patent-Ineligible .............................................. 4

     C.   Alice Part One: The '132 And '304 Patents Recite An Abstract Idea .......................... 6

     D.   Alice Part Two: The Asserted Claims Do Not Recite An "Inventive Concept" That Transforms The Abstract Idea Into A Patent-Eligible Invention .................................. 8

         1.   The Individual Claim Elements Recited In The Independent Asserted Claims Do Not Transform the Abstract Idea ............................................................... 8

         2.   The Independent Asserted Claims, As An Ordered Combination, Do Not Transform The Abstract Idea ......................................................................... 13

         3.   The Independent Asserted Claims Also Fail The M&T Test ........................ 14

         4.   The Dependent Asserted Claims Do Not Add "Something More" To Transform The Recited Abstract Idea To A Patent-Eligible Invention .......... 16

IV.      Conclusion ........................................................................................................ 20

REDACTED

## TABLE OF AUTHORITIES

**Cases**

*Accenture Global Serv., GmbH v. Guidewire Software, Inc.*,
 728 F.3d 1336 (Fed. Cir. 2013) .................................................................. 4, 11, 13

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*,
 134 S. Ct. 2347 (2014) ........................................................................... passim

*Bancorp Serv. v. Sun Life Assur. Co.*,
 687 F.3d 1266 (Fed. Cir. 2012) .................................................................... 2, 15

*Bilski v. Kappos*,
 561 U.S. 593 (2010) ............................................................................... passim

*buySAFE, Inc. v. Google, Inc.*,
 765 F.3d 1350 (Fed. Cir. 2014) ...................................................................... 3, 5

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
 2013 U.S. Dist. LEXIS 107184 (D.N.J. July 31, 2013) ........................................ 15

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
 No. 2013-1112, 2014 WL 7272219 (Fed. Cir. Dec. 23, 2014) ......................... passim

*Cyberfone Sys., LLC v. Cellco P'ship*,
 885 F. Supp. 2d 710 (D. Del. 2012) ................................................................. 16

*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*,
 558 F. App'x 988 (Fed. Cir. 2014) ................................................................. 7, 16

*CyberSource Corp. v. Retail Decisions, Inc.*,
 654 F.3d 1366 (Fed. Cir. 2011) .................................................................. passim

*DDR Holdings, LLC v. Hotels.com, L.P.*,
 773 F.3d 1245 (Fed. Cir. 2014) ..................................................................... 7, 14

*Digitech Image Techs. v. Elect. for Imaging, Inc.*,
 758 F.3d 1344 (Fed. Cir. 2014) .................................................................. passim

*Enfish, LLC v. Microsoft Corp.*
 2014 WL 5661456 (C.D. Cal. Nov. 3, 2014) ................................................. 8, 9, 10

*Gottschalk v. Benson*,
 409 U.S. 63 (1972) ...................................................................................... 4

*Intellectual Ventures I LLC v. Mfr. & Traders Trust Co.*,
 2014 WL 7215193 (D. Del. Dec. 18, 2014) ........................................................ 5

*Joao Bock Trans. Sys., LLC. v. Jack Henry & Assoc., Inc.*,
 2014 WL 7149400 (D. Del. Dec. 15, 2014) ........................................................ 5

*Loyalty Conversion Sys. Corp. v. Am. Airlines Inc.*,
 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014) ...................................................... 5

**REDACTED**

*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011)...................................................................................................... 3

*Money Suite Co. v. MetLife Inc.*
   1:13-cv-1748, Dkt. 30 (D. Del. Jan. 27, 2015.) ......................................................... 5, 7, 11, 13

*Open Text SA v. Box Inc.*,
   3:13-cv-04910 (N.D. Cal.) ............................................................................................... 1

*Parker v. Flook*,
   437 U.S. 584 (1978)..................................................................................................... 4, 13

*Tenon & Groove, LLC v. Plusgrade S.E.C.*,
   2015 WL 82531 (D. Del. Jan. 6, 2015)............................................................................ 5

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014) ..................................................................................... 3, 6, 15

**Statutes**

35 U.S.C. § 101.................................................................................................................. passim

**REDACTED**

In *Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, the U.S. Supreme Court set out a two-part framework for analyzing patent eligibility under 35 U.S.C. § 101.  134 S. Ct. 2347, 2355 (2014). The framework requires a trial court to (1) determine whether the claims "are directed to a patent-ineligible concept[]," i.e., an abstract idea, and (2) if they are, determine whether the claims recite "additional elements [that] 'transform the nature of the claim' into a patent-eligible application." *Id.*   But, the Court cautioned, adding a "generic computer" or reciting "conventional steps" cannot transform an abstract idea into a patent-eligible invention.  *Id.* at 2357.  As U.S. District Judge Donato (Northern District of California) aptly put it: "[T]ake a standard this and a standard that . . . and plug them all together, you're still in the town of standard." (Ex. 10 at 19,[1] Jan. 14, 2015 Hr'g Tr., *Open Text SA v. Box Inc.*, 3:13-cv-04910.)

TT alleges that CQG infringes various claims of U.S. 6,772,132 and U.S. 6,766,304 (Asserted Claims).  The Asserted Claims recite the abstract idea of placing an order for a commodity on an electronic exchange, based on observed market information, as well as updating the market information.  The abstract idea is nothing more than "a fundamental economic practice long prevalent in our system of commerce."  *Cf. Alice*, 134 S. Ct. at 2356.

The elements recited in the Asserted Claims perform basic functions relating to electronic commodity trading and updating market information using unidentified and generic computer components.  Using a generic computer to perform "basic functions," such as obtaining data, are "well-understood, routine, conventional activities previously known to the industry," and do not add "something more" to transform an abstract idea into a patent-eligible invention.  *Id.* at 2354, 2359.  An abstract idea cannot be transformed into a patent-eligible invention merely by reciting a generic computer or adding instructions to "apply it."  *Id.* at 2357-58.  This, however, is precisely what is claimed by the Asserted Claims, making them invalid as a matter of law.  The

---

[1] Citations to Ex. __ are to exhibits to the Declaration of Kenneth R. Adamo, filed / submitted herewith.

**REDACTED**

functions recited in the Asserted Claims—setting, displaying, and selecting—are all "purely conventional" and cannot save the claims. *Id.* at 2359. The Asserted Claims do not recite any inventive concepts sufficient to transform the abstract idea into patent-eligible invention.

To be sure, the Asserted Claims also fail both prongs of the "machine or transformation test" (M&T test). The claims recite conventional and generic computer components that "do[] not impose meaningful limits on the scope of those claims." *Bancorp Serv. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). The claims also do not transform an article into a different state or thing as "[t]he mere collection and organization of data" is not enough. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370, 1375 (Fed. Cir. 2011).

The Asserted Claims are invalid under 35 U.S.C. § 101.[2]

## I.  Statement of Facts

The '132 patent issued August 3, 2004, from an application filed June 9, 2000. (Ex. 1, '132, Cvr at (22).) The '304 patent issued July 20, 2004, from an application filed June 27, 2001. (Ex. 2, '304, Cvr at (22).) Both patent applications claim priority to a provisional application filed March 2, 2000. (Ex. 1, '132, Cvr at (60); Ex. 2, '304, Cvr at (60).) Both patents share the same specification (because the '304 patent is a divisional of the '132 patent) and claim a "Mercury" display, a type of graphical user interface (GUI), and a method of using it for commodity trading. (Ex. 1, '132, Abs; 3:5-6; Ex. 2, '304, Abs, 3:9-10.) The GUI, depicted in Fig. 3, dynamically displays the commodity being traded in a market and allows a trader to place orders. (Ex. 1,



FIG. 3

---

[2] CQG submits this brief pursuant to the structure and parameters set out by the Court in its Minute Entries. Dkts. 886, 892. Although courts resolve patent eligibility in various contexts, *see, e.g.*, Fed. R. Civ. P. 12(b)(6), 12(c), 56, it is always a pure question of law in any context.

REDACTED

'132, 3:11-24; Ex. 2, '304, 3:15-28.) The GUI presents a number of columns to display trading information such as price and order quantities. (Ex. 1, '132, 7:35-51, 8:3-37; Ex. 2, '304, 7:54-8:18.) A trader uses the GUI to execute trades by typing in the commodity and a quantity, for example. (Ex. 1, '132, 9:3-17; Fig. 6, step 1302; Ex. 2, '304, 9:35-49; Fig. 6, step 1302.) The trader can then send the buy order or sell order to the market. (Ex. 1, '132, 9:7-10:63, Fig. 6, steps 1306-1315; Ex. 2, '304, 9:39-11:34, Fig. 6, steps 1306-1315.)

On December 2, 2014, the PTAB instituted a CBMR of the '132 patent, finding it was more likely than not that all claims of the '132 patent recited patent-ineligible subject matter. (Ex. 5, CBM2014-00135, Decision.) On the same day, the PTAB declined to institute a CBMR of the '304 patent, finding Petitioner did not provide analysis of why the claims were invalid. The decision was not on the merits of the § 101 challenge. (Ex. 6, CBM2014-00136, Decision.)

## II. Legal Standard

The § 101 patent-eligibility inquiry is "a threshold test." *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Courts resolve § 101 challenges as a matter of law without claim construction or expert discovery. *See, e.g.*, *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 712-13 (Fed. Cir. 2014) (affirming district court's ruling on pre-answer motion to dismiss); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351, 1355 (Fed. Cir. 2014); *Content Extraction & Transmission LLC v. Wells Fargo Bank*, No. 2013-1112, 2014 WL 7272219, at *4 (Fed. Cir. Dec. 23, 2014). As a matter of law, patent-eligibility is not subject to the "clear and convincing" burden of proof. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2253 (2011) (Breyer, Scalia, Alito, JJ, concurring) ("[w]here the ultimate question of patent validity turns on the correct answer to legal questions . . . today's strict standard of proof has no application."); *Ultramercial*, 772 F.3d at 720 (Mayer, J, concurring) ("no presumption of eligibility should attach" to a § 101 analysis).

3

REDACTED

## III.  The Asserted Patents Recite Patent-Ineligible Subject Matter Under 35 U.S.C. § 101

### A.  Analysis Of Representative Claims Is Appropriate

Courts commonly analyze one or more representative claims in a § 101 analysis.  This is especially true when, as here, the claims are the same or very similar.  In *Alice*, for example, the Supreme Court ruled on 208 claims in four patents based on an analysis of two claims.  134 S. Ct. at 2359-60; *see also Content Extraction*, 2014 WL 7272219, at *1, *4 (affirming district court holding 242 claims in four patents patent-ineligible based on two claims).  The § 101 analysis is the same regardless of claim type: methods, systems, or otherwise.  *See*, *e.g.*, *Alice*, 134 S. Ct. at 2360 (system claims "fail for substantially the same reasons" as method claims); *Accenture Global Serv., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) ("system claims that closely track method claims and are grounded by the same meaningful limitations will generally rise and fall together"); *CyberSource*, 654 F.3d at 1374 ("we look to the underlying invention for patent-eligibility purposes" regardless of claim type).

### B.  Claims Reciting An Abstract Idea Are Patent-Ineligible

The Supreme Court holds abstract ideas patent-ineligible. *See, e.g., Gottschalk v. Benson*, 409 U.S. 63, 71 (1972) (converting numbers with a generic computer); *Parker v. Flook*, 437 U.S. 584, 594-96 (1978) (sounding alarm based on formula limits); *Bilski*, 561 U.S. at 611 (computer implemented risk hedging); *Alice*, 134 S. Ct. at 2356 (computerized "intermediated settlement).

In *Alice*, the Court explained a § 101 analysis requires a (1) determination of whether the claims "are directed to [a] patent-ineligible concept[]," and (2) if they are, a determination whether the claims recite "additional elements [that] 'transform the nature of the claim' into a patent-eligible application." *Id.* at 2355.  The "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention," because a "wholly generic computer implementation is not generally the sort of additional feature that provides any

**REDACTED**

practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id.* at 2358. Nor is it enough to "append[] conventional steps, specified at a high level of generality" or "limit the use of the idea to a particular technological environment." *Id.* at 2357-58. Claims that "merely require generic computer implementation, fail to transform [an] abstract idea into a patent-eligible invention." *Id.* at 2357.

The Federal Circuit has invalidated claims similar to the Asserted Claims under *Alice*.

In *Digitech Image Techs. v. Elect. for Imaging, Inc.*, the Federal Circuit invalidated a digital image processing patent, explaining that, without additional meaningful limitations, "a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible." 758 F.3d 1344, 1351 (Fed. Cir. 2014).

In *buySAFE*, the Federal Circuit found claims directed to a computerized "transaction performance guaranty" invalid, explaining that limiting an abstract idea to the Internet is "an attempt to limit the use of the abstract guarantee idea to a particular technological environment, which has long been held insufficient to save a claim in this context." 765 F.3d at 1355.

In *Content Extraction*, the Federal Circuit held claims reciting basic "scanning and processing technology to recognize and store data from specific data fields such as amounts, addresses, and dates" patent-ineligible because the recited functions were all "well-understood, routine, and conventional activities commonly used in industry." 2014 WL 7272219, at *4.

Various district courts have also invalidated claims similar to those here under § 101.[3]

Courts often use the "machine or transformation test" (M&T) to confirm a § 101 analysis

---

[3] *Money Suite Co. v. MetLife Inc.*, (Ex. 7, 1:13-cv-1748, Dkt. 30 (D. Del. Jan. 27, 2015).)) (generating price quotes for financial products); *Loyalty Conversion Sys. Corp. v. Am. Airlines Inc.*, 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014) (Bryson, J., by designation) (loyalty award exchange); *Tenon & Groove, LLC v. Plusgrade S.E.C.*, 2015 WL 82531 (D. Del. Jan. 6, 2015) (computerized negotiated product upgrade); *Intellectual Ventures I LLC v. Mfr. & Traders Trust Co.*, 2014 WL 7215193 (D. Del. Dec. 18, 2014) (spending limits and notifications, i.e., personal budget); *Joao Bock Trans. Sys., LLC. v. Jack Henry & Assoc., Inc.*, 2014 WL 7149400 (D. Del. Dec. 15, 2014) (transaction security).

REDACTED

as it "can provide a 'useful clue' in the second step of the *Alice* framework." *Ultramercial*, 772 F.3d at 716. The M&T test asks whether a claim is "tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *See, e.g.*, *Bilski*, 561 U.S. at 602, 617. If a claim fails both prongs, it is likely patent-ineligible. *Ultramercial*, 772 F.3d at 716-17.

### C. Alice Part One: The '132 And '304 Patents Recite An Abstract Idea

The '132 patent includes three independent claims reciting similar subject matter that differ by claim type: method (1), computer readable medium (8), and system (14). The '304 patent includes two independent claims that also recite similar subject matter and differ by claim type: method (1) and computer readable medium (27). Representative claims 1 state:

1. A method of placing a trade order for a commodity on an electronic exchange having an inside market with a highest bid price and a lowest ask price, using a graphical user interface and a user input device, said method comprising:

setting a preset parameter for the trade order

displaying market depth of the commodity, through a dynamic display of a plurality of bids and a plurality of asks in the market for the commodity, including at least a portion of the bid and ask quantities of the commodity, the dynamic display being aligned with a static display of prices corresponding thereto, wherein the static display of prices does not move in response to a change in the inside market;

displaying an order entry region aligned with the static display prices comprising a plurality of areas for receiving commands from the user input devices to send trade orders, each area corresponding to a price of the static display of prices; and

selecting a particular area in the order entry region through single action of the user input device with a pointer of the user input device positioned over the particular area to set a plurality of additional parameters for the trade order and send the trade order to the electronic exchange.

(Ex. 1, '132 at Claim 1.)

1. A method for displaying market information relating to and facilitating trading of a commodity being traded in an electronic exchange having an inside market with a highest bid price and a lowest ask price on a graphical user interface, the method comprising:

dynamically displaying a first indicator in one of a plurality of locations in a bid display region, each location in the bid display region corresponding to a price level along a common static price axis, the first indicator representing quantity associated with at least one order to buy the commodity at the highest bid price currently available in the market;

dynamically displaying a second indicator in one of a plurality of locations in an ask display region, each location in the ask display region corresponding to a price level along the common static price axis, the second indicator representing quantity associated with at least one order to sell the commodity at the lowest ask price currently available in the market;

displaying the bid and ask display regions in relation to fixed price levels positioned along the common static price axis such that when the inside market changes, the price levels along the common static price axis do not move and at least one of the first and second indicators moves in the bid or ask display regions relative to the common static price axis;

displaying an order entry region comprising a plurality of locations for receiving commands to send trade orders, each location corresponding to a price level along the common static price axis; and

in response to a selection of a particular location of the order entry region by a single action of a user input device, setting a plurality of parameters for a trade order relating to the commodity and sending the trade order to the electronic exchange.

(Ex. 2, '304 at Claim 1.)

Each patent recites the abstract idea of placing an order for a commodity on an electronic

**REDACTED**

exchange, based on observed market information, as well as updating the market information. In other words, the patents claim entering and executing an order to buy or sell a commodity (e.g., corn) on an electronic exchange (e.g., Chicago Mercantile Exchange; CME) based on, e.g., the current price, and obtaining the current market price. All of these elements existed in the prior art (Ex. 1, '132, 1:59-60, 2:11-22; Ex. 2, '304, 1:65-66, 2:16-27) and amount to nothing more than "a fundamental economic practice long prevalent in our system of commerce." *Cf. Alice*, 134 S. Ct. at 2356. Commodity trading is centuries old, occurring in New York as early as 1725. (Ex. 8, Markham at 867.) The CME opened in 1898 to allow commodities trade and added electronic trading between 1987 and 1992. (Ex. 9, Timeline of CME Achievements.)

Like computerized risk hedging in *Bilski* and intermediated settlement in *Alice*, the Asserted Claims are nothing more than "well-established, fundamental concepts" that are patent-ineligible under § 101. *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 991 (Fed. Cir. 2014); *Bilski*, 561 U.S. at 611; *Alice*, 134 S. Ct. at 2354. This is precisely why the Asserted Claims are distinguishable from those upheld in *DDR Holdings, LLC v. Hotels.com, L.P. See* 773 F.3d 1245, 1257, 1259 (Fed. Cir. 2014) (claims reciting "fundamental economic or longstanding commercial practice" or "processing business information" not patent-ineligible).

Several recent district court cases are also instructive.

In *Money Suite*, Judge Sleet invalidated claims strikingly similar to the Asserted Claims. (Ex. 7, 1:13-cv-1748, Dkt. 30.) There, the court found claims recited an abstract idea because "[u]sing computers to apply commonplace ideas—such as generating price quotes [recited in the claims]—is not a patentable invention, even if the computer is able to handle volumes and complexity at levels impossible for humans." (*Id.* at 11.) The Asserted Claims are even more abstract than those in *Money Suit* because the Asserted Claims merely display prices for

**REDACTED**

commodities; they do not assign prices to them.

In *Enfish, LLC v. Microsoft Corp.*, the court invalidated claims directed to "organizing information using tabular [table] formats" on a computer. 2014 WL 5661456, at *7 (C.D. Cal. Nov. 3, 2014). For millennia, the court stated, "humans have used tables to store information" and "[a] patent on the pervasive concept of tables would preempt too much future inventive activity." *Id.* at *6. The Asserted Claims similarly recite organizing information in tabular format within a GUI; an abstract and entirely commonplace concept.

Indeed, the PTAB has already concluded all 56 claims of the '132 patent more likely than not recite patent-ineligible subject matter. (Ex. 5, CBM2014-00135, Decision.)

### D. Alice Part Two: The Asserted Claims Do Not Recite An "Inventive Concept" That Transforms The Abstract Idea Into A Patent-Eligible Invention

The second part of the *Alice* framework requires the court to consider the claim elements "both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S.Ct. at 2355.

#### 1. The Individual Claim Elements Recited In The Independent Asserted Claims Do Not Transform the Abstract Idea

Claim 1 of the '132 and '304 patents recites performing basic functions using a generic display to present a GUI and controlling the GUI with a "user input device." Both patents state that the invention can be implemented "on any existing or future terminal or device," known to include displays for presenting a GUI, and further discloses that the input device includes a computer mouse, also a known input device. (Ex. 1, '132, 4:4-15; Ex. 2, '304, 4:8-19.)

TT attempted—unsuccessfully—to argue that the '132 patent does not cover an abstract idea in its Preliminary Response in a CBMR proceeding. TT argued "[t]he '132 patent claims a novel GUI tool." (Ex. 4, CBM2014-00135, POPR at 2.) But trading GUIs, like the GUI tool, were common in the prior art. Dkt. 858 at 8. The Background of the Invention section admits

**REDACTED**

that traders regularly "use software that creates specialized interactive trading screens," i.e., a GUI. (Ex. 1, '132, 1:55-59; Ex. 2, '304, 1:61-65.) Prior art GUIs allowed the trader to "enter and execute orders, obtain market quotes, and monitor positions." (Ex. 1, '132, 1:59-60; Ex. 2, '304, 1:65-66.) Prior art GUIs also collected and used the same type of information because "each market supplies and requires the same information to and from every trader" and requires "that certain information be included in each order." (Ex. 1, '132, 2:11-22; Ex. 2, '304, 2:16-27.) Indeed, the "input and output of information is the same for every trader." (*Id*.) GUIs in the prior art also dynamically and rapidly changed values "in the price and quantity fields within the market grid." (Ex. 1, '132, 2:56-57; Ex. 2, '304, 2:60-61.) GUIs, like that of claim 1, were admittedly conventional due to their use in the industry, prior to the effective dates of the patents.

The recited GUI also received and displaying "physical mapping" of information from an exchange. (Ex. 1, '132, 4:61-5:3; Ex. 2, '304, 4:65-5:7.) But physical mapping can admittedly "be done by any technique known to those skilled in the art," prior to the effective dates of the patents. (*Id*.) Indeed, the "present invention is not limited by the method used to map the data to the screen display." (*Id*.) The claims are thus nothing more than instructions to implement an abstract idea on a GUI; this is not patent-eligible. *Alice*, 134 S. Ct. at 2357; *Enfish*, 2014 WL 5661456, at *7 ("organizing information using tabular formats" not patent-eligible).

The functions recited in claim 1 of the '132 and '304 patents—setting, displaying, and selecting—are also purely conventional and cannot save the claims. Specifically:

• *setting a present parameter for the trader order / setting a plurality of parameters for a trade order* ('132, claim 1 / '304, claim 1): these elements do not add "something more" because the admitted point of electronic trading is to enter orders. (Ex. 1, '132, 1:59-60; Ex. 2, '304, 1:65-66.) Allowing a patent to claim such a basic concept raises the very "pre-emption concern that

REDACTED

undergirds [the Supreme Court's] § 101 jurisprudence." *Alice*, 134 S. Ct. at 2358.

- *displaying market depth of the commodity, through a dynamic display of a plurality of bids and a plurality of asks . . . the dynamic display being aligned with a static display of prices corresponding thereto* ('132, claim 1): this element merely calls for aligning the market depth of a commodity next to a static display of prices. Fig. 3 of the '132 patent—annotated by TT in its Preliminary Response to the PTAB (Ex. 4, CBM2014-00135, POPR at 21)—is provided here for illustration. Fig. 3 lines up in a table the dynamic display of bids and asks with the static display of prices. Fig. 3, together with the specification, demonstrates this element is conventional, and common in the prior art. (Ex. 1, '132, 1:59-60; Ex. 2, '304, 1:65-66.) It is nothing more than "organizing information using tabular formats," which is patent-ineligible. *Enfish*, 2014 WL 5661456, at *7; *Digitech*, 758 F.3d at 1350-51.



TT has argued, in its Opposition to CQG's Motion to Stay, the Asserted Claims recite "something more" than an abstract idea because they recite a specific GUI that displays market indicators. Dkt. 858 at 8. But TT's "main inventor," Harris Brumfield, testified the recited GUI is only " <span>REDACTED</span> " (Ex. 3, 9/28/04 Brumfield Dep. Tr. at 33, 50-52; Ex. 4, CBM2014-00135, POPR at 3.) This is nothing more than mere "data-gathering" order entry and data organization, none of which are patent-eligible. *CyberSource*, 654 F.3d at 1372; *Digitech*, 758 F.3d at 1350-51; *Enfish*, 2014 WL 5661456, at *7. The Asserted Claims are not rooted in computer technology; they do not overcome a problem arising in the realm of computers. *Cf. DDR Holdings*, 773 F.3d at 1259. Instead, the Asserted Claims recite a generic GUI displaying market indicators, which according to the patents, was well known in the art. (Ex.

**REDACTED**

1, '132, 1:59-60; Ex. 2, '304, 1:65-66.)

The patents further explain order entry as "is a static vertical column of prices with the bid and ask quantities displayed in vertical columns to the side of the price column and aligned with the corresponding bid and ask prices." (Ex. 1, '132, 7:29-34; Ex. 2, '304, 7:49-54.) Although TT might contend that this comprises a very sophisticated method of organizing market data, "the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system of method." *Accenture*, 728 F.3d at 1345. Similarly, in *Money Suite*, the court held "[u]sing computers to apply commonplace ideas—such as generating price quotes—is not a patentable invention, even if the computer is able to handle volumes and complexity at levels impossible for humans." (Ex. 7, 1:13-cv-1748, Dkt. 30 at 11.) Indeed, here, the element amounts to nothing more than a list of prices and corresponding quantities sought; a conventional organization and display of market data. The patents do not assert this element is anything more than conventional and in fact call it "logical." (Ex. 1, '132, 7:17-18; Ex. 2, '304, 7:37-38.) A process for "organizing information through mathematical correlation," however, is patent-ineligible. *Digitech*, 758 F.3d at 1350-51. The Federal Circuit explained that "[w]ithout additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible." *Id*. at 1351. The same is true of the '132 and '304 patents. These elements amount to nothing more than lining up bid and ask quantities with a price in a table similar to that depicted in Fig. 3. This is not inventive.

• *displaying an order entry region aligned with the static display prices / displaying an order entry region* ('132, claim 1 / '304, claim 1): these elements do not add "something more" because, again, the entire point of electronic trading is to enter orders. The patents admit that

REDACTED

GUIs used to enter orders, obtain market quotes, and monitor positions were known in the art. (Ex. 1, '132, 1:59-60; Ex. 2, '304, 1:65-66.) According to the patents, all prior art GUIs collected and used the same information because "each market supplies and requires the same information to and from every trader" and certain information must "be included in each order." (Ex. 1, '132, 2:11-22; Ex. 2, '304, 2:16-27.) At most, these elements call for receiving data from a user, a form of patent-ineligible "data-gathering." *CyberSource*, 654 F.3d at 1372.

- *selecting a particular area in the order entry region through single action of the user input device / selection of a particular location of the order entry region by a single action of a user input device* ('132, claim 1 / '304, claim 1): these elements are also nothing more than conventional steps of entering an order for a commodity, which, according to the patents, were common in all prior art GUIs. (Ex. 1, '132, 1:59-60; Ex. 2, '304, 1:65-66.) The "single action" element is also conventional. Mr. Brumfield admitted during his depositions he used trading software that allowed                    REDACTED

prior to the effective dates of the patents. (Ex. 3, 9/28/04 H. Brumfield Dep. Tr. at 48.) These elements add nothing new or inventive. *CyberSource*, 654 F.3d at 1372 ("data-gathering" insufficient to transform claim).

- *displaying a first indicator . . . the first indicator representing quantity associated with at least one order to buy / displaying a second indicator . . . the second indicator representing quantity associated with at least one order to sell / displaying the bid and ask display regions in relation to fixed price levels positioned along the common static price axis* ('304, claim 1): these elements are also nothing more than conventional steps of displaying a quantity of a commodity to be bought or sold and corresponding price in relation to one another. As explained in the patents, all prior art GUIs allowed a trader to obtain market quotes and monitor positions, e.g.,

12

**REDACTED**

view prices and quantities. (Ex. 1, '132, 1:59-60; Ex. 2, '304, 1:65-66.) Displaying information is also nothing more than data-gathering and "cannot alone confer patentability." *CyberSource*, 654 F.3d at 1372; *Parker*, 437 U.S. at 590 (same).

- *when the inside market changes, the price levels along the common static price axis do not move and at least one of the first and second indicators moves in the bid or ask display regions relative to the common static price axis* ('304, claim 1): the element is conventional and amounts to nothing more than displaying multiple pieces of information in relation to one another. The patents state that "the 'inside market' is the highest bid price and the lowest ask price" for a commodity. (Ex. 1, '132, 4:58-60; Ex. 2, '304, 4:62-64.) Again, all prior art GUIs obtained market quotes and monitor positions, e.g., prices for bid and ask quantities of the commodity. (Ex. 1, '132, 1:59-60; Ex. 2, '304, 1:65-66.) The Federal Circuit has also held that displaying information, without more, is patent-ineligible. *See Digitech*, 758 F.3d at 1351 (holding that "manipulat[ing] existing information to generate additional information is not patent eligible").

TT may argue this element renders the abstract idea recited in the Asserted Claims patent-eligible because it constitutes an allegedly complex step of correlating market indicators with user information. The Federal Circuit, however, has rejected this argument, explaining "the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system of method." *Accenture*, 728 F.3d at 1345; *see also Money Suite* (Ex. 7, 1:13-cv-1748, Dkt. 30 at 2.)

### 2. The Independent Asserted Claims, As An Ordered Combination, Do Not Transform The Abstract Idea

"[A]s an ordered combination," the generic computer components, GUI and user input device, recited in claim 1 of the '132 and '304 patents, as in *Alice*, "ad[d] nothing . . . not already present when the steps are considered separately." 134 S. Ct. at 2359. The claims, as a whole,

13

REDACTED

recite the abstract idea of placing an order for a commodity on an electronic exchange, based on observed market information, as well as updating the market information; nothing more.

The Supreme Court has held claims that do not "improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field" are patent-ineligible. *Id*. at 2359-60. The claims here do not—and cannot—improve the functioning of a computer because the invention can admittedly be implemented "on any existing or future terminal or device" with a display and a mouse. (Ex. 1, '132, 4:4-15; Ex. 2, '304, 4:8-19.)

The recited GUI may receive data from multiple exchanges and then "translates" the data into "a simple preferred data format." (Ex. 1, '132, 4:28-35; Ex. 2, '304, 4:32-39.) But this is exactly the sort of "organizing information through mathematical correlation" the Federal Circuit held to be patent-ineligible. *Digitech*, 758 F.3d at 1350-51. The GUI may further display a "physical mapping" of data received from an exchange, but this "can be done by any technique known to those skilled in the art." (Ex. 1, '132, 4:61-5:3; Ex. 2, '304, 4:65-5:7.) Indeed, the "present invention is not limited by the method used to map the data to the screen display." (*Id*.) This is not enough to transform the recited abstract idea into a patent-eligible invention. The claims are thus distinguishable from those in *DDR Holdings,* where the Federal Circuit upheld claims that improved the functionality of the computer itself. 773 F.3d at 1259. Here, as in *Alice*, the claims "amount to 'nothing significantly more' than an instruction to apply the abstract idea . . . using some unspecified, generic computer." 134 S. Ct. at 2360.

### 3. The Independent Asserted Claims Also Fail The M&T Test

Courts apply the M&T test as "a 'useful clue' in the second step of the *Alice*" analysis. *Ultramercial*, 772 F.3d at 716. The test asks whether a claim is "tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *Bilski*, 561 U.S. at 602, 617. A claim that fails the test is likely patent-ineligible. *Ultramercial*, 772 F.3d at 716-17.

**REDACTED**

To satisfy the machine prong, "the use of the machine must impose meaningful limits on the claim's scope." *CyberSource*, 654 F.3d at 1375. The "incidental use of a computer to perform [a] mental process" or the "mere[] claiming [of] a software implementation of a purely mental process that could otherwise be performed without the use of a computer" is not enough. *Id*. Using a general purpose computer to perform basic function also is not enough because it "does not impose meaningful limits on the scope of those claims." *Bancorp*, 687 F.3d at 1278.

The claims here are not restricted to a particular machine. The recited GUI presents the "inside market" for a commodity, e.g., prices for bid/asked quantities of the commodity. (Ex. 1, '132, 4:58-60; Ex. 2, '304, 4:62-64.) Admittedly, the GUI requires only a generic "computer or [an] electronic terminal" that is "able to communicate directly or indirectly" with the exchange. (Ex. 1, '132, 3:64-4:2; Ex. 2, '304, 4:1-6.) The GUI can be used "on any existing or future terminal or device." (Ex. 1, '132, 4:4-7; Ex. 2, '304, 4:8-11.) Indeed, the "the present invention is not limited by the type of terminal or device used." (Ex. 1, '132, 4:7-9; Ex. 2, '304, 4:11-13.)

The computer components recited in the Asserted Claims are thus wholly generic and conventional. As in *Bancorp*, the Asserted Claims recite the use of a computer "only for its most basic function" and thus "do[] not impose meaningful limits on the scope of th[e] claims." 687 F.3d at 1278. The GUI organizes and displays data ("purely mental process") that can be performed without a computer; it does not satisfy the machine prong. *CyberSource*, 654 F.3d at 1375. Merely reciting a "data-gathering" using a GUI is also not enough. *See id.* at 1370 ("mere '[data-gathering] step[s] cannot make an otherwise nonstatutory claim statutory'"); *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 2013 U.S. Dist. LEXIS 107184, at *32 (D.N.J. July 31, 2013) ("use of the scanner is pre-solution activity that does not provide any meaningful limitation"); *Cyberfone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 718 (D.

**REDACTED**

Del. 2012), *aff'd Cyberfone*, 558 F. App'x 988 (Fed. Cir. 2014) ("telephone is not an integral part of the claim; it simply functions as a means for collecting data whereas the real focus of the claim is the sorting and storing. As the *CyberSource* Court explained, 'mere [data-gathering] step[s] cannot make an otherwise nonstatutory claim statutory.'").

The Asserted Claims also fail the transformation prong of the M&T test. None of the Asserted Claims transform a particular article into a different state or thing. Rather, they do no more than collect and organize market data, e.g., prices, for a commodity. But "[t]he mere collection and organization of data" is insufficient to meet the transformation prong of the M&T test. *CyberSource*, 654 F.3d at 1370, 1375; *Cyberfone*, 558 F. App'x at 993.

#### 4. The Dependent Asserted Claims Do Not Add "Something More" To Transform The Recited Abstract Idea To A Patent-Eligible Invention

TT has asserted a number of dependent claims of the '132 and '304 patents. These claims, however, recite only a handful of additional elements, each repeated in similar form in conjunction with the different forms of independent claim. These additional features are nothing more than trivial conventional "post-solution activity" that cannot transform the recited patent-ineligible abstract idea into a patent-eligible invention. *CyberSource*, 654 F.3d at 1371-72.

##### a. The Dependent Asserted Claims Of The '132 Patent Are Patent-Ineligible

Because the dependent Asserted Claims are highly repetitive, CQG presents its explanation on a feature-by-feature basis:

- *Claims 2, 9, 15*: the GUI concludes a trade order is a buy order if the pointer is within the "bid order entry region" and a sell order if it is within the "ask order entry region." This amounts to a mere selection between order types based on the pointer's location, "well-known, routine, and conventional functions" of selecting data, akin to data-gathering, that cannot confer patentability. *Content Extraction*, 2014 WL 7272219, at *5; *CyberSource*, 654 F.3d at 1372.

**REDACTED**

- *Claims 3, 10, 16*: the trade order is "for a pre-determined fixed quantity" and "for a price corresponding to the position of the pointer." In other words, the order is for a specified quantity at a price based on the pointer's location. This is conventional because, admittedly, each order in the prior art specified "the name of the commodity, quantity, restrictions, [and] price." (Ex. 1, '132, 2:18-19.) As a "well-known, routine, and conventional function[]," this feature cannot be inventive. *Content Extraction*, 2014 WL 7272219, at *5. Indicating a price with a pointer is further nothing more than patent-ineligible "data-gathering." *CyberSource*, 654 F.3d at 1372.

- *Claim 7*: a trade order may be cancelled "in response to a subsequent single action of the user input device." This is nothing more than cancelling an order using the GUI. This is entirely conventional and has an analogue in the pre-computer where traders cancelled orders verbally or by withdrawing order papers. This does not transform an abstract idea to a patent-eligible invention. *Content Extraction*, 2014 WL 7272219, at *5.

- *Claims 20, 30, 40*: the bids, asks, and prices are displayed oriented vertically. This feature is centuries-old. Indeed, certain languages (e.g., Chinese) are presented oriented vertically. It is no wonder the Federal Circuit has held "organizing information through mathematical correlation" is patent-ineligible. *Digitech*, 758 F.3d at 1350-51.

- *Claims 22, 32, 42*: the display of bids and asks for a commodity "include[s] bid and ask quantities of the commodity." This too adds nothing inventive. Indeed, the '132 patent admits that prior art GUIs were commonly used to "obtain market quotes, and monitor positions," i.e., bid and ask quantity and price. (Ex. 1, '132, 1:59-60.) Displaying both price and quantity is a conventional way of presenting market information to a trader; indeed, disclosing a bid quantity without bid price or vice versa would have little use to a trader looking to for the "slightest speed advantage" in a fast-moving market. (Ex. 1, '132, 2:6-8.) In any case, this feature amounts to

17

REDACTED

nothing more than "organizing information through mathematical correlation" which is patent-ineligible. *Digitech*, 758 F.3d at 1350-51.

- *Claims 23, 33, 43*: the bids and asks are displayed "in different colors." There can be no credible dispute that displaying two pieces of information in different colors is nothing more than a mere conventional step. The concept of using different colors to distinguish information is at least as old as the different colors used in a traffic light.

The features recited in the remaining dependent Asserted Claims of the '132 patent fare no better. They add nothing but trivial conventional steps. These additional steps do not transform the abstract idea of the '132 patent into a patent-eligible invention.

### b. The Dependent Asserted Claims Of The '304 Patent Are Patent-Ineligible

As with the '132 patent, the dependent Asserted Claims of the '304 patent are highly repetitive. Again, CQG presents its explanation on a feature-by-feature basis:

- *Claims 2, 8*: the market information and order entry regions "comprise columns with a plurality of cells that are displayed as a grid such that the cells of each column are aligned." In other words, market information is displayed in a grid. This is non-inventive and entirely conventional at least because the '304 patent admits that prior art GUIs were commonly used to "obtain market quotes, and monitor positions." (Ex. 2, '304, 1:65-66.) This feature further amount to nothing more than "organizing information through mathematical correlation," which is patent-ineligible. *Digitech*, 758 F.3d at 1350-51.

- *Claims 3, 9*: the market information and order entry regions are "oriented vertically." As with claims 20, 30, and 40 of the '132 patent, § III.D.4.a, this conventional feature is centuries-old and patent-ineligible. *Digitech*, 758 F.3d at 1350-51.

- *Claims 5, 6*: one of the cells in a bid (claim 5) or ask (claim 6) display is blank and does not

**REDACTED**

show a quantity. This is nothing more than a trivial conventional step, well known in the prior art. (*See* Ex. 2, '304, 1:65-66 (prior art GUI used to "obtain market quotes, and monitor positions.").) These features also reflect the reality of any market: there are prices at which no one will bid to buy, and similarly, prices at which no one will ask to sell. For example, it is unlikely a trader would be willing to sell gold today for $1/ounce when the market price is well over $1,200/ounce. In short, these claims add nothing to transform the recited abstract idea to a patent-eligible invention. *Content Extraction*, 2014 WL 7272219, at *5.

- *Claim 7*: "displaying at least a portion of the common static price axis in a price display region." This is nothing more than a conventional step of displaying information. It is also merely akin to data-gathering, which "cannot alone confer patentability," *CyberSource*, 654 F.3d at 1372, and "organiz[es] information through mathematical correlation," which is also patent-ineligible. *Digitech*, 758 F.3d at 1350-51.

- *Claim 11*: "dynamically displaying a third indicator . . ., the third indicator representing quantity associated with at least one order to buy the commodity at a price different than the highest bid price currently available in the market; and dynamically displaying a fourth indicator . . ., the fourth indicator representing quantity associated with at least one order to sell the commodity at a price different than the lowest ask price currently available in the market." Put simply, this claim merely calls for displaying at least one bid and one ask quantity different from the current best bid and ask price. This conventional step is a nothing more than "data-gathering" which, without more, is not patent-eligible. *CyberSource*, 654 F.3d at 1372. It also amounts to the "organizing [of] information through mathematical correlation," which is also patent-ineligible. *Digitech*, 758 F.3d at 1350-51.

- *Claim 24*: bid and ask information is displayed "in different colors." As with claims 23, 33,

REDACTED

and 43 of the '132 patent, § III.D.4.a, this is nothing more than a conventional step.

The features recited in the remaining dependent Asserted Claims of the '304 patent fare no better. They add nothing but trivial conventional steps. These additional steps do not transform the abstract idea of the '304 patent into a patent-eligible invention.

## IV.     Conclusion

The Asserted Claims should be found invalid for reciting patent-ineligible subject matter under § 101 as a matter of law.

Dated: February 2, 2015                         Respectfully submitted,

                                                 */s/ Kenneth R. Adamo*
                                                 Kenneth R. Adamo
                                                 Eugene Goryunov
                                                 KIRKLAND & ELLIS LLP
                                                 300 North Lasalle
                                                 Chicago, IL 60654
                                                 Telephone: (312) 862-2000

                                                 Adam G. Kelly
                                                 William Voller III
                                                 J. Simone Jones
                                                 LOEB & LOEB LLP
                                                 321 North Clark, Suite 2300
                                                 Chicago, Illinois  60654
                                                 Telephone: (312) 464-3100

                                                 *Attorneys for CQG, Inc. and CQGT, LLC*

REDACTED

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served via the ECF filing system, email, and/or First Class U.S. mail upon the following on the 2nd day of February, 2015:

Matthew J. Sampson
(sampson@mbhb.com)
S. Richard Carden
(carden@mbhb.com)
Jennifer M. Kurcz
(kurcz@mbhb.com)
Andrea K. Orth
(orth@mbhb.com)
Brandon J. Kennedy
(kennedy@mbhb.com)

Steven F. Borsand
(Steve.Borsand@tradingtechnologies.com)

Trading Technologies International, Inc.
222 South Riverside, Suite 1100
Chicago, IL 60606

McDonnell Boehnen Hulbert & Berghoff LLP
300 South Wacker Drive
Chicago, Illinois 60606

February 2, 2015          By:          */s/ Kenneth R. Adamo*

Kirkland & Ellis LLP
300 North La Salle
Chicago, IL  60654
Telephone:  (312) 862-3475

Attorneys for CQG, Inc. and CQGT, LLC