```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3    TRADING TECHNOLOGIES              )  Docket No. 05 C 4811
      INTERNATIONAL, INC.,             )
 4                                     )
                       Plaintiff,      )  Chicago, Illinois
 5                                     )  February 23, 2015
                  v.                   )  2:21 p.m.
 6                                     )
      CQG, INC. and CQGT, LLC,         )
 7                                     )
                       Defendants.     )
 8

 9                              VOLUME 4
           TRANSCRIPT OF PROCEEDINGS - Final Pretrial Conference
10            BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

11
      APPEARANCES:
12

13    For the Plaintiff:    TRADING TECHNOLOGIES INTERNATIONAL, INC.
                            MR. STEVEN F. BORSAND
14                          222 S. Riverside Plaza
                            Suite 1100
15                          Chicago, IL 60606

16                          McDONNELL BOEHNEN HULBERT & BERGHOFF LLP
                            MR. S. RICHARD CARDEN
17                          MR. JAMES C. GUMINA
                            300 S. Wacker Drive
18                          Suite 3100
                            Chicago, IL 60606
19
                            IRWIN IP LLC
20                          MR. BARRY F. IRWIN
                            1333 Burr Ridge Parkway
21                          Suite 200
                            Burr Ridge, IL 60527
22

23

24

25
```

```
 1    APPEARANCES (Cont'd.):

 2

      For the Defendants:    LOEB & LOEB LLP
 3                           MR. ADAM G. KELLY
                             321 N. Clark Street
 4                           Suite 2300
                             Chicago, IL 60610
 5
                             LOEB & LOEB LLP
 6                           MS. LAURA A. WYTSMA
                             MR. TERRY D. GARNETT
 7                           10100 Santa Monica Boulevard
                             Suite 2200
 8                           Los Angeles, CA 90067

 9
      Court Reporter:        LAURA R. RENKE, CSR, RDR, CRR
10                           Official Court Reporter
                             219 S. Dearborn Street, Room 1432
11                           Chicago, IL 60604
                             312.435.6053
12                           laura_renke@ilnd.uscourts.gov

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (In open court.)

2          THE COURT:  All right.  Be seated.  Thank you for your

3     patience.  It's sometimes hard to believe I'm not the new kid

4     on the block and the new kids need me.  So thank you for your

5     patience while I talked to one of my colleagues.

6          All right.  '5-4811, Trading Technologies.

7          Did you go away to warmer climes?

8          MS. WYTSMA:  No.  Unfortunately, no.

9          THE COURT:  I thought maybe you went and got, like,

10    sort of geared up and came back.

11         All right.  Everybody state your names for the record.

12         TT.

13         MR. BORSAND:  Steve Borsand for Trading Technologies.

14         MR. GUMINA:  Jim Gumina for Trading Technologies.

15         MR. IRWIN:  Barry Irwin for Trading Technologies.

16         MR. CARDEN:  Good afternoon, your Honor.  Richard

17    Carden on behalf of Trading Technologies.

18         THE COURT:  Thank you.

19         MS. WYTSMA:  Laura Wytsma on behalf of defendant CQG.

20         MR. GARNETT:  Terry Garnett for CQG.

21         MR. KELLY:  Adam Kelly for CQG.

22         THE COURT:  All right.  Great.

23         We have several issues to clean up, deal with.

24         And I could not help but think of this morning the

25    California contingent when I was out there walking my dog in

239

1   20 below wind chill factor.

2          Okay.  One second.  Just making sure I have every ...

3          First of all, I want to deal with one of the issues I

4   had dealt with earlier this morning.  Did CQG have a chance to

5   look at the preliminary jury instruction page 4 I was talking

6   about with the confusing statement --

7          MS. WYTSMA:  May I?

8          THE COURT:  -- for the Court?

9          Yes.  Oh, yes.

10         MS. WYTSMA:  Your Honor, my apologies for that.  And I

11   created that confusion.  We were trying to collapse our jury

12   instructions into theirs very late at night, trying to get it

13   to them quickly so that we could meet and confer.

14         And that just wasn't an accurate -- or it was at least

15   an incomplete statement, and it was not intended to be a waiver

16   of our written description.

17         THE COURT:  Okay.

18         MS. WYTSMA:  And I apologize for any confusion.

19         THE COURT:  No, no need to apologize.  I just wanted

20   to make sure -- thought I was missing something.

21         All right.  So that is clear, that will not be part of

22   the preliminary instructions, and that will be taken care of.

23         Also, CQG.  Is CQGT, LLC, a party?  Yea or nay,

24   somebody.

25         MR. CARDEN:  Yes, your Honor, they are.

240

```
 1              THE COURT:  All right.  Just wanted to -- and I wasn't

 2    seeing -- or is that just CQG, the whole title?  Are there two

 3    or one?

 4              MR. CARDEN:  So there's two different parties, CQG and

 5    CQGT, LLC.

 6              THE COURT:  Okay.  I just wanted to make sure.  Okay.

 7    All right.

 8              MS. WYTSMA:  But our position is that only one of

 9    those two companies actually makes, uses, sells -- is accused

10    of the infringing activity in this case.

11              And so to have it presented to the jury in a way where

12    it sounds like there are two different entities, it's a wholly

13    owned subsidiary that doesn't have any responsibility for

14    selling the software that's at issue in this case.  So we just

15    didn't want any jury confusion on that point.

16              THE COURT:  Mm-hmm.

17              MR. CARDEN:  The testimony is clear from their own

18    witnesses that CQGT, LLC, is in charge of their order routing

19    business with respect to CQG Trader and CQG, Inc., is in charge

20    of their business with respect to the integrated client.  So we

21    don't agree with the characterization.

22              THE COURT:  Well, I guess the question is, though,

23    once again, you guys just want to make it even more difficult

24    for my poor jurors.  You've got CQG, and you've got CQG, LLC.

25    Is there -- just when you're drafting the instruction, we have
```

1    to be really clear.  I mean, I have plenty of cases where you

2    have a company that's a subsidiary of another company; there's

3    an instruction.  That instruction deals with it, and then the

4    jurors aren't confused as we go through.

5            But from what you're telling me, you want to charge

6    CQG, LLC, with its own total issue.  I mean, I just don't

7    understand why you'd want to make it even more difficult here.

8            MR. CARDEN:  I think we're fine describing them as an

9    entity called CQG.  The issue that we come up with is that we

10   don't want to be put in the position where someone comes to us

11   and says, well, you don't get to -- you don't get to recover

12   anything for infringement based upon, for instance, CQG Trader

13   because you don't have the proper party in the case and since

14   their testimony is the testimony that set it up.  And when they

15   filed their declaratory judgment case, both of the parties were

16   involved too.

17           So we just don't want to be in a position where they

18   say we haven't met our proofs because we haven't included the

19   right party.

20           THE COURT:  And so the question is, when you do an

21   instruction at the close of the case giving the relationship

22   between CQG and CQGT, LLC, would that instruction take care of

23   the relationship and -- you know, we can put the instruction

24   saying they are a subsidiary, and if they are found liable for

25   this, then this company is also liable?

242

1            MR. CARDEN:  I think we can try and work something out

2      if it's --

3            THE COURT:  Can you try to work that out because that

4      way it's not confusing for the jury, but you all can each have

5      your various positions.  All right.  So that's just something I

6      need you to look at.

7            MR. CARDEN:  Very good.

8            THE COURT:  All right?  Okay.  Thank you.

9            And I'm assuming you're looking at verdict forms

10     anyway because they were pretty messed up, for lack of a more

11     legal term.  But there was clearly problems with cutting and

12     pasting and references to the wrong patents, words missing.

13           Again, if you all are trying to give me a hint that

14     you really don't want to try it, I'll take it.  But other than

15     that, you need to clean up the case.

16           Let's see.  On your exhibit lists, again, I know

17     you're going to give me some updated lists and also ones that

18     are legible for my poor eyes and that of my staff.

19           But much of what the Court in perusing saw on the

20     list, there's a lot of things -- case law, expert reports,

21     discovery documents -- that's not exhibits that go into

22     evidence, so why even put that on the exhibit list?  I mean,

23     unless -- or make sure you separate them and understand that I

24     don't want to waste time on people's objections to stuff that

25     everybody knows doesn't get in anyway.

1    So, again, let's clean up.  Either have two sets,

2   just, well, we're doing these for exhibits, but they won't be

3   admitted or offered into evidence because they don't come in.

4    Did you wish to say something?

5    MS. WYTSMA:  Your Honor, one of the reasons why you

6   saw some case law on CQG's witness -- or exhibit list is

7   because of the issue of willfulness and our client's state of

8   mind and things that they rely upon to show that they didn't

9   subjectively believe that they infringed the patent.  And so,

10   for example, the Federal Circuit decision bears on their state

11   of mind.

12    So ordinarily I agree with you it's not evidence in a

13   typical case, but on that particular issue, it might be.

14    THE COURT:  Well, you can admit it.  I am not -- I am

15   not -- I mean, you can offer it.  I'm not admitting case law as

16   an exhibit -- as evidence for the jury.

17    MS. WYTSMA:  Okay.  Understood.

18    THE COURT:  So you can do it just knowing -- I'm going

19   to tell you right now that's going to be my ruling.

20    MS. WYTSMA:  Okay.

21    THE COURT:  Unless you can show me some precedent

22   otherwise.  All right.

23    Anything else on that?  You all understand, again,

24   clean up, look at your various lists for things that are

25   clearly not admissible and make sure we address that.  If you

1    want to use them and whether it's demonstrative or refreshing

2    recollection, just letting me know and letting the other side

3    know that it's possible that you're going to bring these

4    matters up, you want to have them available, that's one list.

5         It's another thing to have matters on exhibit lists

6    and try to move them into evidence when everyone knows that you

7    can't.  All right?

8         Again, if there's something particularly that you

9    really know you want to present, such as if you feel that

10   you've got the authority behind you to stand on admitting a

11   case into -- case law into evidence, then that's the kind of

12   thing that needs to be dealt with ahead of time so that the

13   Court can hear objections on it and we don't get that in front

14   of the jury.

15        All right.  As to my -- the statement of the case.

16   Again, all the jury needs to just know, have an idea --

17   prospective jurors -- on what this case is generally about.

18   Even this is almost too much information, what I gave.  They're

19   not listening to that.  Right now they're worried about whether

20   they're getting picked.  And so they just need the basics, that

21   it's a patent case; it involves stocks and trading and who the

22   companies are.  I gave them a little bit more.  But it's not my

23   intention to give them any more than that.

24        And because we have so many lawyers on both sides, I'm

25   going to forgo my normal practice of introducing each

```
 1    individual person.  I will introduce the firm, and you each
 2    introduce yourselves and your regular tech person and your
 3    client if you have a representative present.  You'll have the
 4    opportunity to do that in the middle of my statement of the
 5    case.
 6              And were you able to -- again, I'm sorry, TT, but the
 7    table you had was right up against -- were you able to do
 8    something?  Good.  Okay.  So I don't mind blocking people from
 9    sitting on the front row.  The only time that that may be sort
10    of an issue is when we pick the jury.  After they're picked,
11    that's fine.  We don't have to have anybody right there, or
12    they can be your people blocked or whatever.
13              But before they were just too close for comfort to my
14    jury.  Okay?  Thank you for moving.
15              So any other questions about the statement of the
16    case?  From the plaintiff?  From the defense?
17              All right.  Thank you.
18              The preliminary instructions.
19              Oh, I want to get from you also.  Do you all have a
20    glossary of terms that you have prepared or submitted?
21              MR. CARDEN:  We did submit it, and there was a highly
22    redlined version submitted by CQG.  I believe both were filed,
23    so they should be available for the Court.
24              THE COURT:  Have you all talked about them, the
25    differences?
```

 1          MR. CARDEN:  About the redlines?  I don't believe
 2    we've done that.
 3          MR. GUMINA:  No, we've not.
 4          MR. CARDEN:  There's some fairly substantial
 5    differences from our initial review.
 6          THE COURT:  Okay.  That's CQG's.
 7          MR. GUMINA:  Your Honor, if I may.
 8          THE COURT:  Yes.
 9          MR. GUMINA:  I think what we submitted was the
10    glossary that Judge Moran used, basically.  And if I'm
11    incorrect, they will correct me, undoubtedly.  What I believe
12    CQG submitted was a comparison of that to what they had
13    previously submitted in a redlined version.
14          THE COURT:  Is that correct, CQG?
15          MS. WYTSMA:  Substantially.  It wasn't identical to
16    our initially proposed glossary, but there were terms that we
17    added to TT's proposed glossary from our original proposed
18    glossary.  And we just did it in one document so that the Court
19    could see the differences between the two parties.
20          THE COURT:  So, again, CQG, you gave me TT's proposed
21    glossary, and you redlined it?  Is that what happened?  That's
22    what it looks to be.
23          MS. WYTSMA:  If you're looking at a redlined copy,
24    then yes.  The redlining is CQG's proposed revisions to TT's
25    proposed glossary.

1    THE COURT:  All right.  And do you have an argument

2  with them saying what they used was used by Judge Moran?

3    MS. WYTSMA:  I frankly don't know what was used in the

4  *eSpeed* trial.  I know there were different issues in that case.

5  And so I haven't gone to look at it.  I don't know one way or

6  the other.

7    I can tell you that the glossary that we've proposed

8  originally has been used in many, many patent trials in the

9  past.  So I just don't think it's relevant to what should be

10  used in this case.

11    THE COURT:  All right.  Then I'll take a look at it.

12  Thank you.

13    The preliminary instructions are next.

14    Oh.  And before we get to that, before we get to

15  preliminary instructions, did you all have an opportunity to

16  look at the little tutorial, the PowerPoint?

17    MR. CARDEN:  We did, your Honor.  We actually

18  submitted comments back to Ms. Hunt.  And we had only suggested

19  the removal of one slide, which dealt with --

20    THE COURT:  The last one?

21    MR. CARDEN:  No, it was one that dealt with single

22  action versus -- and single click, which we -- because it's a

23  claim term that's not really in dispute, we didn't see that it

24  was necessary.  But we had no other comments.

25    THE COURT:  Okay.  No comments?  No "nice job, guys"?

1        MR. CARDEN:  No, we actually did say that.

2        THE COURT:  Oh, okay.  All right.

3        Yes, go ahead.

4        MS. WYTSMA:  That was my comment.

5        We agreed with the one proposed change that TT

6 requested, and then the only other revision that we had

7 requested was there was a -- one sentence about I think the

8 purpose of the damages award is to help a -- an inventor recoup

9 the money that they've invested and that kind of thing, and we

10 just thought that that was --

11        THE COURT:  Yeah.  Well, you're right.  We'll get rid

12 of that one.

13        MS. WYTSMA:  We were all very highly impressed.  In

14 fact, we wanted to know if maybe we could borrow a couple of

15 the slides for our case.

16        THE COURT:  You can talk to them after this is all

17 over.  I'm sure they'll do things for a fee.

18        All right.  Great.  So they'll make -- those changes

19 will be made.  And my externs will be introduced to the jury,

20 and they will get to do the presentation.  All right?

21        So we'll have the -- hopefully, my plan is -- if we

22 pick quickly enough -- the first day we will do -- I will swear

23 them in.  I will do the video from the FJC.  They will do the

24 tutorial.  Then depending on where we are then will be whether

25 the Court goes into the preliminary instructions.

1          And because they're doing -- we have the FJC video and

2     the PowerPoint, the Court is going to shorten up some of my

3     remarks so we don't get ridiculously repetitive.  So I'll have

4     my general jury remarks on how a trial goes with a little bit

5     extra because of the case -- and let me find those.

6          So basically my whole spiel about what a patent is and

7     how one is obtained I don't think I need because that will be a

8     third go-round.  By then, I'd really lose them.

9          So for the most part, I'm going to go right into the

10    patents-at-issue/patents-in-suit instruction, then summary of

11    contentions, overview of the applicable law, and then the

12    outline of the trial.  And that will sort of dovetail into --

13    from being specific about patents, dovetails into how the trial

14    is done.  We're putting together a notebook, which will have a

15    full-size legal pad instead of the little notepads they

16    normally have.  They will have that.

17         It will have the final glossary.  It will have the

18    preliminary jury instructions.  And that will be from the

19    Court.  That will be their folder from the Court.  It will have

20    three rings.  They'll have a hole punch in the back.  If

21    there's a few extra documents to put in that, that's fine.  And

22    then you all can tell me if you have something else you wish to

23    present them with.  That can be done in a separate binder.  But

24    that's going to be the one they have from the Court on a

25    regular basis.

1        And, again, there's 12 and with three strikes each.

2   So I think we're looking at maybe bringing 48, 52 people in.

3   All right?

4        Yes.

5        MS. WYTSMA:  On the preliminary jury instructions, we

6   had proposed at the tail end of the joint document an

7   instruction about breaks and recesses.  Is that something --

8        THE COURT:  Oh, that's part of my normal --

9        MS. WYTSMA:  Okay.

10       THE COURT:  -- spiel.  Breaks, recesses, not speaking

11  to the lawyers, not speaking to any witnesses.  We'll do a

12  15-minute grace period.  So my -- especially when we have

13  weather issues and stuff, my policy for both lawyers, staff,

14  everybody, is from the time we say we're going to start,

15  there's like a 15-minute grace period where nobody has to

16  really call in or say anything.  You can if you want, but

17  there's 15 minutes, and that time we're going to start unless

18  somebody has called in or told us otherwise.

19       Or we definitely expect if somebody's train is late

20  and he says it's going to be a half an hour late that someone

21  calls us -- whether they're a juror, lawyer, whoever -- and

22  says, "My train is running late."  So we will have all their

23  contact information.  I expect the same from counsel.

24       And if it's possible, with the number of counsel at

25  each table, if all of them are here, we're missing one counsel,

1   as long as that's not the person who is leading the charge, I

2   would hope we'd be able to go ahead.

3            But the same thing, I mean, for me.  We're going to --

4   if some case is going long, I will let you all know as you come

5   up.  My staff will say, "You know what?  She's in the middle of

6   an emergency detention hearing," or "Something else is going

7   on.  It's going to be about 20 minutes."

8            The jury will also be told so they can step out of the

9   room, use their phone in private, go to the second floor,

10  whatever they want to do for a time certain, and then they come

11  back.

12           So I will talk about breaks.  I will talk about lunch.

13  I will talk about the practice of them needing to get here.  I

14  will reiterate -- I'm going to tell you, this is probably -- I

15  foresee this as the toughest charge of telling people to stay

16  away from the Internet because they will do so not to be nosy,

17  not to be mean, just trying to get up to speed and figure out

18  what's going on.

19           And there's no way for me to monitor that.  I have

20  them sign statements in the back to say they won't, but if

21  there's ever a case that's begging for people to go on the

22  Internet, it's this one.  So yeah.  There's nothing I can do

23  about it.  I'll just keep telling them, but that's the best I

24  can do.  Okay?

25           Anything else on preliminary jury instructions?  I run

 1    the gamut about, you know, they do breakfast.  You know, we do

 2    the whole thing.

 3              MR. GUMINA:  Yes, your Honor.  We have a request.

 4              THE COURT:  Yes.

 5              MR. GUMINA:  Since you're showing the video --

 6    okay? -- the video has certain sections that refers to how

 7    patents can be challenged from a validity standpoint.  And

 8    we're a little concerned that the jury will become confused

 9    about that and think there might be a validity issue in this

10    case.  So we'd like you to include a -- or consider including

11    in your instructions that there's no prior art validity

12    challenge that the jury's going to be asked to decide.

13              THE COURT:  Do you really think they're going to get

14    that from that initial video?  They're going to say, "Ooh,

15    there's a validity issue here"?

16              I mean, I can emphasize that.  I really think that

17    they're not really going to start really getting this until

18    these guys get done.

19              MR. GUMINA:  All right.

20              THE COURT:  But that's a question.  Do I put too much

21    emphasis on something at this point?  Or do we save it, and

22    then if something else comes up, I just -- I sort of think that

23    we're going to hit them with something, and they're going to be

24    going, "There's a validity" -- you know, we're going to raise

25    something that they're not going to get.  That early on,

1    they're not going to focus.  They're focusing on it's a patent

2    case.

3            MR. GUMINA:  I gotcha.

4            THE COURT:  So all right?  Thank you, though.  Noted

5    that you tried to present it, but my history with juries tells

6    me at this point they're still trying to figure out how they're

7    missing work and how they're going to get their kid to -- you

8    know.  So yeah.

9            This is one of those things where I really had to

10   vacillate about doing that third talk because I thought, well,

11   maybe by the time I say it, they'll get it.  But I also -- it's

12   a close line of overdoing it versus, you know, I just really

13   think at this point we want to bring them in slowly.  If I hit

14   them with that, then they're going to start going, "Oh, wow.

15   This is complicated."

16           MR. GUMINA:  Okay.

17           THE COURT:  All right?  Let's see.  So we have the

18   preliminary jury instructions.  We've got the glossary.

19           Oh, the -- did you all get a copy of the

20   questionnaire?

21           MR. GUMINA:  We did.

22           THE COURT:  So what I want to do is also you all tell

23   me what other -- I'm not going to add other questions to the

24   questionnaire.  I will add them to my spiel if there's

25   particular questions that you want the Court to address.  So --

1    that aren't contained in my three-page questionnaire.

2              MR. GUMINA:  No.

3              THE COURT:  Is there anything else?

4              MR. CARDEN:  I don't think so.

5              THE COURT:  I mean, I will ask more questions based on

6    answers.  You know, I mean, just the normal flow of if I get a

7    certain answer and they tell me, "Oh, well, tell me how are you

8    involved in that?  When did you -- how involved are you in

9    stock trading?  You're in a club?"  I'll go into the whole

10   thing on that.

11             But I'm just saying is there any other question -- I

12   think it's pretty thorough.  But if there's any other question

13   that you can think of that I haven't asked and you think of it

14   later, please let me know, and it's something that I will

15   consider adding just in my questions in general to them.

16             We have the witness lists.  I see they've had some

17   shrinkage.  And so does that still mean -- I mean, so that I'm

18   still planning on the two and a half weeks that I will tell

19   them that we're doing this.  Is everybody good with that?

20             MR. CARDEN:  Yes, your Honor.

21             THE COURT:  But it sounds like with some of the

22   shrinkage, we will definitely meet it, and you can say with

23   full confidence:  "Yes, Judge.  We agree we'll be done by the

24   13th."

25             Or I can still say the 16th.  What do you think, go to

1    the Monday or --

2            MR. CARDEN:  If you believe that that's good, your

3    Honor, especially given that maybe we'll have another weather

4    day, that's fine with TT.  But we plan to be done by the 13th,

5    certainly.

6            THE COURT:  Meaning we plan to --

7            MR. CARDEN:  We plan for the trial to be done.

8            THE COURT:  Okay.  Give you a heart attack.

9            All right.

10           MS. WYTSMA:  Your Honor --

11           THE COURT:  I'll say the 16th.  And that way that

12   gives us a little wiggle room, and we'll look like saints when

13   we finish on the 11th.

14           So but that's -- if we go and we're not taking off

15   Fridays, Fridays will be a shorter day.  But, you know, if we

16   get five hours in a day, at least, five to six, we should be

17   doing pretty well.

18           The experts, I was asking for some time parameters.

19   Do you have anything for me?

20           MR. CARDEN:  We thought about this quite a bit.  The

21   one -- the one issue we have I think on the side -- on the

22   expert side for us is that our infringement expert may need to

23   be on for quite some time.

24           THE COURT:  What is -- I just want to know.  What is

25   "quite some time"?

1     MR. CARDEN:  He may be on for a full day between our

2   direct and the cross.  We expect that he will likely be on for

3   a full day.  The rest of the experts will not be anywhere near

4   that: two hours, maybe three hours, if that.  We don't want

5   them to be on that long.  But the infringement expert may be on

6   for --

7     THE COURT:  And what's his name again?

8     MR. CARDEN:  Mr. Thomas.

9     THE COURT:  Thomas.

10    First of all, tell me what -- I'll deal with the time

11  you're saying.  But tell me what you think about this.

12    MS. WYTSMA:  I think that with respect to most

13  experts, we are looking at a two- to three-hour range -- some

14  will be very short -- on willfulness depending on the scope of

15  what the Court allows on examination.

16    But I, frankly, am surprised to hear that there's an

17  anticipation of a whole day with one witness.  So I guess our

18  cross-examination is largely going to depend on the scope of

19  the direct with respect to Mr. Thomas.

20    THE COURT:  All right.  Let me tell you what we're

21  going to do.

22    When I hear that, then I hear the lawyers are looking

23  at what they're doing; they're not thinking of their audience.

24  All right?  So a whole day for one witness on infringing is not

25  keeping your audience in mind.  All right?

1    And so there's got to be a way to focus your

2    testimony -- I mean, your questions to a point where it's

3    shorter than that.  So this is the big witness; four hours

4    total.  All right?

5    Now, obviously, if it's not getting repetitive, then

6    let me tell you.  The one thing every juror says:  "Why do they

7    keep asking the same question 18 different ways?  Do they think

8    we're stupid?"  They can't stand it.

9    And if it's something that's not sexy, which this

10   isn't going to be, they are really not going to be happy.

11   So, you know, if that means we're talking two and a

12   half hours to three hours for the direct, usually cross is

13   shorter, usually.  Hour, hour-and-a-half cross.  That's what

14   you need to look at for that main person.

15   All other experts, I would look at an hour and a half

16   to two hours on the direct, with no more than an hour on the

17   cross.  So you're talking about maximum three hours on

18   everybody else.  If this person is as big as you all say, I'll

19   give you another hour for the person.  I need you to try to

20   stay within those confines.

21   I am not going to, you know, by the second look at my

22   watch and say, "Okay.  That's it.  You're done."  But I will

23   bring you to the side and say, "Somebody needs to wind it up

24   because this is painful."  And I'll tell you.  All right?

25   Because I will look -- I am very in tune to my juries, and I

 1    will watch them.

 2          And if I am hearing repetitive questions -- and I

 3    expect the objections.  Okay?  Not to be, you know, disruptive,

 4    but I do expect if somebody is asking the question for the

 5    fourth time, I expect objections.

 6          Or I might say, "Asked and answered sustained."  No,

 7    if it gets to be at that point.  I mean, I like hearing -- I

 8    love litigation.  I love hearing good litigators, and I expect

 9    to hear it from you.  But if it's just getting painful, I will

10    shut it down.  All right?

11          Okay.  So that's all I ask.  I wouldn't plan for

12    somebody to be on a day.  Plan for them to be on a little bit

13    shorter.  That's all I'm saying.  Okay?

14          Maybe even try to break it up so you have some really

15    short witness start out; then you have your person -- your big

16    expert start.  Then we have a break for lunch; then he

17    continues.  So at least we have two people maybe on that day.

18    I would ask you to try to mix it up like that so then maybe

19    they're on for four hours, four to four and a half hours, but

20    it's a split in the day, something like that.  Okay?

21          MR. CARDEN:  I think, actually, with Mr. Thomas, your

22    Honor, we were probably planning to split him between two days.

23    Just looking at the schedule, we thought he would probably

24    start out --

25          THE COURT:  Oh, start out in an afternoon, then go

1    to --

2              MR. CARDEN:  Finish in the morning.

3              THE COURT:  Yeah, that helps.  But even then, though,

4    they do notice.

5              MR. CARDEN:  Yes.

6              THE COURT:  That split doesn't totally absolve you of

7    it.  But that definitely helps with the schedule, yes.  That

8    definitely takes the pain out of it, yeah.

9              All right.  Anything -- any other witnesses that CQG

10   has that you were expecting to be extremely lengthy or you need

11   to warn me about now so I can give you some time parameters?

12             MS. WYTSMA:  I don't anticipate any other witness

13   lasting four hours.

14             THE COURT:  Okay.

15             MS. WYTSMA:  Probably would be surprised if any lasted

16   more than two to three hours.

17             THE COURT:  Okay.  Well, I'll be watching that too.

18   All right.

19             Is there anything else that needs to be brought up

20   from TT?

21             MR. GUMINA:  We have a couple of issues, your Honor.

22             THE COURT:  Mm-hmm, please.

23             MR. GUMINA:  One has arisen -- well, one is arising,

24   and one has arisen.

25             We anticipate that there will be some significant

1  cross-examination of some of our witnesses using exhibits that

2  were not previously disclosed to us.  Okay?  I mean, we have

3  the documents undoubtedly, but we're not going to know what

4  documents they're going to use in cross-examination.

5          THE COURT:  Oh.

6          MR. GUMINA:  Okay?

7          THE COURT:  Mm-hmm.

8          MR. GUMINA:  Some of these exhibits very likely will

9  be objectionable to us on multiple levels.

10         And since the Court doesn't -- has indicated you don't

11 like sidebars, and we won't have an opportunity to resolve

12 these objections the morning of the examination, my question

13 is, how would the Court like to deal with that?

14         THE COURT:  Why not?

15         MR. GUMINA:  Because we won't know what exhibits

16 they're going to use.

17         THE COURT:  Why not?

18         MR. GUMINA:  We won't know how to deal with them.

19         THE COURT:  Why not?

20         MS. WYTSMA:  Parties have agreed that we will disclose

21 exhibits being used by the calling party at least 72 hours in

22 advance or, actually, 7:00 three days out.  But until we know

23 the scope of what their testimony is, we may not use any

24 documents with them or we may use -- you know, I just -- it's

25 hard to know.

1          THE COURT:  Okay.  I get the point.  But, on the other

2     hand, this case is such a paper case and there's so much paper

3     and you all know the paper that to me there's no reason to be

4     able to give them a general -- of the documents they have

5     provided you with for the direct, if there are some other than

6     that, and, you know, that you can at least point them to on the

7     day of that witness, that morning, then the Court wants you to

8     point it out -- all right? -- before court starts that day.

9          MR. GUMINA:  So we can deal with them that morning?

10          THE COURT:  So we can deal with them that morning.

11    All right?

12          MR. GUMINA:  I'm going to let Steve handle the other

13    one.

14          THE COURT:  All right.  Thank you.

15          But, in other words, basically, again, just again

16    asking you to be civil.  So all agree to the 72-hour window,

17    which is fantastic, and then all the Court is saying is either

18    the night before, when you leave that evening -- you know

19    you're calling whoever the next day or they're calling them --

20    that you say, "Okay.  Well, yeah.  We were planning on, you

21    know, using this other set of documents that you all aren't

22    talking about in cross."  And then you all can address it with

23    me in the morning.  Okay?  So at least the night before or

24    that -- early that morning -- all right? -- or by e-mail or

25    however you do it.  Okay?

1          Yes, Mr. Borsand.

2          MR. BORSAND:  Okay.  This relates to an issue that

3    we've been conferring on, and it's narrowed some, but that

4    whole issue I raised with you before about the 282 notice with

5    the 400 references and trying to get them to tell us what prior

6    art that they may rely on for whatever they're going to do as

7    state of the art.

8          And now I think we've settled -- you know, they've

9    given us what they say is their exhaustive list of 54 items,

10   just we've raised some objections to some of those that we're

11   going to have to be raising with you.

12         But one issue that's come to a head on this that I

13   think we have not agreed after a conferral today that I was not

14   in, but this is what was reported to me, is that we believe

15   some of the stuff they're intending to use, or maybe that

16   they're saying they may use, we dispute that either the

17   functionality of it or whether it was really ever even

18   available.  And these were things that were battled quite

19   intently in other litigation.

20         And so the concern I have is that even though they're

21   not putting on a 102/103 defense in the case, which they bear

22   the burden of -- burden on, they also -- when you make a

23   102/103 defense, you also bear the burden on establishing how

24   things work, if it was a dispute or whether it qualifies as

25   prior art, whether it was really available.

1      So the concern we have is that -- you know, and

2   normally in a case where they have the burden, we -- like in

3   the *eSpeed* case, we had a short rebuttal case to rebut some

4   things that we hotly contested.

5      If they go to some of these areas, we have a concern

6   about possibly the need for some rebuttal if, you know, it

7   can't get handled right there on the fly and, you know,

8   redirect and whatever.

9      So that's an issue.  We've raised this with the other

10  side.  They, of course -- they don't agree, so we're at

11  loggerheads on that.  I wanted to let you know --

12      THE COURT:  So basically, cutting to the chase, you're

13  just saying, "We may be requesting rebuttal witnesses."

14      MR. BORSAND:  Right.  And it would probably be, like,

15  from an expert like Mr. Thomas.

16      THE COURT:  I won't be giving you an answer about that

17  until I hear the evidence and decide whether you get a

18  rebuttal.  You can ask all you want.

19      MR. BORSAND:  Right.

20      THE COURT:  I'll tell you, out of 18 years on the

21  bench, I think I've allowed one rebuttal witness.

22      MR. BORSAND:  So in just the context, though, in

23  patent cases, where a prior art --

24      THE COURT:  And I understand.  If all of a sudden

25  there's an issue that ends up being their burden that they

264

1    bring up and you need to rebut it, the Court understands.

2         MR. BORSAND:  Okay.  And, you know, we're in a weird

3    pickle here, which is it's kind of ironic that in a case that

4    really there was a 102/103 defense, we would know all the

5    details.  We would have had depositions of their expert.  We

6    would know everything they're saying.

7         And we -- now we're going into this case not really

8    knowing because it's not a defense, which is kind of -- it

9    seems backwards in a case where the issue isn't front and

10   center.  We should probably know more about it.

11        THE COURT:  Are you asking that they make it front and

12   center?

13        MR. BORSAND:  No.  But I'm saying so that's our

14   problem.  That's our problem.

15        THE COURT:  Then I think we need to leave it alone.

16   Right?

17        MR. BORSAND:  Okay.

18        THE COURT:  I will listen to it again.  You guys,

19   like, overprepare sometimes, I think.  All right.  But yes.

20        Go ahead, Counsel.

21        MR. GARNETT:  Maybe address that briefly.  I think

22   what Mr. Borsand is referring to are documents that are

23   associated with the patents and their prosecution before the

24   United States Patent Office.  Those documents are part of the

25   file history.  They're part of the official record from the

1    United States Patent Office.  They were produced to us by their

2    side.  They're part of the reexamination.  They were part --

3    some of them were probably part of the original prosecution

4    history.

5            There's no issue whatsoever that these documents are

6    authentic and that these documents were referenced by the

7    United States Patent Office.

8            We should probably just move the entire file history.

9    When I mean that, I mean from the date of the provisional

10   filing until today.  Anything that was submitted to the patent

11   office and that the patent office made of record and that you

12   can get from the patent office, there's no doubt that that is

13   an authentic document.  We should just move those into

14   evidence.

15           We might raise some of those publications that are

16   part of the United States Patent Office official record.  If

17   they want to cross the witness on those documents, they're free

18   to do so.  I don't think there's a need for a rebuttal case,

19   but I agree with your Honor.  If there's something that you

20   think they should rebut, that's fine.

21           But I think if we just move those documents into

22   evidence, preadmit them, I see no problem then.  I don't think

23   we'd have a problem in the mornings talking about these

24   documents before the witness goes on.  Whether they're revealed

25   or whether they're not, they already know what those documents

1    are.

2          Mr. Borsand was involved in submitting most of those

3    documents to the United States Patent Office.  There's no

4    surprise here.  They've known about them; they produced them to

5    us.  I see no issue whatsoever with respect to any of these

6    documents.

7          And we don't care if they're prior art.  If

8    Mr. Borsand wants to question a witness about them and bring up

9    the fact about they're not prior art, that's fine with us.

10   These are state of the art documents, so around the time of the

11   invention.  It can be after the conception date; it can be

12   before the conception date.  It doesn't matter.  It all goes to

13   an argument that we've already raised with your Honor about

14   state of the art and how that relates to their allegation that

15   their invention is pioneering.

16          MR. BORSAND:  Real quick.

17          MR. GARNETT:  Thank you, your Honor.

18          MR. BORSAND:  He jumped ahead to the issue -- the

19   other issue we have that we didn't apply -- put a motion to you

20   on.  But we don't agree with everything he says there.  The

21   file wrapper, what he's talking about, the bulk of it is in the

22   reexams where literally the truck was backed up to the patent

23   office with all sorts of materials from this -- the *eSpeed* and

24   *GL* litigation.

25          And it includes all sorts of stuff that absolutely are

1   not necessarily authentic.  There's huge disputes over whether

2   they were really legit documents.  There's things there related

3   to the Walter Buist/RCG debacle.  There's expert -- there's

4   contentions, interrogatory responses, stuff that's not

5   evidence, and even documents that are -- were seriously

6   questioned as to whether they were authentic.

7        So it's not as simple as he's saying, and we were

8   going to address -- we weren't -- I wasn't intending to bring

9   that issue to a head with you today.  But it's not exactly --

10   what we -- the only thing you know from the file wrapper is

11   whatever that material was.  The patent examiner or the

12   reexamination examiner, whatever they checked that they looked

13   at and considered they don't necessarily endorse as legit, that

14   it's authentic; they looked at it and considered it.

15        But that doesn't mean it's, like, an authentic

16   document at all.  In fact, they were given things that were

17   hotly in dispute out of caution because they were being raised

18   by parties in litigation.  And basically if we wouldn't have

19   done that, we would have been accused of withholding

20   information from the patent office.

21        THE COURT:  Well, isn't it true that evidence can

22   be -- I mean, there's evidence can still be hotly contested,

23   but it's still admitted into evidence and then --

24        MR. BORSAND:  Some --

25        THE COURT:  -- and then it's up to the jury or the

1    trier of fact to determine whether or not it should be relied

2    upon in making -- reaching a decision.

3        So I guess the question I had when I heard this

4    magnanimous offer to just bring in everything is just

5    basically, well, even if I were to do that, that doesn't mean

6    that -- so then you don't have an admission based on

7    authentication objection, but you may have a relevance

8    objection, or you may have some other.

9        MR. BORSAND:  Hearsay.

10       THE COURT:  Just because you have -- but if it was

11   part of a file that was considered by a trier of fact, it is

12   part of the court file, which sounds sort of like, what, the

13   case file?  Is that what you're saying, Counsel --

14       MR. GARNETT:  Your Honor --

15       THE COURT:  -- in the patent?

16       MR. BORSAND:  It wasn't --

17       MR. GARNETT:  -- first of all, we don't expect --

18   first of all, all of those materials, every single one that we

19   intend to use Mr. Borsand submitted to the United States Patent

20   and Trademark Office.  His law firm did that.  They are prior

21   publications or post-invention publications around the time

22   of --

23       THE COURT:  Mr. Garnett, I'm going to stop you right

24   there because if that's the case, show them to him; let him

25   know which ones they are.  And then I'm assuming that will

1    quiet him.  If he gave them all to you, then who is he to argue

2    that they aren't legitimate?

3         MR. GARNETT:  We did, and it hasn't quieted him.  But

4    he well knows that if I brought the patent with me, I could

5    show you.  There's a list of something called other

6    publications right at the back of the reexamination

7    certificate, attached to the patent, and it's just a list of

8    publications that Mr. Borsand and his firm submitted to the

9    patent office that he deemed in an IDS, information disclosure

10   statement, that were relevant to the process of examining that

11   patent application.

12        Those are the documents we want to use because those

13   show the state of the art at the time.  If Mr. Borsand wants to

14   contest -- which is what he says, hotly contest it.  If he

15   wants to contest they're not prior art, let him.  I'm not

16   offering them as if they were prior art.  I really don't care

17   whether they're prior art or not.

18        They are state of the art evidence that we want to use

19   to show what the state of the art looked like.  And they are

20   representations made by the patentee to the patent office,

21   submitted to the patent office in the information disclosure

22   and relevant to the patentability of that patent, relevant to

23   the state of the art for that patent.

24        MR. BORSAND:  It's --

25        MR. GARNETT:  That's all they are.

1          MR. BORSAND:  It's --

2          MR. GARNETT:  And that's all we want in.  It's public

3     record.  I can't imagine --

4          MR. BORSAND:  It's --

5          MR. GARNETT:  -- why there's any authenticity issue

6     with respect to those documents.

7          THE COURT:  There's a difference between authenticity

8     and relevant info.

9          MR. BORSAND:  There's a host of issues, again, that we

10    were going to prepare a short motion on to deal with it because

11    he's not being complete here.  But, for example, one of the

12    things he's referring to is a full deposition transcript of a

13    person.  There's hearsay.  There's all sorts of issues.

14         And what he's saying is not accurate.  When you submit

15    thing in an IDS to the patent office, it's done under the law

16    in the forms, with a blatant disclaimer that there's no

17    admission whatsoever about what any of this is, whether it's

18    authentic or anything.  It's done under a procedure at the

19    patent office because of their duty-to-disclose rules of

20    anything you may know about that may have been thrown or

21    alleged at you.

22         THE COURT:  Well, you do understand --

23         MR. BORSAND:  And so we're whittling down our issue --

24         THE COURT:  Okay.  Counsel, you do understand --

25         MR. BORSAND:  -- and your list of lists.

1   THE COURT:  -- too that even matters that are allowed

2   into evidence don't necessarily go back to the jury.  You do

3   understand that.

4   MR. BORSAND:  Right.  I understand.

5   THE COURT:  All right.

6   MR. BORSAND:  So what --

7   THE COURT:  Just so we're not all, "Oh, so the jury

8   gets all this."

9   MR. BORSAND:  Right.

10  THE COURT:  No, that's a whole separate issue of what

11  the jury actually gets --

12  MR. BORSAND:  We're --

13  THE COURT:  -- about what's admitted into evidence.

14  MR. BORSAND:  We're focusing in from their list on --

15  we're checking them -- and I think we've told them about a few

16  already -- but on the ones that we are concerned about that

17  we'll raise an issue on.

18  MR. GARNETT:  Your Honor, if I could just briefly.

19  And I know this is dragging on.

20  We are not and have not identified deposition

21  transcripts --

22  MR. BORSAND:  Yes, you have.

23  THE COURT:  Wait, wait.  Excuse me.  Don't do that,

24  please, Mr. Borsand.

25  MR. GARNETT:  We have not.

1          And if deposition transcripts and interrogatory

2     responses are something that we identified, we're happy to take

3     them up.

4          But we're talking about publications related to

5     trading screens that were submitted to the United States Patent

6     Office by the patentee.  I've been doing patent law for

7     20 years.  I've never had the opposing side ever once dispute

8     the authenticity of references submitted in an information

9     disclosure to the patent office and say they're not admissible.

10          It just -- I'm sorry, but it floors me.

11          THE COURT:  You know what I'm going to do?  And, you

12     know, there's firsts for everything.  So what I'm --

13          MR. GARNETT:  That's right.  You're right.

14          THE COURT:  -- going to do, though, is allow you to

15     either put it in writing, and you can have it in writing -- and

16     it's something that doesn't have to come up Wednesday.  You can

17     put it in writing, or you can do it on sort of an as-needed

18     basis, that each -- in the morning, if you find out what the

19     evidence is.

20          But, again, what I'm going to caution you -- and

21     that's both sides -- once we get into this trial -- first of

22     all, a couple of things.  You can make your arguments, and that

23     will be it.  There will be no interrupting each other, no

24     talking to each other.  And so this Court will control this

25     trial.  All right?

1    But the other thing is if you start making objections

2   about certain pieces of evidence -- and there's a lot for both

3   sides to have, and you all are drawing sometimes from the same

4   trough.  What's good for the goose.  That's all I'm going to

5   say.

6    So if you start arguing about, "Oh, we don't want

7   something in," you'd better have all your ducks in a row

8   because if all of a sudden you want something in from that same

9   place, I'm going to -- it's not even going to be a question.

10  Okay?  Whoever brings up the objection stands by it.  They're

11  fussing about somebody else's something or trying to get

12  something else in, I'm going to rule the same way, and there

13  will be no further discussion on it.

14   That's a warning.  Okay?  A friendly one, but it is.

15  I will stick by that.  All right?  We have too much work to do

16  in this case to keep spinning our wheels over the same issues

17  flipped around.  All right?  So if you all can come to some

18  agreement or agree to disagree, I suggest that you do.

19   If it's something that's overencompassing and it might

20  have something in it that really gets somebody upset, then

21  maybe we don't let the whole thing in and you take it piece by

22  piece.  But we'll see how it goes.

23   But I'll wait for either the written motion -- and if

24  they file one, you have two days to get your answer in, your

25  response in to that.  Maybe reply will be allowed on this

1    motion if one happens, or you can bring it up at a later time.

2    All right?  Thank you very much on that.

3              MR. GARNETT:  Appreciate it.

4              THE COURT:  Anything else from TT?

5              MR. GUMINA:  No.

6              THE COURT:  No?

7              Anything else from CQG?

8              MS. WYTSMA:  We have no further issues.

9              THE COURT:  All right.  It's ten after 3:00.  And we

10   will see you -- I'll be here tomorrow working, but, otherwise,

11   I will see you at 10:00 on Wednesday.

12             Thank you very much.  Stay warm, everyone.

13             MR. CARDEN:  Thank you, your Honor.

14        (Concluded at 3:08 p.m.)

15                   C E R T I F I C A T E

16        I certify that the foregoing is a correct transcript of the

17   record of proceedings in the above-entitled matter.

18

19   /s/ LAURA R. RENKE                        February 24, 2015
     LAURA R. RENKE, CSR, RDR, CRR
20   Official Court Reporter

21

22

23

24

25