**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Trading Technologies International, Inc., | Civil Action No. 05-CV-4811 |
| Plaintiff, | Judge Sharon Johnson Coleman |
| v. | Magistrate Judge Sidney I. Schenkier |
| CQG, Inc. and CQGT, LLC, | |
| Defendants. | |

**CQG'S MOTION FOR JUDGMENT AS A MATTER OF LAW
UNDER FEDERAL RULE OF CIVIL PROCEDURE 50(A)**

**INTRODUCTION**

After over two weeks of trial and the testimony of a dozen-plus witnesses, Trading Technologies International, Inc. ("TT") has not introduced legally sufficient evidence for the jury to find in TT's favor on its infringement, willfulness, or damages claims.

**LEGAL STANDARD**

"If a party has been fully heard on an issue during a jury trial and … a reasonable jury would not have a legally sufficient evidentiary basis to find for the party," the court may grant judgment as a matter of law. Fed. R. Civ. P. 50(a). A motion under Rule 50(a) "may be made at any time before the case is submitted to the jury." *Id.* TT's case-in-chief has closed, and, therefore, if TT has not established a sufficient evidentiary basis that a reasonable jury could find in its favor on one or more issues, judgment should be granted as a matter of law. *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1106 (Fed. Cir. 2003).

**ARGUMENT**

**I.     The Evidence Is Insufficient for the Jury to Find Literal Infringement[1]**

As the party with the burden of proof on infringement, TT "must show the presence of every [claim] element or its substantial equivalent in the accused device." *Demarini Sports v. Worth,* 239 F.3d 1314, 1322 (Fed. Cir. 2001); *see also Transclean Corp. v. Bridgewood Servs.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002) (infringement requires "a determination that every claim limitation or its equivalent be found in the accused device."). The evidence has shown a fundamental fact of this case: TT's patents are limited to a "static display of prices" or a "common static price axis", yet the price column in the accused order entry interface is not "static." Still, TT advances three theories of direct infringement:

---

[1] This motion does not address the Doctrine of Equivalents now that the Court has ruled the infringement theory is barred by prosecution history estoppel and collateral estoppel.

1. That CQG's DOMTrader products with a non-static price column nevertheless have a "static" column of prices when a user selects a price—so long as the jury disregards the moving prices in the market window pane;

2. That the price column in CQG's DOMTrader accused interfaces can be rendered static by manipulating the market window with six separate steps or by modifying an "ini" file—even though there is no evidence that anyone ever did so—and despite automatic movement at least once a day; and

3. That CQG's ChartTrader product has a static price column even though prices move automatically at least once a day.

TT's evidence is legally insufficient for any reasonable jury to find literal infringement on either theory.

### A. Evidentiary Failure

As a threshold evidentiary matter, TT failed to present any *evidence* of the accused software product itself. It failed to lay a foundation for a pivot table with data concerning the software. It failed to proffer any evidence of actual sales. And it failed to lay a foundation as to which versions of the software infringed.

### B. Price Select

TT has failed to establish any evidence of infringement because CQG's price column is dynamic, not fixed. TT's patents are directed to displaying market information related to and facilitating trading of a commodity being traded in an electronic exchange having an inside market with a highest bid price and a lowest ask price on a graphical user interface (or GUI).

Each of the asserted claims of the '304 patent includes a "common static price axis" limitation and each of the asserted claims of the '132 patent includes a "static display of prices" limitation (collectively, the "Static Limitation"). As construed by the Federal Circuit in *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, ("*eSpeed*"), the Static Limitation requires "price levels that do not change positions unless a manual re-centering [or re-positioning] command is received." 595 F.3d 1340, 1352-1355 (Fed. Cir. 2010); Jury Instruction Claim Construction Chart. This Court

found that "if there is movement, it must be by manual command as opposed to automatic." Jury Instruction Claim Construction Chart ("common static price axis" and "static display of prices").

Although TT has attempted to shoehorn CQG's technology into this Static Limitation, the evidence it has presented is insufficient to support its claim. CQG's price columns **do** change **without** any manual re-centering or re-positioning command; those columns move automatically. The fact that the inside market prices are moving at the top or bottom of the price column in a "market window" does not change this simple fact. No reasonable jury could find infringement of a static price column in CQG's products, because it simply isn't there unless you ignore the prices moving at the top or bottom of the price axis.

Further, no reasonable jury could find infringement because prices move automatically "out of the box" before a price is selected. Even after a price is selected, prices move automatically following cancellation of a working order whenever market conditions (*i.e.*, the inside market) require movement to keep the inside market prices visible.

### C. Manipulation of Market Window

TT has also theorized that CQG's products (sold before November 2010) infringed if a user were to follow six complicated steps that results in a "disabling of the market window." But TT failed to introduce any evidence that CQG's accused products and processes include the Static Limitation, even after manipulation of the market window for the reasons discussed above.

Moreover, TT failed to introduce evidence showing that anyone other than its own employee and experts ever manipulated the market window pane to create a static price axis. Nor did TT produce any evidence that anyone (other than its own employee and experts) ever manipulated an "ini" file to create a purportedly static price axis. Moreover, a product only infringes in a "mode" if it is *reasonably* capable of operating in an infringing mode. The steps necessary to create a purportedly static price window are not reasonable. Indeed, the testimony

of experienced traders establishes that no trader would ever take such steps. Moreover, in no way can the many steps necessary to manipulate the market window or disable the "ini" file be deemed a "mode."

Lastly, CQG has proven that the price column in the DOMTrader *always* moves automatically at least once a day during an "end of day" shift event. Similarly, no reasonable jury could find infringement because prices move automatically "out of the box" before a price is selected. Even after a price is selected, prices also move automatically following cancellation of a working order whenever market conditions (*i.e.*, the inside market) require movement to keep the inside market prices visible.

Based on the evidence at trial, no reasonable jury could find literal infringement based on manipulation of the market window or modifying the "ini" file.

### D. ChartTrader

Similar to the DOMTrader products, the price column in the ChartTrader products always moves at least once per day. This movement is not based on a manual re-centering or re-positioning command and is therefore automatic movement. Based on the evidence at trial, no reasonably jury could find literal infringement by the ChartTrader.

### E. Mr. Thomas' Opinions Are Based on the Wrong Claim Construction

Mr. Thomas' opinions at trial on alleged infringement are based on the wrong claim construction. Therefore, no reasonable jury could find infringement in this case. Instead of considering whether there is movement based on a manual re-centering or re-positioning command, as is required by this Court's claim construction, Mr. Thomas opined that any movement that is predictable is permissible movement. *See e.g.*, T. Tr. 614:1-3. He also opined that any movement that is within the control of the user, but not the result of a manual re-centering or re-positioning command, is permissible movement. *Id*. Because the only

4

"evidence" of infringement was introduced through Mr. Thomas, and because Mr. Thomas applied the wrong claim construction, no reasonable jury could possibly find infringement in this case.

## II.  The Evidence Is Insufficient to Support a Jury Finding of Indirect Infringement

"There can be no inducement or contributory infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation omitted); *see also Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement [.]").  TT has failed to establish any direct infringement as a matter of law (Section I, *supra*), and any claim for indirect infringement therefore also fails as a matter of law.  And even if it did, no reasonable jury could find indirect infringement because TT failed to show any intent to infringe, whether styled as inducement or contributory infringement.

### A.  The Evidence Does Not Support Infringement By Inducement

TT has presented no evidence to support an inducement claim.  "Whoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  Section 271(c), however, requires knowledge of the existence of the patent that is infringed and "induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011).  No reasonable jury could find for TT under this theory.  Although CQG was certainly aware of the patents, TT failed to present evidence that CQG possessed the requisite intent.  To the contrary, CQG obtained opinions of counsel which stated that its software products did **not** infringe.  The evidence cannot support a finding that CQG knew that its actions would induce infringement or that it recklessly disregarded such a risk.  This is particularly true as to TT's infringement theory

based on manipulation of the market window, as CQG had no knowledge that the software defect would create a static price ladder and immediately remedied the defect once discovered.

TT also failed to show that a third party directly infringed its patents. Particularly as to the manipulation of the market window, there is no evidence of any CQG customers using the DOMTrader in an allegedly infringing manner. Without a showing of direct infringement, there can be no inducement. Moreover, even if TT could show that a third party used CQG's products in an infringing manner (which it cannot), there is no evidence that CQG took any active steps to induce that infringement.

>    B.  **The Evidence Does Not Support a Finding of Contributory Infringement**

Nor has TT produced any evidence to support a theory of contributory infringement. "'Whoever offers to sell or sells . . . a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent' shall be liable as a contributory infringer." *Pharmastem Therapeutics, Inc. v. Viacell, Inc*., 491 F.3d 1342, 1356 (Fed. Cir. 2007) (quoting 35 U.S.C. § 271(c)). No reasonable jury could find for TT on this theory. CQG did not supply any product intending that it be used to infringe. To the contrary, CQG's products do not infringe at all, much less are they especially made or adapted to infringe TT's patents. Lastly, TT has not demonstrated that CQG's accused software has no substantial noninfringing uses. Indeed, Mr. Thomas testified at trial that the accused DOMTrader in the Integrated Client software has noninfringing uses.

## III. The Evidence Is Insufficient to Support a Finding of Willful Infringement

As an initial matter, the issue of willfulness need not be decided because its sole purpose is to allow a patentee to seek enhanced damages. But TT cannot seek enhanced damages, as it

did not seek a preliminary injunction in this case. *See Netscape Communs. Corp. v. Valueclick, Inc.*, 684 F. Supp. 2d 699, 728 (E.D. Va. 2010) ("when a plaintiff bases its claim of willful infringement on conduct occurring after the lawsuit's initiation, ordinarily it must file a preliminary injunction in order to receive enhanced damages for willful infringement").

But even if that does not bar TT from pursuing willfulness, TT has not provided sufficient evidence for a reasonable jury to find subjective willfulness, or for this Court to find objective willfulness as a matter of law.

Following the Federal Circuit's en banc decision in *In re Seagate Technology, LLC,* 497 F.3d 1360 (Fed. Cir. 2007), willful infringement requires evidence of objective and subjective recklessness. First, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id*. at 1371.[2] Because this step involves an objective assessment, the accused infringer's state of mind is irrelevant. *Id*. If and only if the patentee satisfies the objective prong, it "must also demonstrate that this objectively-defined risk … was either known or so obvious that it should have been known to the accused infringer." *Id*.; *see also Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.,* 682 F.3d 1003, 1006 (Fed. Cir. 2012).

"While the fact that an issue was submitted to a jury does not automatically immunize an accused infringer from a finding of willful infringement, the record developed in the infringement proceeding in this case, viewed objectively, indisputably shows that the question of equivalence was a close one, particularly insofar as equivalence 'requires an intensely factual inquiry.'" *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1337 (Fed. Cir.

---

[2] The objective recklessness standard represented a significant departure from prior precedent, which imposed a duty of care on a potential infringer to determine if its conduct infringed once aware of patent rights. *See Underwater Devices Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389-90 (Fed. Cir. 1983).

7

2009) (citing *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1381 (Fed. Cir. 2000)).

### A. The Evidence Does Not Support Objective Willfulness

The Court, not the jury, is the sole arbiter of the objective willfulness prong. *Bard*, 682 F.3d at 1006-08. And TT has produced no evidence that CQG had any reason to believe it infringed TT's patents, much less clear and convincing evidence of an objectively high likelihood of infringement. TT's own expert admitted that prices in the price column in CQG's products move, which proves that CQG's products do not have the Static Limitation. Ignoring that movement, as TT and its expert do, is simply not enough to meet TT's burden to show infringement.

CQG obtained two separate written opinions of counsel—one for each patent-in-suit. These opinions expressly concluded that CQG's products did not infringe because they did not contain a critical element of TT's patents—the requirement that all prices be static (*i.e.*, the Static Limitation). Given that the opinions contain the indicia of competency that courts routinely recognize when analyzing opinions of counsel, the objective competency of CQG's opinions of counsel is self-evident. And their competency is further bolstered by the Static Limitation (which underlies the ten-year-old opinions) forming the primary basis of CQG's current non-infringement defenses. Given the competency of the opinions and CQG's good faith reliance on them, any infringement by CQG (though there was none) cannot be willful as a matter of law, and it follows that TT is not entitled to enhanced damages under 35 U.S.C. § 285.

In addition to the evidence presented to the jury, the facts that TT never moved for summary judgment of infringement and that the '132 patent is subject to a Covered Business Method Review further negate any finding of objective willfulness. So, too, do the decisions of Judge Moran and the Federal Circuit, as well as district judges in this Court.

### B. The Evidence Does Not Support Subjective Willfulness

Even if TT could establish objective willfulness (and it cannot), there is still no reason to send willfulness to the jury because it has not established any evidence of subjective willfulness. Even if it meets the objective prong, TT must also meet the subjective prong, by demonstrated that the "objectively-defined risk … was either known or so obvious that it should have been known to the accused infringer." *In re Seagate,* 497 F.3d at 1371. TT has established no such evidence, much less evidence on which any reasonable jury could rely, to find subjective willfulness.

Moreover, as set forth above, CQG, after learning of TT's patents, secured an opinion of counsel for each asserted patent. The opinions were communicated to CQG management, who reasonably relied on them. When CQG learned of a defect that presented a risk of alleged infringement, it *immediately* fixed it. And significantly, copying is not at issue in this case.

Lastly, the fact that CQG's founder relied on astrology for certain litigation-related dates has absolutely no bearing whatsoever on whether CQG believed it infringed the asserted patents.

## IV. The Evidence Is Insufficient to Support TT's Damages Claim

A patentee that successfully proves infringement is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty *for the use made of the invention* by the infringer." 35 U.S.C. § 284 (emphasis added). A reasonable royalty is often determined through the lens of a hypothetical negotiation between the parties at the time the infringement began. *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1312 (Fed. Cir. 2011). But when small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product. *LaserDynamics, Inc. v. Quanta Computer*, 694 F.3d 51, 67 (Fed. Cir. 2012).

TT's damages theories are riddled with fundamental errors at every step. The reasonable royalty calculation reflects the product of two elements: (1) the royalty base, or "the revenue pool implicated by the infringement," and (2) the royalty rate, or the "the percentage of that pool adequate to compensate the plaintiff." *Cornell Univ. v. Hewlett-Packard Co.,* 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009) (Rader, C.J.).

At every step, TT's damages claim fails to tie a reasonable royalty to the use or value of the claimed invention. First, TT dramatically overstates its hypothetical "royalty base" by including transactions from interfaces not accused of infringement, and by failing to make any connection between executed trades and any specific patented feature. Second, TT includes in its royalty base unpatented features of CQG's accused products without satisfying the entire market value rule. And third, TT compounds its errors by multiplying its artificially inflated base by an artificially inflated royalty rate. The result, predictably, is a massively inflated damages claim of over $260 million—for a company that has generated just $3 million per year over the last decade.

### A. There Is No Evidentiary Support for Any Damages Theory.

TT failed to introduce any evidence showing sales of the accused software. It never laid any foundation for the pivot table from which the data used by its expert was obtained. Nor did it lay any foundation showing which software versions purportedly infringed. Thus, at the outset, TT's damages claim fails for lack of evidentiary support.

### B. There Is No Evidence to Support TT's Purported Royalty Base Under its So-Called "Applicable Trade Approach"

TT's calculations begin with a purported "royalty base" based on a so-called "applicable trade approach," which uses CQG's entire filled lots as the starting point. That is, all transactions made with all CQG products, regardless of whether the products are part of this case

should be included.  This approach is staggeringly overbroad.  It completely fails to distinguish between the CQG interfaces products accused of infringing and the CQG interfaces not so accused.  And even for CQG products that are actually accused in the case, it fails to demonstrate that the patented features (*e.g*., static price column) drive demand for all executed trades, rather than other features not at issue, without meeting the requirements of the entire market value rule. In other words, TT makes no showing at all that its "royalty base" has any connection to the patented features of an accused CQG product or that its invention drove demand for non-patented features or products.  To accept TT's analysis, the jury would have to conclude that damages may be assessed based on (a) the CQG interfaces not accused of infringement, and on (b) features of CQG products that TT has not established drive customer demand.  No reasonable jury could do that.

### C. There Is No Evidence to Support TT's Purported Royalty Rate

There is no legally sufficient evidence to support TT's claimed royalty rate.  Importantly, TT has not introduced a single piece of evidence to show that anyone *ever* agreed to pay a going forward royalty rate of more than 10 cents per filled transaction or that anyone actually paid minimum royalty payments.  Even if the settlement licenses admitted at trial are considered— and they should not be deemed probative or even admissible since signed under duress—they do not support TT's damages theory.  Nor does the *eSpeed* judgment entered by remittur—based on different evidence, against different defendants, based on different products, in a different case.

There is simply no legally adequate basis to support the royalty rate claimed by TT.  And this is true of the claimed minimum royalty payment as well.  Although three licenses (of almost thirty) contemplate a minimum payment, no one has ever paid a minimum royalty.  And no party has *ever* agreed to the excessive royalty payment demanded in this case.  Moreover, TT's expert

11

conceded that the minimum royalty payment applies to traders who *never* even used the accused software—a problem bearing on both the royalty base and rate.

TT has failed to present evidence sufficient to support its grossly excessive damages claim. To put its staggering damages claim in perspective, TT seeks every penny of profit CQG made during the damages period on *every single* product offered by CQG during that time—and a hundred-million-plus more.

## V. The Evidence Shows that The Patents are Invalid Under 35 U.S.C. § 112[3]

The patents-in-suit are invalid for lack of written description under 35 U.S.C. § 112 ¶ 1 because TT has asserted patent rights beyond the scope of what the patent specification discloses. In other words, the specification (i.e., the written description) fails to support TT's broad interpretation of its patent claims.

The written description requirement "ensure[s] fair play in the presentation of claims after the original filing date and [] guard[s] against manipulation of that process by the patent applicant. *PowerOasis, Inc. v. T-Mobile USA, Inc*., 522 F.3d 1299, 1306 (Fed. Cir. 2008). Section 112 also prevents a patentee "from later asserting that he invented that which he did not," *Agilent Technologies, Inc. v. Affymetrix*, *Inc*., 567 F.3d 1366, 1383 (Fed. Cir. 2009), and provides a safeguard against sweeping, overbroad claims that, if upheld, would "entitle an inventor to a claim scope far greater than what a person of skill in the art would understand the inventor to possess[.]" *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005); *accord PowerOasis*, 522 F.3d at 1306. Thus, if the full scope of the construed claims go beyond what is described in the specification, they are invalid under 35 U.S.C. § 112,

---

[3] CQG contends that the patents are invalid under Section 101 and will address that issue on appeal. But as it is a pure question of law already resolved by the Court, the issue is not addressed in this Rule 50 motion.

¶ 1.  *ICU Med., Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368, 1378-79 (Fed. Cir. 2008); *LizardTech*, 424 F.3d at 1346; *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158-60 (Fed. Cir. 1998).

According to TT, the Static Limitation covers both (1) price columns where all prices are static; (2) price columns where only some prices are static some of the time and where prices move in the column without a manual re-centering command.  Yet the specification only discloses a price column where all prices are static all of the time.  Because the inventors were not in possession of an invention where only some prices in a price column are static, or some prices in the price column are static just some of the time, as TT asserts, each of the asserted claims of the patents-in-suit lack written description support and are invalid under 35 U.S.C. § 112 ¶ 1 as a matter of law.

## CONCLUSION

The evidence does not support TT's claims.  They should be dismissed as a matter of law.

Dated:  March 16, 2015

Respectfully submitted,

By: /s/ Laura A. Wytsma
Adam G. Kelly
William J. Voller III
Christopher M. Swickhamer
John A. Cotiguala
LOEB & LOEB LLP
321 North Clark, Suite 2300
Chicago, Illinois  60654
(312) 464-3100 Telephone
(312) 464-3111 Facsimile

Terry D. Garnett (pro hac vice)
Laura A. Wytsma (pro hac vice)
Donald A. Miller (pro hac vice)
LOEB & LOEB LLP
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, California 90067
(310) 282-2000 Telephone

(310) 282-2200 Facsimile

*ATTORNEYS FOR DEFENDANTS
CQG, INC. and CQGT, LLC*

**CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing document has been served on all counsel of record via the Court's Case Management/Electronic Case Filing and/or electronic mail on March 16, 2015.

                                              By:  /s/ Laura A. Wytsma
                                                                       Laura A. Wytsma