UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRADING TECHNOLOGIES INTERNATIONAL, INC., | )<br>)<br>)<br>) |
| Plaintiff | ) Judge Sharon Johnson Coleman<br>) |
| v. | ) Civil Action No. 05 C 4811<br>) |
| CQG, INC., and CQGT, LLC, | )<br>) |
| Defendants. | ) |

**TT'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON INFRINGEMENT**

Pursuant to Rule 50 of the Federal Rules of Civil Procedure, TT moves for judgment as a matter of law on the issues of literal infringement, inducement of infringement, contributory infringement. Judgement as a matter of law is appropriate under Rule 50 if, in light of the entire record, no reasonable jury could find to the contrary. *McMillan v. Stoll*, No. 09 C 1622, 2012 WL 707117 at *1 (N.D. Ill. Mar. 5, 2012) (quoting *Schandelmeier v. Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011)). With respect to each of the issues, the evidence conclusively establishes that Plaintiff is entitled to judgement as a matter of law.[1]

**1.   LITERAL INFRINGEMENT**

Plaintiff has asserted that certain of CQG's products literally infringe the claims of the patents in suit. TT has put in evidence with respect to each claim term for the asserted claims, specifically claims 1, 8, 21, 25, 34, and 35 of the '132 patent and claims 1, 7, 16, 17, 22, 26 and

---

[1] TT previously moved for judgment as a matter of law with respect to CQG's 35 U.S.C § 112 written description defense. Dkt. 1163. To the extent necessary and appropriate, TT reasserts that motion and incorporates it by reference.

1

27 of the '304 Patent. *See* Trial Transcript 687 – 690 (Thomas). The parties subsequently entered a stipulation that the dependent claims rise and fall with the independent claims. Thus, only claims 1 and 8 of the '132 patent and claims 1 and 27 of the '304 patent need to be discussed. These claims are of two types – method claims and computer-readable medium (CRM) claims.

With respect to these claims, TT's infringement expert, Mr. Thomas, established the correspondence of each of the elements of the claims to the accused devices. *See* Trial Transcript 687 – 690 (Thomas). CQG, however, has only disputed the presence of the "static" element of the claims. There is no evidence in the record indicating that the remainder of the elements of the claims are not literally met.

The court has construed the claim terms "static line of prices" and "static display of prices" to mean:

> A line comprising prices levels that do not change positions unless a manual recentering or repositioning command is received, meaning if there is movement it must be by manual command as opposed to automatic and where a line of prices corresponds to at least one bid value and one ask value; and
>
> A display of prices comprising prices levels that do not change positions unless a manual recentering or repositioning command is received, meaning if there is movement it must be by manual command as opposed to automatic.

Nothing in the claim construction requires that every price in the line or display be static. Nor does the construction require that the entire price column on the display be static. All that is required for infringement is a mode of operation where there is a range of price levels that do not change position unless as a result of a manual repositioning or manual recentering command.

To literally infringe, the accused product must include each and every element of the claim. *See Sloan Valve Co. v. Zurn Indus., Inc.*, 2013 WL 6132598 at *8 (N.D. Ill. 2013) (citing

*Mas–Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998)). If a device meets all the elements of the claim in a single operational state, regardless of whether it can be operated in non-infringing states, it still infringes. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010).

TT has accused three CQG products of infringing literally – the CQG Integrated Client (CQGIC) (version Ranges 1-8), the CQG Trader, including WebTrader (CQGT/WT) (all version ranges but 9). Both CQGIC and CQGT/WT include a DOMTrader window having similar functionality, so the products can be dealt with together with respect to the DOMTrader. CQGIC also includes a ChartTrader window that has slightly different functionality, which is dealt with separately. Mr. Thomas, the only expert meeting the definition of a PHOSITA in this case, demonstrated that versions of the DOMTrader (in CQGIC and CQGT/WT) and ChartTrader (in CQGIC) literally infringe the asserted independent and dependent claims of the patents in suit. *See* Trial Transcript at 625:11-640:6.

With respect to the DOMTrader in CQGIC and CQGT/WT, TT has put forth two theories of literal infringement. Specifically TT has set out evidence with respect to two modes of operation of these products that literally infringe the claims of the patent in suit, both of which occur within the DOMTrader's Responsive Scale setting. The first is the Browse Prices Mode, *i.e.*, the DOMTrader with a price selected. The second is the Browse Prices Mode with the market window disabled.

**A.     Browse Prices Mode**

The evidence is undisputed that the DOMTrader can be operated in the Responsive scale, Browse Prices Mode, wherein it has a display/line of price levels that do not move (absent a manual command), regardless of where the inside market moves. Trial Transcript 625-626 (Thomas), 1547-48 (Shterk), PTX2871 at 10 (Korepanov). Mr. Thomas established the presence of a static display/line of price levels in the DOMTrader in the Responsive scale's Browse Prices Mode **[CQGIC Ranges 1, 7 and 8 PTX5605 and CQGT/WT Ranges 1 and 4 PTX 5606].** *See* Trial Transcript at 683-693 for the claims of the '304 patent and Trial Transcript at 693-697 for the claims of the '132 patent.

CQG appears to have two responses to this showing. First CQG argues that the appearance of a market window in the Browse Prices Mode makes the price column non-static. The facts do not support this conclusion. Even when a market window appears, the prices where the market window ***does not*** appear, *i.e.*, the zone of non-market window prices, do not move. As this Court has previously held, there is nothing in the claim construction that requires all prices to be static. Nor is there a requirement that the entire price column be static. All that is required is for there to be a range of price levels that do not move unless in response to a manual command. The DOMTrader meets this limitation regardless of the presence of the market window.

CQG also argues that Shift K (new day shift) takes the DOMTrader outside of the scope of the claims.[2] However, Shift K has no impact on the infringement analysis for two reasons. First, it happens when the exchange is in an out-of-session/closed state during a noninfringing mode of operation. Trial Transcript 651-652 (Thomas), 1923 (Mellor). Thus, Shift K has no

---

[2] Version ranges 1-4 of the DOMTrader did not have the Shift K functionality, as a result this response does not apply to them. *See* Trial Transcript at 653 (Thomas). PTX 5790.

impact on the modes of operation that do infringe. Second, it does not constitute automatic movement in any event because it is not completely outside the control of the user. In other words, Shift K is predictable and expected because a user will know when it will happen (unlike unpredictable and unexpected movement that results from changes in the inside market). Trial Transcript 625-626 (Thomas). As a result, Shift K does not impact the infringement analysis.

### B. Browse Prices Mode with Market Window Disabled

Mr. Thomas also established that the DOMTrader, in certain versions, can be operated in the Responsive scale, Browse Prices Mode with the market window disabled. In this operational state, in these versions, **[CQGIC Ranges 1-8, CQGT/WT Ranges 1, 3, 4, 8]** the price levels in the DOMTrader are static. Trial Transcript 649:7- 654:4 (Thomas). Mr. Thomas demonstrated that the appearance of the market window can be disabled in two different ways - (1) altering the order.ini files and (2) resizing the market window to be larger than the DOMTrader price scale. Trial Transcript at 640-654 (Thomas) *See also* Trial Transcript at 2003-04 (Prince), 2187, 2193-94 (Katin). The fact that the market window can be disabled in this manner was confirmed by multiple witnesses. *See id*. at 762-61(Burns), 1490-91(Shterk), 2003-04(Prince), 2187, 2193-94 (Katin), 2267-2269 (Schroeter) and PTX 2871 at 14-15 (Korepanov). Indeed the ability to resize the market window was in the accused product from 2004 to 2010, in version ranges 1-8. *Id*. at 1487, 1490 (Shterk), 2187 (Katin). With the market window disabled, the DOMTrader in the Browse Prices Mode operates in exactly the the same manner as the preferred embodiment in the patent.

There is no dispute that the products are capable of being operated in the market window disabled mode. Rather, CQG challenges whether the products are "reasonably" capable of

operating in the infringing mode. First, the case law is directed to capability, not reasonable capability. *Finjin, Inc. v. Secure Comp. Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (quoting *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991)) (emphasis added). Indeed this court has found that this is a fictitious distinction. Dkt 841 at p. 4. There is no challenge with respect to the capability of the products to operate in this mode. Second, despite CQG's effort to demonstrate otherwise, it is very simple to disable the appearance of the market window. Changing the "ini" file is as simple as changes a 1 to a 0 in a text file. Resizing the market widow is as simple as moving and clicking a mouse. These are not complicated procedures. Either can be accomplished in a negligible amount of time. Even if "reasonable capability" is somehow distinct from "capability," this is not a case of unreasonable product behavior. This functionality was easily discovered by Mr. Burns, Trial Transcript at 761-7622, and demonstrated by Mr. Thomas. *Id*. at 642.

### C. ChartTrader

Mr. Thomas also addressed the functionality of the ChartTrader window in CQGIC and testified that all versions of ChartTrader infringe when operated in the Responsive scale, Regular Scroll Mode. Trial Transcript 687-693 (Thomas). Again, the only challenge to infringement with respect to ChartTrader is Shift K. For the same reasons noted above with respect to the DOMTrader, Shift K does not take the ChartTrader outside the scope of the claims.

The record demonstrates that the products accused of literal infringement, including versions of CQGIC and CQGT/WT with the DOMTrader (all version ranges except range 9), and the versions of CQGIC with the ChartTrader (ranges 1-4A), literally infringe the asserted claims of the patent. The testimony with respect to the actual operation of these products is

6

substantially unrebutted. In each case, the DOMTrader can operate in a mode that has a line of comprising price levels which do not move unless a manual command is received. Claim 8 of the '132 patent and claim 27 of the '304 patent are directed to computer-readable medium containing operable computer code with the claimed functionality. As shown above, the CQGIC and CQGT/WT products in the noted ranges literally include the claimed functionality. Thus, when CQG makes, uses, sells, or offers to sell its software as stored on a computer-readable medium, it has committed acts of literal infringement with respect to these claims. 35 U.S.C. §271 (a). Similarly, claim 1 of the '132 patent and claim 1 of the '304 patent are directed to methods of placing a trade order for a commodity. Whenever CQG or its customers operate the accused products in one of the infringing modes, there is literal infringement of the method claims. *See*, e.g., Trial Transcript at 1994 and 2001 (Prince).

**2. INDIRECT INFRINGEMENT**

This Court should also enter judgment as a matter of law that CQG has committed acts of indirect infringement, namely induced infringement and contributory infringement. Such judgment is warranted because TT has definitively established each element necessary for liability under 35 U.S.C. §§ 271(b)[3], (c)[4].

**A.** **Induced Infringement**

---

[3] 35 U.S.C. § 271 (b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."
[4] 35 U.S.C. § 271(c) provides that "[w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

First, liability for induced infringement requires evidence that (1) CQG knew, or was willfully blind to the fact, that performing certain steps would infringe at least one of the TT patents, (2) CQG took affirmative steps to induce others to perform these steps, and (3) others did in fact perform these steps. *Cascades Computer Innovation, LLC v. Samsung Electronics Co. Ltd.*, 2015 WL 94117 (N.D. Ill. 2015); *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2065 (2011); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).

TT has established the first element through at least the testimony of Mr. Shterk, Mr. Mather, and Mr. Schroeter. For instance, Messrs. Shterk, Mather, and Schroeter testified that they were aware of the patents-in-suit before issuance as well as after issuance. Trial Tr. 1516:19 - 1518:25 (Mr. Shterk); 1662:25 - 1664:15 (Mr. Mather); 1670:6 - 1672:12 (Mr. Mather); 2238:3 - 2239:25, 2241:10 - 2242:4 (Mr. Schroeter). Further, Messrs. Mather and Schroeter testified that they were monitoring the progress of the patents-in suit through the *eSpeed* litigation, and particularly through claim construction. *Id.* at 1670:6-20 (Mr. Mather); 2251:23 - 2253:18 (Mr. Schroeter).

Additionally, it is generally undisputed that CQG was aware what functionality was allegedly infringing. Indeed, Mr. Shterk testified that "hover" was purposefully added to ensure that the user would get their price. *Id.* at 1532:7-10 (Mr. Shterk). Moreover, Mr. Shterk testified that market-window-disable functionality was eventually removed from the products because CQG personnel, including Mr. Shterk, considered it to be infringing. *Id.* at 1483:19 - 1484:9, 1558:20 - 1559:1, 1569:15 - 1570:9, (Mr. Shterk); PTX 191, 192. Notably, this is the same functionality that TT currently accuses of infringement. In view of this, it is undisputed that

8

CQG was aware of the patents-in-suit, since at least 2003. And TT has clearly established that CQG was aware of the particular functionality that would infringe the patents-in-suit.

Regarding the second element, it is also undisputed that CQG provides the allegedly-infringing software to customers. Numerous witnesses established that CQG sells the software, including witnesses that testified that they are current CQG customers. *Id.* at 392:17-22 (Mr. McDonnell); 692:3-10, 698:7 - 699:15 (Mr. Thomas); 1513:24 - 1514:2 (Mr. Shterk). Further, it is undisputed that CQG provides the mechanism by which customers obtain the allegedly-infringing software. Simply put, CQG provides a website and users download the software from that website. *Id.* at 1873:18-25 (Dr. Mellor).

TT has also adduced additional evidence that establishes the second element; particularly, through the testimony of at least Messrs. Shterk, Katin, Prince, and Mellor. For instance, Mr. Shterk testified that CQG provided user guides that explained how to use the product, which noted, *inter alia*, specifically how the various modes of the DOMTrader operate. *Id.* at 1540:10 - 1541:21, 1543:15-17 (Mr. Shterk). Mr. Katin testified that CQG software contained an .ini file, which enabled a user to put the software into a mode (*i.e.*, market-window-disabled mode) that CQG considered (and TT alleges) infringed. *Id.* at 2194:5-23 (Mr. Katin). And Mr. Prince testified that, as a CQG employee, he modified .ini files for customers. *Id.* at 2003:12 - 2004:2 (Mr. Prince). Additionally, Mr. Prince testified that, as a CQG employee, he described the Price Hold, or "Hover," functionality to customers and even witnessed customers using it. *Id.* at 2002:23 - 2003:11, 2006:22 - 2007:7 (Mr. Prince).

Accordingly, TT adduced sufficient evidence to establish that CQG took affirmative steps to induce others to perform the steps CQG knew would infringe the patents-in-suit, namely

9

providing customers with user manuals as well as in-person explanation and demonstration of the infringing functionality.

Finally, it is undisputed that customers used the product in allegedly-infringing modes. For instance, both damages experts rely on the Pivot Table, produced by CQG, which illustrates that several hundreds of thousands transactions have been entered using the allegedly infringing software. *Id.* at 889:20 - 890:20 (Mr. Sims); 2035:8-15 (Mr. Peterson). Further, this Court's adverse inference instruction[5] permits the finding of an even greater number of uses by end-users. Accordingly, TT and CQG have introduced overwhelming evidence of this third factor -- actual use of the product in allegedly-infringing modes.

In sum, TT has definitively established each element necessary for liability for induced infringement. As such, this Court should enter judgment as a matter of law that CQG has committed acts of induced indirect infringement.

### B. Contributory Infringement

Second, as recited in TT's proposed jury instruction, liability for contributory infringement requires evidence that: (1) CQG sells, offers to sell, or imports within the United States a component of a product, or apparatus for use in a process, during the time the '132 and '304 patents were in force; (2) the component or apparatus has no substantial, non-infringing use; (3) the component or apparatus constitutes a material part of the invention; (4) CQG was

---

[5] The Court's adverse instruction is as follows: "There was evidence that was requested from TT -- from CQG by TT, and at this time you are instructed that CQG failed to preserve the information from a data set called the customer experience logs. These logs contained information about both the disabling of confirmation windows and the selection or lack of a selection of a price by users in the accused products. Due to the failure to preserve by CQG, you may infer that the data would have been unfavorable to CQG's positions and favorable to TT's positions regarding the disabling of confirmation windows and the selection or lack of selection of prices by users in this case." *Id.* at 2008:6-16.

aware of the '132 or '304 patents and knew that the products or processes for which the component or apparatus has no other substantial use may be covered by a claim of the '132 or '304 patents or may satisfy a claim of the '132 or '304 patents under the doctrine of equivalents; and (5) that use directly infringes the claim. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. Case: 1:05-cv-04811 2012); *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1353 (Fed. Cir. 2010); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

As an initial matter, CQG supplies to its customers the DOMTrader and ChartTrader windows, each of which can be operated in at least one infringing mode of operation. The DOMTrader can be operated in the Responsive scale, Browse Prices Mode, with or without the market window disabled.[6] The ChartTrader can be operated in the Responsive scale, Regular Scroll Mode. Each of these is a basis for TT's assertion of infringement. The evidence at trial supports these allegations. For example, at trial, TT's expert Mr. Thomas established, on a claim-by-claim and element-by-element basis, that the DOMTrader and ChartTrader infringe the patents-in-suit. *See*, *e.g.*, '304 patent Claim 1 (Trial Tr. 683:21-689:16), Claim 7 (Trial Tr. 690:3-12), Claims 16-17 (Trial Tr. 690:13-22), Claim 22 (Trial Tr. 690:23-691:7), Claim 26 (Trial Tr. 691:11-22), Claim 27 (Trial Tr. 691:23-693:21); '132 patent Claim 1 (Trial Tr. 693:22-695:2), Claim 7 (Trial Tr. 695:20-696:10), Claim 24 (Trial Tr. 696:11-17), Claim 25 (Trial Tr. 696:18-23), Claim 8 (Trial Tr. 696:24-697:4), Claim 34 (Trial Tr. 697:8-17), Claim 35 (Trial Tr. 697:18-24).

---

[6] The Responsive Scale, Market Mode with Price Hold functionality is implicated by equivalents, and, if the Court grants TT's motion to reconsider on PHE (Dkt. No. 1176), then this mode should also be considered under the contributory infringement theory.

Further, the loading of the software on a customer's computer constitutes direct infringement of the CRM claims, and the use of the software is a direct infringement of the method claims. And CQG's customer's used the infringing features in the accused software. *See*, *supra* at n. 5 (Adverse Inference on Customer Experience Logs); Trial Tr. (Prince Testimony), 2001:8-2002:6 (indicating he used price select and hover functionality in the responsive DOM and saw other people use that functionality "quite often"), 2002:23 - 2003:2 (stating he described hover functionality to customers of CQG and they actually used that functionality), 2003:15-2004:24 (testifying that he altered INI files to change the default number of rows for customers to meet their preferences); Trial Tr. (Shterk Testimony) 1476:14-1478:20 (email chain discussing customer issue, recommendation to use price select and results of use in that mode). And, it is undisputed by CQG that DOMTrader and ChartTrader are non-staple articles of commerce. *See*, *e.g.*, Dkt 1179. Mr. Thomas went on to testify that CQG contributed to direct infringement by providing customers with the software. Trial Tr. (Thomas Testimony) at 700:12-15.

In addition, DOMTrader and ChartTrader are not capable of substantial noninfringing uses. The proper analysis begins by determining whether the specific hardware and software accused of infringement are "separate and distinct" from a larger product. *Fujitsu Ltd. v. LG Elecs., Inc.*, 620 F.3d 1321, 1330-1331 (Fed. Cir. 2010) (citing *i4i Partnership v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010)). For example, in *i4i Partnership*, Microsoft Word was held to be the larger product and XML Editor within Word was held to be "separate and distinct" from all other functions of Word such that contributory infringement was analyzed based upon the separable feature rather than the entire product. *Id*. Likewise, in *Fujitsu*, the

Federal Circuit treated the specific hardware and software that performs the infringing fragmentation processes as separate and distinct features. *Fujitsu Ltd.*, 620 F.3d at 1331. In the present case, the responsive scale in the DOMTrader and ChartTrader are individual modules that are part of CQG's larger Integrated Client ("IC") platform, and these modules are separate and distinct from the other functions of the IC for purposes of the contributory infringement analysis.

Further, in *Fujitsu*, the Federal Circuit held that it was of no consequence that a user could turn off the infringing features, because "when activated, the product is infringing." *Id*. The Court acknowledged that whether a user activates accused fragmentation functions in software is relevant to the extent of direct infringement, but does not establish substantial non-infringing uses and ruled that the fragmentation software does not have substantial non-infringing uses. *Id*. As noted above, TT's expert Mr. Thomas provided detailed testimony regarding infringing modes and he also testified to the following regarding CQG's responsive mode:

> **Q** **So taking this into consideration, in your opinion do the CQG products have a static price axis?**
> A Yes, they do.
>
> **Q** **Why is that?**
> A Because they function in such a way that there is a mode in which the price axis is static.
>
> **Q** **Do the accused products have a noninfringing mode?**
> A Yes, they do.
>
> **Q** **And could you describe to the jury what mode that is.**
> A In the DOMTrader -- well, in the accused products, that is known as the dynamic scale mode.
>
> **Q** **What mode in the accused products meets the construction of static?**
> A Okay. Now, that is called the responsive scale mode.

13

| | | |
|---|---|---|
| Q | | Okay. And with respect to DOMTrader, how do you put that product into that responsive scale mode? |
| A | | Well, there's a menu setting, and you can actually see it here. There's a menu setting where you can choose either one, responsive scale or dynamic scale. And, actually, the default mode, so to speak, the default setting is the responsive scale. So, well, if you just got the software and you opened it for the first time, it would be in the responsive scale. |
| Q | | Does the presence of the dynamic scale impact your opinion in any way? |
| A | | No, not at all. |
| Q | | And why not? |
| A | | Because it's just an additional mode. The fact is is that the responsive scale mode is there, and that's all you need. |

Trial Tr. (Thomas Testimony), 617:21-619:1. The foregoing evidence is analogous to *Fujitsu*. and for at least these reasons, TT has set forth sufficient evidence to prove contributory infringement.

### 3. CONCLUSION

For the foregoing reasons, TT respectfully requests that the Court enter judgment as a matter of law on the issues of literal infringement, inducement of infringement, contributory infringement

|  |  |  |
|---|---|---|
|  |  | Respectfully submitted, |
| Date: March 16, 2015 | By: | s/Cole B. Richter |
|  |  | Leif R. Sigmond, Jr. (ID No. 6204980) |
|  |  | (sigmond@mbhb.com) |
|  |  | Matthew J. Sampson (ID No. 6207606) |
|  |  | (sampson@mbhb.com) |
|  |  | Michael D. Gannon (ID No. 6206940) |
|  |  | (gannon@mbhb.com) |
|  |  | S. Richard Carden (ID No. 6269504) |

(carden@mbhb.com)
Jennifer M. Kurcz (ID No. 6279893)
(kurcz@mbhb.com)
Cole B. Richter (ID No. 6315686)
(richter@mbhb.com)
**McDonnell Boehnen Hulbert & Berghoff LLP**
300 South Wacker Drive
Chicago, Illinois 60606
Tel.: (312) 913-0001
Fax: (312) 913-0002


Steven F. Borsand (ID No. 6206597)
(Steve.Borsand@tradingtechnologies.com)
**Trading Technologies International, Inc**.
222 South Riverside
Suite 1100
Chicago, IL 60606
Tel: (312) 476-1000
Fax: (312) 476-1182


**Attorneys for Plaintiff,
TRADING TECHNOLOGIES
INTERNATIONAL, INC.**

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing TT'S COMBINED MOTIONS FOR DIRECTED VERDICT ON INFRINGEMENT was served on March 16, 2015 as follows:

***Via Filing Via this Court's CM-ECF System, which caused a copy to be served on all registered users and Via Email:***

***Counsel for CQG, Inc., and CQGT, LLC:***

Adam G. Kelly
Loeb & Loeb LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
akelly@loeb.com


William Joshua Voller III
Loeb & Loeb LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
wvoller@loeb.com


Laura A. Wytsma
Loeb & Loeb LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, CA 90067
lwytsma@loeb.com


s/ Cole B. Richter