# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Trading Technologies International, Inc., | Civil Action No. 05-CV-4811 |
| Plaintiff, | Judge Sharon Johnson Coleman |
| v. | Magistrate Judge Sidney I. Schenkier |
| CQG, Inc. and CQGT, LLC, | |
| Defendants. | |

# CQG'S MOTION FOR JUDGMENT AS A MATTER OF LAW
# UNDER FEDERAL RULE OF CIVIL PROCEDURE 50(B)

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

ARGUMENT ...........................................................................................................3

I.     TT Presented Legally Insufficient Evidence at Trial to Support the Jury's
Finding of Literal Infringement. .......................................................................3

    A.    TT Presented No Evidence to Show Infringement of the Method
Claims Under Any Theory of Infringement............................................6

         1.    TT Failed to Introduce Any Evidence that CQG Performed
Each Step of the Method Claims. ................................................7

         2.    TT Failed to Introduce Any Evidence that CQG Controlled or
Directed its Customers to Perform Each of the Method Steps. ..................8

    B.    No Rational Jury Could Have Found Infringement of CRM Claims
Because CQG's DOMTrader and ChartTrader Are Not "Reasonably
Capable" of Operating in a Mode. .........................................................10

         1.    The CRM Claims Are Drawn to Capability. .............................10

         2.    Neither the Browse Prices State, Nor the No Market Pane State,
Are Modes of Operation. ..........................................................11

         3.    The No Market Pane State Is Not a Reasonable Mode
of Operation. ..............................................................................15

             a.    Entering the No Market Pane State is Unreasonable and
Requires Significant and Unusual Alterations. .............16

             b.    TT Presented No Evidence at Trial That CQG Intended
for or Instructed Customers to Enter the No Market Pane
State. .............................................................................21

             c.    TT Presented No Evidence That Anyone Actually
Entered the No Market Pane State. ................................24

    C.    TT Failed to Prove that the DOMTrader or ChartTrader Satisfies the
Static Limitation....................................................................................26

         1.    Single-Click Cancellation Negates the Static Limitation in the
DOMTrader (Browse Prices & No Market Pane States)...........27

         2.    The New Day Event Shift in Prices—Shift K—Negates the
Static Limitation as a Matter of Law (DOMTrader and
ChartTrader)...............................................................................29

3.      Automatic Movement in the Market Panes Negates the Static
        Limitation (DOMTrader, Browse Prices State). ........................................30

4.      Automatic Movement Out-of-the-Box and Upon Start Up
        Negates the Static Limitation (DOMTrader & ChartTrader). ..................31

D.      The Jury Verdict Was Premised on Testimony that Contradicts the
        Claim Construction. ............................................................................................32

II.     There Is No Legally Sufficient Evidence to Support the Jury's Damages Award. ..........33

A.      Because TT Failed To Submit Any Evidence Tying Its Claimed
        Damages to Use of the Invention, Damages Should Be Rejected
        as a Matter of Law. ...........................................................................................36

        1.      TT Did Not Prove That a Static Price Ladder Drove Demand for
                Use of CQG's Integrated Client Software. .................................................36

        2.      TT Offered No Evidence That Any Trader Ever Manipulated
                the DOMTrader Order Entry Interface. .....................................................38

B.      The Jury's Royalty Base Reflects Errors Resulting From Incorrect
        Analysis, Double-Counting, and Faulty Math Based on TT's Changed
        Damages Claim Without the Benefit of Expert Testimony. .................................38

        1.      The Jury's Damages Calculation. .............................................................39

        2.      After the Court Eliminated the Doctrine of Equivalents
                from the Case, the 3.34 Ratio Used by the Jury Became
                an Invalid Data Point. ..............................................................................41

        3.      TT's Double-Counting Demonstrative .....................................................45

C.      There Is No Legally Sufficient Evidence to Support the Jury's
        "Minimum" Royalty Award. .................................................................................45

D.      There Is No Legally Sufficient Evidence to Support the Jury's
        Ten Cent Royalty Rate. .......................................................................................47

E.      The Jury's Royalty Award Cannot Be Deemed "Reasonable." .............................49

F.      The Damages Award Should Be Reduced as a Matter of Law .............................50

CONCLUSION ..................................................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amhil Enters. Ltd. v. WAWA, Inc.*,
   81 F.3d 1554 (Fed. Cir. 1996)...................................................................3

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
   709 F.3d 1348 (Fed. Cir. 2013).............................................................6, 8, 9

*Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*,
   555 F.3d 984 (Fed. Cir. 2009)...................................................................6

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993).............................................................................46

*Carter v. District of Columbia*,
   795 F.2d 116 (D.C. Cir. 1986).................................................................55

*Century Wrecker Corp. v. E.R. Buske Mfg. Co.*,
   898 F. Supp. 1334 (N.D. Iowa 1995).........................................................49

*Consolidated Cos. v. Lexington Ins. Co.*,
   616 F.3d 422,435-436 (5th Cir. 2010) .......................................................56

*Cornell Univ. v. Hewlett-Packard Co.*,
   609 F. Supp. 2d 279 (N.D.N.Y. 2009)................................................34, 37, 55

*D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*,
   692 F.2d 1245 (9th Cir. 1982) .................................................................56

*Ericsson, Inc. v. D-Link Sys. Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014)....................................................... *passim*

*Fantasy Sport Props v. Sportsline.com, Inc.*,
   287 F.3d 1108 (Fed. Cir. 2002)................................................................16

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010).......................................................6, 10, 11

*Garretson v. Clark*,
   111 U.S. 120 (1884).......................................................................33, 34, 35

*Golden Hour Data Sys., Inc. v. emsCharts, Inc.*,
   614 F.3d 1367 (Fed. Cir. 2010)..................................................................9

**Page(s)**

*Grain Processing Corp. v. American Maize-Prods. Co.*,
   893 F. Supp. 1386 (N.D. Ind. 1995) ...................................................................50

*Harper v. Albert*,
   400 F.3d 1052 (7th Cir. 2005) ..........................................................................3

*Henderson v. Sheahan*,
   196 F.3d 839 (7th Cir. 1999) ...........................................................................33

*Holmes v. West Palm Beach Housing Auth.*,
   309 F.3d 752 (11th Cir. 2002) ..........................................................................55

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010)..........................................................................49

*Intelligent Verification Sys., LLC v. Microsoft Corp.*,
   2015 U.S. Dist. LEXIS 43042 (E.D. Va. Mar. 24, 2015) ......................................34

*Johansen v. Combustion Eng'g, Inc.*,
   170 F.3d 1320 (11th Cir. 1999) ...................................................................55, 56

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999).......................................................................................46

*LaserDynamics, Inc. v. Quanta Computer*,
   694 F.3d 51 (Fed. Cir. 2012).................................................................33, 34, 48

*Lucent Techs., Inc. v. Gateway, Inc.*
   580 F.3d 1301,1318 (Fed. Cir. 2009)...............................................................25

*Lucent Techs., Inc. v. Gateway Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)..................................................................34, 41

*Massey v. Blue Cross-Blue Shield of Ill.*,
   226 F.3d 922 (7th Cir. 2000) ..........................................................................3

*Meyer Int'l Props., Ltd. v. Bodum, Inc.*,
   690 F.3d 1354 (Fed. Cir. 2012).......................................................................25

*Minks v. Polaris Indus., Inc.*,
   2007 U.S. Dist. LEXIS 47220 (M.D. Fla. June 29, 2007)....................................47

*Muniauction, Inc. v. Thomson Corp.*,
   532 F.3d 1318 (Fed. Cir. 2008).......................................................................9

# TABLE OF AUTHORITIES

Page(s)

*NTP, Inc. v. Research in Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005).............................................................6

*Ormco Corp. v. Align Tech, Inc.*,
463 F.3d 1299 (Fed. Cir. 2006)...........................................................6, 7

*Paymaster Techs., Inc. v. United States*,
61 Fed. Cl. 593, 2004 U.S. Claims LEXIS 211 (Fed. Cl. 2004)...........................48

*ResQNet.com, Inc. v. Lansa, Inc.*
594 F.3d 860 (Fed. Cir. 2010)........................................................34, 46

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995)............................................................33

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
607 F.3d 784 (Fed. Cir. 2010)............................................................16

*Southwall Techs., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995)............................................................3

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010)..................................................... *passim*

*Trell v. Marlee Elecs. Corp.*,
912 F.2d 1443 (Fed. Cir. 1990)..........................................................49

*Tronzo v. Biomet, Inc.*,
236 F.3d 1342 (Fed. Cir. 2001)..........................................................55

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)..................................................34, 47, 48

*Versata Software, Inc. v. SAP Am., Inc.*,
717 F.3d 1255 (Fed. Cir. 2013)......................................................15, 16

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)......................................................33, 34

*W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Research Assocs., Inc.*,
1990 U.S. Dist. LEXIS 15497 (D. Ariz. 1990)............................................49

*Zegers v. Zegers*,
458 F.2d 726 (7th Cir. 1972) ...........................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

35 U.S.C. § 284................................................................................................33, 36, 38

**Other Authorities**

Fed. R. Civ. P. 50(b) ...........................................................................................32, 37

**INTRODUCTION**

Although Trading Technologies International, Inc. ("TT") presented the jury with many colorful demonstratives, it failed to present legally sufficient *evidence* to support its infringement or damages claims. First, TT failed to prove that CQG actually performed the steps of the method claims. Second, TT failed to prove that CQG's Integrated Client or Trader software include reasonable modes of operation, necessary to support the infringement finding on computer readable medium ("CRM") claims. Finally, the testimony and admitted exhibits did not—indeed, as a matter of law could not—establish that CQG's Integrated Client and Trader software have a "static display of prices" or "static price axis" as required by the asserted patents, U.S. Patent Nos. 6,772,132 and 6,766,304.

As to TT's first infringement theory, the "Browse Prices" theory, it is undisputed that there are always at least two prices automatically moving at either the top or bottom of the single line or display of prices (*i.e.*, in the single price column) of the DOMTrader order entry interface. TT's suggestion that this is an "additional" feature to otherwise static prices in the line or display of prices is both legally and logically flawed. First, the patents do not require a graphical user interface where only some prices in a line or display of prices are static. The patents require an entirely static "line" or "display" of prices—the entire price column must be static. Yet, TT failed to controvert CQG's evidence that the DOMTrader interface includes a single price "line" or "display" or "axis." And at least two prices in that "line" or "display" of prices are always subject to automatic movement without any manual re-centering or re-positioning command. Although the two prices are located in what is sometimes called a "Market Pane," they are still part of the *one and only* price "line" or "display" in the interface. They are not an additional or separate feature.

TT's second infringement theory, the "No Market Pane" theory, required a user without instruction from CQG to exploit either a defect involving six illogical steps or change the content of a configuration (.ini) file (a complicated process) to prevent the Market Pane from displaying the critical inside market prices. Importantly, TT failed to show that any customer knew it was possible to prevent the Market Pane from being displayed using the defect or the .ini file. TT also failed to introduce any evidence that CQG taught its customers how to prevent the Market Pane from appearing. Instead, the evidence establishes that CQG did not know of the defect and that only its internal programmers used the .ini file for development purposes. Finally, independent traders insisted that no trader would ever want to use the distorted process that prevented the Market Pane from displaying the critical inside market prices because it required extra work and did not add value. In short, the No Market Pane theory is unreasonable.

TT also admitted that the DOMTrader interface when operating under either infringement theory and the ChartTrader interface was always capable of additional automatic movement contrary to the Static Limitation. For instance, TT admitted that the DOMTrader and ChartTrader line or display of prices automatically moved at least once a day at or about the time that the exchanges changed its calendar date. The DOMTrader line or display of prices was also capable of moving automatically during normal use of the trading software (*i.e.*, after a user cancelled a working order).

In short, there is no substantial evidence to support the jury's infringement finding. Indeed, the undisputed evidence precludes an infringement finding as a matter of law. But even if substantial evidence supported the jury's infringement finding (and it does not), there is no substantial evidence to support the jury's damages award.

Setting aside clear errors in the jury's calculations (in part attributable to TT's misleading demonstrative), TT failed to submit any evidence—let alone substantial evidence—tying damages to actual use of the claimed invention. Because TT failed to meet this threshold causation requirement, its damages award should be rejected altogether, or reduced as a matter of law to an amount that reflects actual use of the accused interfaces using the jury's royalty rate.

After three weeks of trial, TT failed to prove its claims with substantial evidence; the Court can and should ensure that the final judgment reflects this failure of proof.

## ARGUMENT

Judgment as a matter of law "is proper when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Harper v. Albert*, 400 F.3d 1052, 1061 (7th Cir. 2005). Based on the totality of the evidence, a court must determine whether the jury was presented with a "legally sufficient amount of evidence from which it could reasonably derive its verdict." *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000).

After over two weeks of trial, TT failed to present legally sufficient evidence for a reasonable jury to find literal infringement or the damages awarded in the verdict. As a matter of law, the Court should enter judgment of noninfringement. Alternatively, it should reduce damages to the maximum amount TT could seek for use of the claimed invention.

## I.    TT Presented Legally Insufficient Evidence at Trial to Support the Jury's Finding of Literal Infringement.

For literal infringement, TT bore the burden of proving the presence of every claim element in CQG's accused software. *Amhil Enters. Ltd. v. WAWA, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996) (noting literal infringement exists when a "properly construed claim reads on the accused device exactly"); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.

Cir. 1995) ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly.").

Both asserted patents have a "static" price column limitation. Ex. 1 ("Jury Instructional Claim Construction Chart"). In the '132 patent, the static limitation is the "static display of prices," defined as a "*display* of prices comprising price levels that do not change positions unless a manual recentering or repositioning command is received, meaning, if there is movement, it must be by manual command as opposed to automatic." *Id*. (emphasis added). In the '304 patent, the static limitation is the "common static price axis," construed in relevant part as a "*line* comprising price levels that do not change positions unless a manual recentering or repositioning command is received, meaning, if there is movement, it must be by manual command as opposed to automatic." *Id*. (emphasis added); *see also Trading Techs. Int'l, Inc. v. eSpeed, Inc.* ("*eSpeed*"), 595 F.3d 1340, 1352-1355 (Fed. Cir. 2010) (static limitation requires "price levels that do not change positions unless a manual re-centering command is received").

At trial, TT advanced three theories of literal infringement:

1. Under its "Browse Prices" theory[1], TT alleged that the DOMTrader interface has a "static" line/display of prices when a user selects a price;

2. Under its "No Market Pane" theory, TT alleged that the price column in the DOMTrader interface could be rendered static by manipulating the relative sizes of the DOMTrader and market pane with six separate steps ("Resizing Process") or by modifying an ".ini" file (".ini Modification"); and

3. Lastly, TT alleged that the price column in CQG's ChartTrader interface could be rendered static by only operating the interface in the so-called "regular scroll state."[2]

---

[1] TT refers to use of the DOMTrader interface with a price selected as the "Browse Prices Mode." CQG disputes that the DOMTrader includes any modes of operation other than Responsive and Dynamic. Tr. 618:4-20; 1810:15-18. But ultimately it is irrelevant whether the Browse Prices state is a mode, because the column, line, or display of prices in the DOMTrader is never static when a price is selected.

[2] Like the DOMTrader interface, the ChartTrader interface does not include any modes of operation other than the responsive and dynamic modes. *Id*. at 1943:13-1944:2.

The jury agreed with TT that CQG literally infringed. Dkt. 1210 at ¶¶ 1-2. But in light of the Court's construction of "static," no rational jury could have found that CQG infringed the method claims or the CRM claims under any of these three theories.

Regarding the *method* claims (claims 1 of the '132 patent and '304 patent), TT failed to introduce *any* evidence that CQG personally used the accused DOMTrader or ChartTrader interfaces so as to perform each of the steps of the asserted methods. Nor did TT plead or introduce any evidence that CQG controlled or directed its customers to perform each of the steps of the asserted methods using the accused DOMTrader and ChartTrader software interfaces under any theory of infringement.

Regarding the *CRM* claims (claim 8 of the '132 patent and claim 27 of the '304 patent), TT failed to introduce any evidence that the DOMTrader and ChartTrader interfaces could reasonably operate in the alleged infringing modes of operation. Further, no rational jury could have found that the DOMTrader and ChartTrader are capable of meeting the static limitation of the asserted claims under the Court's construction. In particular, the DOMTrader and ChartTrader interfaces cannot satisfy the static limitation because: (1) in the DOMTrader's Browse Prices and No Market Pane states, cancellation of an order is not a manual re-centering or re-positioning command, yet cancellation permits future automatic movement; (2) in the DOMTrader's Browse Prices and No Market Pane states and in the ChartTrader, it is undisputed that movement associated with the afternoon new day shift (*i.e.*, Shift K) is automatic and unavoidable; (3) in the DOMTrader's Browse Prices state, there is always automatic movement in the top and bottom market pane portions of CQG's line or display of prices; and (4) in the DOMTrader's Browse Prices and No Market Pane states, prices in the line or display of prices are always dynamic out-of-the box and before selecting a price.

Finally, the jury's verdict was necessarily influenced by Mr. Thomas' advocacy of an incorrect claim construction in his infringement analysis. Tr. 613:20-614:24 (substituting predictability and control standards for the Court's binding claim construction). Because TT presented its infringement case through the wrong claim construction lens, this Court should set aside the jury verdict and enter judgment in CQG's favor on non-infringement.

## A. TT Presented No Evidence to Show Infringement of the Method Claims Under Any Theory of Infringement.

It is axiomatic that the "use of a process necessarily involves doing or performing each of the steps recited." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005). Thus, "[m]ethod claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use." *Ormco Corp. v. Align Tech, Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006); *Ericsson, Inc. v. D-Link Sys. Inc.*, 773 F.3d 1201, 1221 (Fed. Cir. 2014). The "reasonably capable" test applies "only to claim language that specifies that the claim is drawn to capability." *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009). Because method claims are drawn to actual operation and not capability, they are not subject to the reasonable capable test. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1203-04 (Fed. Cir. 2010) (contrasting method claims, which "required performance of each claimed step" to system and storage medium claims drawn to capability). To prove direct infringement of a method claim, "a patent holder must establish that an accused infringer performs all the steps of the claimed method, either personally or through another acting under his direction or control." *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013).

### 1. TT Failed to Introduce Any Evidence that CQG Performed Each Step of the Method Claims.

The record is devoid of any evidence that CQG actually performed any of the steps of the asserted method claims using the DOMTrader interface in the Integrated Client or Trader products or using the ChartTrader interface in the Integrated Client product. *See, e.g.*, *Ormco Corp.*, 463 F.3d at 1311 (infringement of a method claim requires performance of the steps of the claim, not the sale of software capable of infringing use). Indeed, TT failed to lay a foundation for or otherwise admit the Power Pivot table or Gateway Transactional data that it alleged evidenced the specific use of CQG's Integrated Client and Trader products, including the accused interfaces. Tr. 2472:11-12; 2477:18-25 (not admitting the Pivot Table as an exhibit). Without these databases, TT cannot possibly establish use of the products by CQG.

At best, TT introduced evidence that CQG developed the Integrated Client and Trader software, which includes the DOMTrader and ChartTrader interfaces. Tr. at 1464:3-21; 1467:5-6; 2186:15-19 (development of DOMTrader); *id.* at 1564:1-15 (development and retirement of ChartTrader). But Mr. Thomas' testimony that CQG uses and tests the accused software is insufficient because it is uncorroborated speculation devoid of any support. *See id.* at 698:11-13 (Thomas testimony).

While Mr. Glista, CQG's director of order routing (*id.* at 1805:14-1806:14), testified that he conducted hundreds of product demonstrations for customers (*id.* at 1807:15-25), there is *no* testimony that the demonstrations were conducted on a *live* exchange, as the method claims require. DTX0003 at col. 12, ll. 36-39, 42, 46-49, 53-55, 58-62, 63-64, col. 13, ll. 1-3 (method claim 1 of the '304 patent requires facilitating trading of a commodity being traded in an electronic exchange having an inside market, displaying indicators representing quantities from the exchange, interaction with a market, moving indicators in response to changes in the inside

market on the exchange, and sending a trade order to the electronic exchange); DTX0004 at col. 12, ll. 1-2, 8, 15-16, 21-26 (exemplary claim 1 of the '132 patent requires placing a trade order for a commodity on an electronic exchange having an inside market, displaying market depth of a commodity from the exchange, not moving the display of prices in response to a change in the inside market on the exchange, and receiving commands to send trade orders to the exchange). Thus, Mr. Thomas' testimony regarding CQG's alleged use and testing of the accused interfaces is conjecture, not substantial evidence.

Beyond these infirmities, Mr. Thomas' testimony is irrelevant to the No Market Pane theory, because there is no evidence supporting or suggesting that CQG actually operated the DOMTrader in the No Market Pane state using the Resizing Process or by .ini Modification. Tr. at 1830:3-10; 1831:4-16; 1831:24-1832:8; 1833:4-11; 1839:2-11, 15-17 (no use by CQG customer support); *id*. at 1497:20-1498:3; 1569:8-11; 1570:19-1571:4; 2193:7-19 (no use or knowledge by CQG product development); *id*. at 1816:9-24 (no use by CQG personnel that demonstrated the product).

Because TT failed to offer any evidence that CQG practiced any of the steps in the asserted method claims, this Court should rule as a matter of law that CQG did not infringe claim 1 of either patent.

### 2. TT Failed to Introduce Any Evidence that CQG Controlled or Directed its Customers to Perform Each of the Method Steps.

TT never pled or argued that CQG was liable as a direct infringer under a theory of divided infringement or vicarious liability. *See Aristocrat Techs.*, 709 F.3d at 1362 (vicariously liability for infringement of a method claim exists when a third party uses a method at the accused infringer's direction or control). For this reason alone, the Court should not consider any such argument by TT in reviewing the sufficiency of the evidence. *Compare* L.R. 2.2(e) ("If

alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described.") *with* Ex. 2 (Final Infringement Contentions) (no joint direct infringement theory).

For argument's sake, however, TT failed to offer any evidence that CQG exercised control or direction over any third party's performance of each step of the method claims. *Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1380 (Fed. Cir. 2010); *see also Aristocrat Techs.*, 709 F.3d at 1363 ("One party's direction or control over another in a principal-agent relationship or like contractual relationship operates as an exception to [the] general rule [that infringement of a method claim requires a single party to commit all of the required acts], but absent that agency relationship or joint enterprise, [there can be no] vicarious liab[ility] for another's actions."). In fact, TT failed to introduce any evidence that *anyone* ever used the ChartTrader interface. (Tr. at 1564 at 13-15) (no use). Nor did TT introduce any evidence that CQG's customers performed any of the steps of the asserted claims under a principal-agent or other contractual relationship. As the Federal Circuit found in *Muniauction, Inc. v. Thomson Corp.*, merely controlling access to CQG's system by virtue of its dissemination under license and CQG's dissemination of user guides containing instruction on how to use that software "is not sufficient to incur liability for direct infringement" of a method claim. 532 F.3d 1318, 1330 (Fed. Cir. 2008).

Having failed to put forth *any* evidence that CQG directed or controlled customers to perform each step of the claims under a principal-agent or contractual relationship, no rational jury could have found that CQG directly infringed method claim 1 of the '132 patent or method claim 1 of the '304 patent. Thus, this Court should rule as a matter of law that CQG did not infringe those method claims.

**B.      No Rational Jury Could Have Found Infringement of CRM Claims Because CQG's DOMTrader and ChartTrader Are Not "Reasonably Capable" of Operating in a Mode.**

The Integrated Client and Trader software accused of infringement had many components.  The Integrated Client product includes charting tools, market data tools, and APIs, amongst others, and (for an additional fee) order entry interfaces.  Tr. 2429:5-2430:11; 1202:3-22; PTX 1234.0027, 0031, 0042-45, 0107-124, 0190-200 (describing the non-infringing Order Ticket and Order View interfaces in Integrated Client).  Similarly, the Trader product includes various order entry interfaces.  PTX 1234.0027, 0031, 0042-45, 0201-205 (describing the non-infringing Order Ticket interface in Trader).  Of these many features, TT accused only the order entry interfaces of infringing.  But not all order entry interfaces, just two:  DOMTrader and ChartTrader.  And of these two, TT conceded that CQG's software could be operated in an entirely non-infringing dynamic mode.  *Id*. at 618:4-8.  But even when the DOMTrader is operated in an allegedly infringing responsive mode, the prices in CQG's line/display of prices move automatically without any user command.  And TT knew this.  So TT's long-time employee Mike Burns, as head of research and development for TT, looked for a way to manipulate CQG's software to create an infringement claim.  *Id*. at 732:5-7, 761:1-762:13, 767:14-18.  And after five years of litigation, TT claimed to have found two so-called modes of infringement:  the Browse Prices state and the No Market Pane state.  *Id*.  Yet, neither state is a mode and the No Market Pane state is entirely unreasonable.

### 1.      The CRM Claims Are Drawn to Capability.

Claims drawn to capability include limitations that are stylized as a component "for" performing some function.  *See Finjan*, 626 F.3d at 1204-1205; *Ericsson*, 773 F.3d at 1216. Here, TT's CRM claims are drawn to capability because they each recite a program code (*i.e.*, a component) for performing the various method steps (*i.e.*, a function).  DTX0004 at 12:54-13:17

(claim 8 of '132 patent); DTX0003 at 14:47-15:17 (claim 27 of '304 patent). Because TT's CRM claims are drawn to capability, CQG's accused products could be found to infringe only if they were "*reasonably* capable of satisfying [each of the] the claim limitation[s] [in a mode of operation]." *Finjan*, 626 F.3d at 1204 (emphasis added);

>### 2. Neither the Browse Prices State, Nor the No Market Pane State, Are Modes of Operation.

The Browse Prices state requires the selection of a price, which can be de-selected automatically in normal operation of the software (*e.g.*, Shift K and cancellation of a working order) or through a specific command to deselect (*e.g.*, pressing the escape key). Tr. 651:4-652:25; 1901:25-1903:14 (Shift K); *id.* at 1900:21-1901:17 (cancellation); *id.* at 639:2-22 (escape key).

The No Market Pane state requires a user to temporarily prevent the Market Pane from being displayed using one of two techniques: the Resizing Process and the .ini Modification technique. The Resizing Process requires a half-dozen steps involving intentionally selecting and unselecting prices, as well as re-sizing the Market Pane relative to the overall size of the DOMTrader. *Id.* at 717:5-718:4, 1905:11-21. And the .ini Modification technique requires locating a specific .ini file among many in a complex file structure associated with the Integrated Client product and then modifying that file.[3] *Id.* at 719:8-721:1; 2194:16-2200:15; DTX2345 (exemplary order.ini file).

---

[3] The .ini Modification technique was possible in Integrated Client from approximately 2004 to 2005 only. Tr. 2194:8-15. And it was never possible in Trader. Tr. 2200:22-2201:7. Accordingly, .ini Modification cannot support a finding of infringement for versions of Integrated Client after 2005. Nor can it support an infringement finding for any version of Trader. Thus, if this Court to find that the .ini Modification is a reasonable mode, but the Resizing Process is not a reasonable mode, then damages would necessarily be limited to 2004-2005 transactions.

Even under TT's view of "mode,"[4] neither of these states are "modes of operation."  At trial, TT's expert Mr. Thomas defined mode by reference to:  (1) an automatic car transmission with reverse, neutral, and drive modes; (2) a home thermostat with heating and cooling modes; (3) cruise control on cars with on and off modes; (4) smart phones with on and off switches for entering an airplane mode that turn off the phone's wireless antennas; (5) smart phones with on and off switches for entering and exiting start driving mode, which prevents text messaging so long as movement is detected.  Tr. at 617:4-20.  In describing these modes, TT displayed the following trial demonstrative.



PTX 5581.

---

[4] CQG disputes that a mode theory can be used to evade the Federal Circuit's permanency claim construction.  *See* CQG's Proposed Jury Instructions (Dkt. 1141) at 31; *eSpeed*, 595 F.3d at 1353-54 (permanency).

Implicit in this definition of mode are two requirements: (1) a mode is something that is entered and exited like a switch with well-identified and delineated on and off controls; and (2) normal operation of the software/device does not automatically cause the software/device to leave the selected mode.

For example, an automatic car transmission may have three different modes, but they are selectable by moving the shifter to a marked location in the shifting assembly. The shifter is a switch, which tells the transmission which mode is on and which modes are off. When the shifter is aligned with the N in the shifting assembly, then the reverse and drive modes are off and the neutral mode is on. *See id.* Similarly in the thermostat image in TT's demonstrative, the thermostat had a button that allowed the user to engage or disengage a "heat mode" like a switch. The same is true with the cruise control on a car. *See id.* The cruise control was either on or off, as determined by a single on/off button (*i.e.*, a switch). *See id.* And finally the smartphone images had on and off swipe or button switches to turn on or off the airplane mode (antennas on or off) and the start driving mode (text messaging on or off). *See id.*

Contrary to this definition of mode, the Browse Prices state and the No Market Pane state are not "modes" because the DOMTrader does not have a well-identified or delieneated switch for entering or exiting the state. Instead, entering the Browse Prices state requires selection of a price. Tr. at 639:2-22. But there may be tens of prices visible and selecting one of tens of prices is hardly the same as turning on or off a switch labeled "ENTER MODE." Similarly, entering the No Market Pane state is a complex process that also involves (among other things) selecting a price. For example, if the Resizing Process is used, a user must: select a price, cause or wait for the Market Pane to appear, resize the Market Pane to be large, deselect a price with an escape key to no longer show the Market Pane, shrink the DOMTrader to be smaller than the Market

Pane, and then reselect a price in the line or display of prices. *Id.* at 642:1-15; 1905:11-21. And entering the No Market Pane state by the .ini Modification technique requires navigating a complex file structure to locate one of many .ini files and then carefully modifying the file to replace a ":1" with a "0", saving the file, then restarting the software, and selecting a price. *Id.* at 718:8-721:1; 2194:16-2200-15; DTX2345. Like the Browse Prices state, CQG's software does not have a plainly labeled switch for entering the No Market Pane state.

Another common characteristic to TT's definition of "mode" is that the mode can only be exited purposefully and deliberately by way of the on/off switch. Normal use of the software or device does not cause the mode to exit. For example, depressing an accelerator pedal to accelerate one's car in a drive mode does not automatically cause the car to leave the drive mode and enter the reverse mode. Nor does use of a game application (*e.g.*, Tetris) cause an iPhone to automatically turn on its antennae and exit the airplane mode when a user has set the airplane mode to "on." In TT's definition of mode, an on/off switch is always required to enter and *exit* the mode.

But this definitional characteristic of mode is not found in either accused "mode,"[5] because each of the so-called accused modes requires selection of a price. And, de-selection of a price (which causes the software to exit the so-called "mode") can and does unavoidably and automatically occur through normal use of CQG's interfaces. For example, each day, whether a trader wants it or not, the DOMTrader and ChartTrader interfaces undergo an automatic de-selection of a price or order as part of the afternoon new day shift (called Shift K). *Id.* at

---

[5] While the Browse Prices and No Market Pane state are not modes, CQG's DOMTrader and ChartTrader is capable of operating in two modes: a responsive scale mode and a dynamic scale mode. These scales are "modes" under TT's definition, because they are selectable via a well-identified and delineated radio button in a settings menu. Tr. 618:4-16 (choose one of the scales). In other words, from the perspective of the user, a user enters and exits the mode purposefully via these radio buttons and not via normal operation of the software.

1901:18-1902:16.  Similarly, through normal use of the software, users may cancel an order that is "working" on the exchange.  *Id*. at 699:18-20 (TT admission that users cancel orders).  Mr. Thomas testified that orders are routinely cancelled and that the ratio of cancelled to filled orders may be as high as 100 cancels to 1 fill.  *Id*. at 700:2-10.  When a user cancels a working order with a price selected, the user *automatically* leaves the "mode," because the price is automatically de-selected.  *Id*. at 1900:21-22; 1947:4-5 (de-selection); *see Trading Techs. Int'l, Inc. v eSpeed, Inc.*, 595 F.3d 1340, 1354 (Fed. Cir. 2010) (a manual command can have automatic movement associated with it).

Because the Browse Prices and No Market Pane states do not meet TT's definition of "mode," judgment of non-infringement should be entered in favor of CQG as a matter of law.

### 3.     The No Market Pane State Is Not a Reasonable Mode of Operation.

As recognized in this Court's jury charge, claims drawn to capability "may be found to infringe if it is reasonably capable of satisfying the claim limitation" in that mode.  *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013) (an accused product "may be found to infringe [a claim drawn to capability] if it is *reasonably* capable of satisfying the claim limitation") (emphasis added); *see also* Tr. 2711:1-6 (jury charge).  But such a finding would have required evidence far beyond mere capability of infringing use with "significant alterations."  *Ericsson*, 773 F.3d at 1217 ("[O]ur case law supports finding infringement by a 'reasonably capable' accused device … where, as here, there is evidence that the accused device is actually used in an infringing manner and can be so used *without significant alterations*.") (emphasis added).

For example, in *Versata Software*, the defendant published instructions on how to use the claimed functionality in the software, and the defendant's expert testified that it would be "expected" and not unusual for defendant's customers to use that functionality.  717 F.3d at

1263. *Id.* In *Silicon Graphics, Inc. v. ATI Techs., Inc.*, the defendant's circuit and frame buffer were necessarily activated, and thus performed the infringing functionality, whenever they were connected to the Microsoft Windows operating system. 607 F.3d 784, 795 (Fed. Cir. 2010). In *Fantasy Sport Props v. Sportsline.com, Inc.,* 287 F.3d 1108, 1118-1119 (Fed. Cir. 2002), defendant's webpage material explained how to have the claimed position-specific scoring in an online fantasy sports league by creating different scoring configurations for each position using a wizard tool. 287 F.3d at 1118-1119. Lastly, in *Ericsson*, the accused device was "*actually used in an infringing manner and can be so used without significant alterations.*" 773 F.3d at 1217 (emphasis added).

Here, TT failed to introduce any evidence that (1) the DOMTrader could reasonably be used in the No Market Pane state without significant or complicated alterations; (2) CQG intended, instructed, or taught any customers to use the No Market Pane state; or (3) any customers actually used the No Market Pane State in the DOMTrader (other than TT's own employees and experts during litigation) together with all of the other features of the CRM claims. Indeed, the evidence at trial is that traders would not operate CQG's software in the No Market Pane state. Tr. at 1207:9-15, 19-22; 1214:6-9; 1856:17-24; 1860:20-23; 1861:7-24; 1862:13-16; 1863:4-8. As such, TT did not satisfy the "reasonably capable" infringement test and no reasonable jury could have found otherwise on the trial record.

### a. Entering the No Market Pane State is Unreasonable and Requires Significant and Unusual Alterations.

At trial, TT presented no evidence to establish that the Resizing Process or .ini Modification technique are "reasonable" uses of the DOMTrader. Both the six-step Resizing Process and the complex and obscure .ini Modification technique constitute "significant

alterations."  There was simply no evidence to support a finding that either technique was "reasonable."

The Resizing Process requires 6 steps:  (1) selecting a price; (2) displaying a Market Pane; (3) resizing the Market Pane to be relatively large compared to the size of the DOMTrader; (4) deselecting the price (*e.g.*, by pressing escape) to remove the Market Pane; (5) resizing the DOMTrader to be smaller than the Market Pane size; and (6) reselecting a price.  *Id*. at 717:5-718:4, 1905:11-21.  Although TT employee Mr. Burns claimed that the Resizing Process was "pretty easy," he could not even recall the steps necessary to enter the No Market Pane state.  *Id*. at 769:21-22 (failure to recall necessary step of de-selecting a price to remove the Market Pane). Likewise, despite Mr. Thomas' claim that the Resizing Process was "easy," (*id*. at 643:5-6), he admitted that he didn't figure it out on his own (*id*. at 718:10-12).  Instead, TT's lawyers told him how to enter the No Market Pane state using the Resizing Process.  *Id*.  And of course, TT and its lawyers did not figure out how to manipulate the DOMTrader interface until five years after filing suit.  *See supra* at 7-8.  And even then, CQG *immediately* remedied the defect.  *Id*. at 1487:9-12; 1488:21-22

As for the ini. Modification technique, Mr. Katin testified that a user had to first figure out that Integrated Client had .ini files installed on the user's machine buried in the C: folder and nested in 5 subfolders—users, public, documents, CQG Net, and private.  *Id*. at 2200:2-9.  Then, the user would have to figure out which of the .ini files within the nested private folder controlled the Market Pane.  *Id*. at 12-15.  Next, the user would have to somehow determine that the Market Pane auto appear setting controls the visibility of the Market Pane and then remove the "1" and the "colon" after the setting name and replace it with a "0," save the file, and then

restart Integrated Client.  *Id*. at 2196:25-2197:4.  Importantly, TT failed to present any evidence that this complex process constituted "reasonable" use of the Integrated Client software.

Messrs. Crouch and Veselica, seasoned professional traders with 80 years of combined trading experience (*id*. at 1201:10-25; 1203:16-1204:13; 1204:22-1205:2; 1852:1-1853:2), testified that (1) they had never been instructed on how to enter the No Market Pane state using either technique; (2) prior to 2014 when they viewed CQG-prepared demonstrations of the Resizing Process as part of this litigation, they had never known it was possible to enter the No Market Pane state; and (3) had they known how to enter the No Market Pane state, they would never have done it.  *See infra* at 18-20, 22.  In fact, both Messrs. Crouch and Veselica testified that they would *never* enter the No Market Pane state, because it hides information important to traders and is distorted.  Tr. at 1207:9-15, 19-22; 1214:6-9; 1856:17-24; 1860:20-23; 1861:7-24; 1862:13-16; 1863:4-8.  This testimony was particularly relevant because it was unbiased and from the perspective of the user.  Both witnesses testified that they used both CQG and TT products.  (Tr. at 1203:16-1204:1; 1205:20-21; 1207:23-25; 1209:11-17) (Crouch); (*id*. at 1853:20-1855:6) (Veselica).  Further both Messrs. Crouch and Veselica testified that their trading experience included managing teams of futures traders in multiple countries that collectively placed millions of orders.  *Id*. at 1203:16-1204:13; 1204:22-1205:2; 1853:3-9; 1854:19-1855:1; 1861:17-20.

Mr. Crouch testified that "as a professional trader" he could "[]not imagine that [he] would want the DOMTrader to act like that" and that he has "never seen the actions that were taken in [the video of the Resizing Process], that [he] can't image why anyone would want to take those actions, and that no one has ever showed me those actions."  *Id*. at 1207:19-22; 1214:6-9.  Mr. Crouch also told the jury that he had two reactions to the video of the Resizing

Process. *Id.* at 1207:4-15. His "first reaction was, well, why would you want to do that, because, you know, we basically trade price." *Id.* at 1207:9-10. As Mr. Crouch explained, if a trader doesn't "know where the price is," because the Market Pane is not displayed, then they wouldn't know where to trade. *Id.* at 1207:10-11. Mr. Crouch's second reaction was that the Resizing Process "took a lot of effort and distortion" that he "certainly wouldn't spend anytime [doing because it results in] get[ting] inferior information." *Id.* at 1207:13-15.

Mr. Veselica's testimony mirrored that of Mr. Crouch. In particular, he testified that the inside market is "critical" because a trader" want[s] to know where [the] best bid is and what the best offer is so that [they] know the price that [they] have a good chance of executing your trade at." *Id.* at 1856:17-24. Accordingly, he explained that had CQG ever shown him "how to modify the DOMTrader tool such that the [M]arket [W]indow would disappear off the screen," he "would have said [that he has] no interest." *Id.* at 1860:20-23. And he explained why: "you want the most salient information possible . . . in your critical sort of view" and that he "would have no interest in using" something that "causes . . . extra work." *Id.* at 1861:7-12. Mr. Veselica told the jury that he "didn't think that [entering the No Market Pane state] was something that created value." *Id.* at 1861:13-16. Finally, he testified that after watching the same video that "during a normal market day [the Resizing Process is] more work than you really want." *Id.* at 1863:4-8.

Messrs. Crouch's and Veselica's testimony regarding the importance of always viewing the inside market—which would be hidden if the Market Pane was not displayed—is further supported by the asserted patents and the trial testimony of Mr. Brumfield (the primary inventor) and Mr. Thomas (TT's technical expert). In particular, the patents indicate that "a trader will want to be able to see the inside market to assess future trades. The system of the present

invention addresses this problem with a one click centering feature." DTX0003 at col 9, ll. 17-20 ('304 patent); DTX0004 at col 8, ll. 51-54 ('132 patent). And Mr. Brumfield confirmed that it was "problematic" for him when he "los[t] his focus of the inside market" and that it resulted in "exposure" to him. Tr. at 469:2-5. Finally, Mr. Thomas testified that the inside market is "one of those things that's pretty critical before you make a decision." *Id*. at 544:19-20.

In addition, Mr. Shterk, the former head of CQG product development and strategy from 2006-2012 and one of the developers of the DOMTrader (*Id*. at 1461:4-1462:5, 1464:3-21; 1467:5-6; 2186:15-19), testified that he had never seen anyone enter the No Market Pane state by the Resizing Process and that such a configuration was "weird." *Id*. at 1481:24-1482:7 (never seen before TT identified it); *id*. at 1481:12 (describing the configuration). Similarly, Mr. Glista, CQG's director of order routing, testified that he had demonstrated the product over 500 times to CQG customers, but didn't know about the Resizing Process until the litigation, and even then insisted that "It would make no logical sense for a trader to do that." *Id*. at 1807:20; 1816:11-24. If both (1) the head of product development/strategy and one of the original developers of the DOMTrader and (2) a seasoned product specialist in charge of demonstrating the product at CQG had never seen or heard of the Resizing Process, then it is unreasonable.

In sum, the jury heard testimony that entering the unadvertised No Market Pane state is complex, time consuming, weird, illogical, and distorted and that entering such a state would hide important market information. In other words, the trial record only supports one finding: the Resizing Process and .ini Modification technique are unreasonable uses of the software that constitute significant and unusual alteration to the DOMTrader.

### b. TT Presented No Evidence at Trial That CQG Intended for or Instructed Customers to Enter the No Market Pane State.

TT presented no evidence that CQG intended, instructed, or taught customers how to enter the No Market Pane state using either the Resizing Process or .ini Modification technique. Mr. Thomas testified that he was unable to identify any user guide that explained either technique. *Id*. at 718:5-9; *id.* at 721:2-4. In fact, Mr. Thomas didn't uncover either disabling technique on his own; instead, TT's attorneys told him how to enter the Market Pane state. *Id*. at 718:10-12.

Mr. Shterk and Mr. Katin, both developers of the DOMTrader, testified that entering the No Market Pane state was not described in any product literature. *Id*. at 1464:3-21; 1467:5-6; 2186:15-19 (Shterk and Katin developed DOMTrader); *id*. at 1481:24-1482:7 (Shterk had never seen the DOMTrader configured such that Market Pane could not appear prior to viewing the video made by TT's attorneys in 2010); *id*. at 1552:8-1554:11; 2197:10-19; 2200:16-21 (Shterk and Katin testifying that there was no product literature available to users explaining the .ini Modification technique). Further, the only document that TT presented describing the .ini Modification technique was an internal document for CQG software developers, not CQG customers. *Id*. at 1557:7-21. But that document misidentifies the relevant .ini file as the "cqg.ini" file when the .ini Modification technique requires modifying the "order.ini" file. *Compare* PTX 135.0063 (Market Window auto appearance flag in cqg.ini file); Tr. 1553:15-16 (testimony regarding "CQG INI registry" in PTX 135 *with* Tr. at 2194:16-2197:4 (modifying order.ini file); and DTX 2345 (order.ini file example). Finally, Mr. Glista testified that he didn't even know the Resizing Process existed despite have demonstrated the product more than 500 times. *Id*. at 1807:20; 1816:11-24.

Ms. Ashton, CQG's customer service manager since 2000 (*id*. at 1827:25-1828:2) similarly testified that: (1) she had never seen or been asked questions regarding the Resizing Process or entering the No Market Pane state prior to 2013-2104 when she viewed a demonstration of the Resizing Process as part of an investigation in furtherance of this litigation (*id*. at 1830:3-10; 1831:4-16; 1839:15-17); (2) she had never taught a CQG customer or employee the Resizing Process or otherwise how to enter the No Market Pane state (*id*. at 1833:4-11); and (3) none of CQG's front line technicians had seen, used, or taught the Resizing Process to any CQG user (*id*. at 1831:24-1832:8; 1839:2-11).

Third-party testimony corroborated CQG's witnesses. For example, Mr. Crouch, a professional trader who has used CQG to trade spreads on the DOMTrader since 2005 testified that he has never seen a CQG manual or online tutorial that explained the Resizing Process. *Id*. at 1205:20-21; 1207:23-1208:11. Nor had he seen anyone ever enter the No Market Pane state prior to seeing a video in 2014 showing the Resizing Process. *Id*. at 1206:14-1207:18. Mr. Veselica, another professional trader who has used CQG to place trades since the early 2000s, testified that he never received any instruction regarding and was unaware that one could enter the No Market Pane state using the Resizing Process or the .ini Modification techniques, even though he had supervised traders in the United States, London, Mumbai, Madrid, Sydney, and Singapore. *Id*. at 1857:23-1860:23; 1861:17-24. Mr. Veselica further added that he would have been a good person for CQG to have demonstrated such features because he "had so many traders and [they] were constantly bugging people," and that CQG would regularly send people to "explain the functionality of their products." *Id*. at 1859:24-1860:3; 1860:16-19.

Mr. Shterk further testified that he was unaware of the defect associated with the Resizing Process that permitted enter into the No Market Pane state until TT's attorneys brought

it to CQG's attention in 2010 (*id*. at 1497:20-1498:3; 1570:19-1571:4). He also testified that he had never heard of any customer modifying an .ini file to enter the No Market Pane state. *Id*. at 1569:8-11. And Mr. Katin offered similar testimony that customers did not use .ini files. *Id*. at 2193:7-19. Instead only developers used ini files for testing purposes. *Id*.

Despite Mr. Thomas' conjecture that a customer requested the Resizing Process (Tr. at 645:9; 646:8), TT provided no evidence of any such request at trial. The unrebutted evidence established the contrary. Mr. Shterk testified that no customer requested the disabling of the Market Pane. *Id*. at 1496:23-1497:7. Mr. Katin—the developer who checked-in the code resulting in the defect—testified that the code was intended to prevent a system crash, not to create a static price axis. *Id*. at 1489:23-1490:11 (Katin check-in); *id*. at 2192:5 – 2193:6 (prevent system crashes). The unrebutted testimony at trial also established that the Resizing Process was a "defect," because it contradicted an intended functionality requirement of the software, which required the DOMTrader to "pop up" a Market Pane when the inside market would otherwise leave the visible display of prices. *Id*. at 1490:24-1491:3 (Shterk definition of "requirement"); *id*. at 2187:25-2188:11 (Katin definition of "requirement" as intended functionality); *id*. at 1493:4-19; 2188:20-2190:19; PTX 196.0002) (pop-up requirement); *id*. 1483:3-13; 2187:11-24; 2188:20 - 2190:19 (describing defect as not meeting requirements set by Mr. Mather). Notably, Mr. Shterk fixed the defect within one day of being notified by TT of the Resizing Process. *Id*. at 1491:13-20 (unintended consequences); *id*. at 1487:9-12; 1488:21-22 (fixed in one day). In fact, when CQG was later asked by a customer to have an entirely static price column, CQG swiftly rejected it with an "absolutely not" response. *Id.* at 1506:13-17.

In short, the uncontroverted evidence at trial established that CQG never intended for any trader to manipulate its Integrated Client software to enter the No Market Pane state—and traders

did not actually do so, or have any reason to do so.  Indeed, doing so would make no logical

sense and have resulted in getting inferior information.  *Id*. at 1816:11-12; 1207:13-15.

> ### c.  TT Presented No Evidence That Anyone Actually Entered the No Market Pane State.

Although TT claimed it would present witnesses such as former CQG employee Jason

Virgil or trader Luke Goodwillie to testify at trial on manipulation of the Market Pane, it failed to

do so.  *Compare* Ex. 3 (Virgil Declaration) at ¶¶ 10, 11, 13 (Resizing Process) *with* Ex. 4 (Initial

Disclosures) at 6-7 (Virgil and Goodwillie have discoverable information on the use of CQG

software and instructions on how to operate CQG software) and Dkt. 992 at 2 (Virgil and

Goodwillie will testify as to the subject matter of their declarations, which included use of CQG

software and instructions regarding how to operate CQG software).  This significant evidentiary

gap (particularly as to damages) cannot be overstated.  TT presented no evidence—*none*—that

any trader ever entered the No Market Pane state.

Instead, TT introduced evidence that Mr. Thomas (TT's technical expert) and Mr. Burns

(TT's then-vice president of research and development) entered the No Market Pane state

through the Resizing Process "in connection with this case" in 2010—five years after TT sued

CQG.  *Id*. at 642:4-17 (Thomas video regarding Resizing Process); *id*. at 732:5-7 (Burns' title);

*id*. at 761:1-762:13 (Burns' using Resizing Process); *id*. at 767:14-18 (date and relationship to

case).  Yet, Mr. Thomas admitted that he did not discover the Resizing Process himself; instead,

TT's lawyers told him about it.  *Id*. at 718:10-12.  And although Mr. Burns claimed that the

Resizing Process was "easy to do," (*id*. at 769:14-15), Mr. Burns incredibly could not remember

the specific steps necessary to enter the No Market Pane state using the Resizing Process (*id*. at

19-25).  And, even after five-plus years of pre-litigation and litigation investigation into CQG

product operation, Mr. Burns uncovered only one of the two theoretical methodologies that could

be employed to enter the No Market Pane state, having offered no testimony regarding the .ini Modification technique.

Putting aside these fatal inconsistencies that a rational jury could not reasonably ignore, it is well established that an expert's actions do not constitute infringement. *See Meyer Int'l Props., Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1369-70 (Fed. Cir. 2012) (noting method claims are not infringed where "only evidence of direct infringement was the activities of [the patentee's] own expert"). Under the same logic, the use of an accused product to infringe a method claim by a patentee's paid employee in a litigation setting is similarly insufficient as a matter of law. *See Lucent Techs., Inc. v. Gateway, Inc.* 580 F.3d 1301,1318 (Fed. Cir. 2009) (finding use of method by expert and his wife insufficient to support jury verdict of infringement).

Importantly, the only evidence the jury heard regarding the No Market Pane state was that it was unadvertised, distorted, weird, and complex, and that it required a lot of work to provide inferior information and therefore did not create value. *See supra* at 17-25. This evidence was elicited not only from CQG's expert and current and former employees, but also from unbiased traders who used both TT and CQG software to support their trading operations. *Id*. at 718:5-9 (not advertised in user manuals); *id*. at 1830:3-10; 1831:4-1832:8; 1832:13-1833:11; 1839:2-11, 15-17 (not known or taught by CQG customer support); *id*. at 1207:13-15; 1861:7-16; 1862:14-17; 1863:4-8 (distorted, took a lot of work, inferior information, did not create value); *id* at 1481:12 (weird); and *id*. at 2203:15 (complex process).

Unsurprisingly, there was no evidence that any trader actually used the DOMTrader in the No Market Pane state while also satisfying the remaining limitations of the CRM claims. In fact there was no evidence that any customer complained when CQG removed the ability to enter the No Market Pane state via .ini Modification in 2005 and via the Resizing Process in 2010.

Thus, because there was no evidence of use of the DOMTrader while in the No Market Pane State, entry of judgment in favor of CQG is appropriate.

**C.    TT Failed to Prove that the DOMTrader or ChartTrader Satisfies the Static Limitation.**

According to the Court's construction, the static limitation requires a line or display of prices "that do not change positions unless a manual recentering or repositioning command is received, meaning, if there is movement, it must be by manual command as opposed to automatic." Ex. 1. Yet, TT failed to provide any evidence that the DOMTrader or ChartTrader satisfied this construction. In fact, the only perspective-of-the-user evidence presented to the jury (*i.e.*, from independent traders) was that CQG's products were <u>not</u> static. For example, both Messrs. Crouch and Veselica testified that they use the DOMTrader to always show market prices, which means that the scale cannot be "static." Tr. at 1207:4-12; 21-22 (Crouch explaining that traders need to see market prices in order to trade and that you cannot have the market prices scrolling off a static screen); *id*. at 1860:20-1862:22 (seeing inside market prices is critical).

And although Messrs. Crouch and Veselica preferred the dynamic nature of the DOMTrader, other customers complained that the DOMTrader was too "jumpy." Internal records demonstrate that these customers asked CQG to "lock" the DOMTrader and make it static. But CQG refused. For example, a CQG customer complained that the DOMTrader "ladder still jumps around and confuses him" even with price selection (i.e., in the Browse Prices state with market windows). PTX 188.000 2. And separate records establish that another customer asked whether CQG could "lock the [DOMTrader] in place, so that the scale does not mo[v]e around when the [inside market] run[s] off the display." (DTX 2114_0002). CQG's answer was "no," because that locking the line/display of prices was something that TT had

patented.  (DTX 2114_0001 1; DTX 2115).  Instead, CQG suggested elongating the DOMTrader to reduce the frequency by which the DOMTrader jumped.  DTX 2114.

As explained below, expert testimony similarly demonstrates that the DOMTrader and ChartTrader are incapable of satisfying the static limitation because of single-click cancellation commands, Shift K, the presence of Market Panes that dynamically display the inside market, and the out-of-the-box movement of the line/display of prices prior to selection of a price.

### 1. Single-Click Cancellation Negates the Static Limitation in the DOMTrader (Browse Prices & No Market Pane States)

At trial, Dr. Mellor explained, and Mr. Thomas agreed, that traders can cancel working orders on the DOMTrader using a single click of the mouse.  Tr. at 1898:24-1900:4 (right click cancellation); 700:2-10.  Dr. Mellor further explained that when a user single-click cancels a working order in a DOMTrader with a price selected (*i.e.*, in both the Browse Prices and No Market Pane states), price selection is removed, and the DOMTrader will re-center the inside market on the DOMTrader if re-centering is necessary based on market conditions to keep those prices visible.  *Id.* at 1900:21-1901:4; 1947:2-7.  So any subsequent movement after a single-click cancellation command is non-infringing automatic movement that is not in response to a manual re-centering or re-positioning command.

That single click cancellation commands are manual is irrelevant, because the claims as construed by this Court permit movement *only* in response to a manual re-centering or re-positioning command.  Ex. 1.  And, as Dr. Mellor testified—without rebuttal from TT—single-click cancellation commands are neither a manual re-centering or re-positioning command, because they do not guarantee movement.  Tr. at 1898:5-22; 1901:8-17.  Rather, single-click cancellation commands are simply manual cancellation commands because they guarantee cancellation of a working order.  *Id.* at 1900:18-1901:17.

The fine distinction between a manual cancellation command and a manual re-centering/re-positioning command is supported by the *eSpeed* decision. There, the Federal Circuit distinguished automatic movement in response to a change in the inside market *with* automatic movement in response to a manual command that places an order. *eSpeed*, 595 F.3d at 1354. The same analysis is equally applicable here and compels a finding as a matter of law that because manual *cancellation* commands are not manual *re-centering* or *re-positioning* commands, the static limitation has not been satisfied.

But, *eSpeed* does not stop there. Indeed, *eSpeed* decision further clarifies that automatic movement can follow from a manual command, and under the court's construction, automatic movement means that the static limitation has not been satisfied. *Id*. (*eSpeed*); Ex. 1 (construction). In *eSpeed*, the Federal Circuit explained that automatic movement can follow a manual command to place an order. 595 F.3d at 1354. Here, as Dr. Mellor explained, automatic market-driven movement *may* follow the manual, single-click cancellation command. Thus, not only is any movement following entry of a single-click cancellation command not the result of a manual re-centering command or re-positioning command (as demonstrated above), but it is non-infringing automatic movement under *eSpeed*.

Further canceling a working order is part of the normal operation of the software. Mr. Thomas testified that of the many orders that traders place, most of them are cancelled, and then only a few of the non-cancelled orders are filled. *Id*. at 700:2-10. Mr. Thomas speculated that there may be a 100-to-1 ratio of cancels to fills. *Id*. Mr. Burns similarly testified that canceling working orders is a normal operation of trading software. *Id*. at 743:24-744:1. Finally, the asserted patents teach that canceling orders can be performed on a product with a static display of prices/common static price axis. DTX 0003 at 11:35-49; DTX 0004 at 10:64-11:11

(discussing single click deletion/cancellation of working trades to, among other things, "stop the losses from pilling [sic] up.").

Because cancellation of a working order is neither a manual re-centering or re-positioning command and because it permits future automatic movement based on market conditions, the existence of single click cancellation in the accused products necessarily negates the Static Limitation, requiring judgment as a matter of law in CQG's favor.

### 2. The New Day Event Shift in Prices—Shift K—Negates the Static Limitation as a Matter of Law (DOMTrader and ChartTrader).

Despite the near 24-hour nature of trading (Tr. 1854:10-12), each exchange maintains trading day hours that delineate when a one day ends and the next day begins. PTX 1234.0020-23, 0094-95. At this transition point, the DOMTrader and ChartTrader software sends a new day event. Tr. at 1901:25-1902:2. As a result of this new day event, price selection is removed and both the DOMTrader and ChartTrader software automatically re-centers the price column/display of prices/line of prices without a manual re-centering or re-positioning command. *Id*. at 1901:25-1903:14; 682:24; 1953:22-1954:11.

Both Dr. Mellor and Mr. Thomas testified that a trader cannot stop price shifting in the line/display of prices in the DOMTrader (in both the Browse Prices and No Market Pane state) and ChartTrader resulting from a new day event—or "Shift K." Tr. 651:4-652:25 (Thomas); *id*. at 1901:18-1903:25 (Mellor); *id.* at 682:24-683:2 (ChartTrader). As Dr. Mellor explained, the shift is "not a manual recentering command or a repositioning command. And it … in fact, it's automatic." *Id*. at 1903:11-14; *see also id*. at 1902:20-22 ("So after it receives the new day event, the price column moves and then it continues to move as necessary to keep the inside market on the screen.").

Although both experts agreed that Shift K is not a *manual* re-centering command or a re-positioning command, Mr. Thomas suggested that the automatic movement caused by Shift K did not preclude infringement because: (1) the trading exchanges are closed at the time; and/or (2) a trader knows when the shift will occur (*i.e.*, its predictable). *Id*. at 651:6-8; 651:16-651:9. Yet, whether exchanges are open or automatic movement is "predictable" is utterly irrelevant to infringement under this Court's claim construction. Ex. 1. Movement is either in response to a manual re-centering or re-positioning command—or is not. *Id*.

Because the shift in the price column resulting from a new day event (*i.e.*, shift K) is not the result of a manual re-centering or re-positioning command, it constitutes non-infringing automatic movement. Thus, as a matter of law, this Court should enter judgment of non-infringement.

**3. Automatic Movement in the Market Panes Negates the Static Limitation (DOMTrader, Browse Prices State).**

Regarding the DOMTrader Browse Prices Mode, both experts agreed that prices always move automatically in the Market Panes. Tr. at 714:6-16 (Thomas); *id*. at 1894:5-1898:2 (Mellor). Yet Mr. Thomas testified that the automatic movement can be ignored because the rows in the top and bottom Market Panes constitute "extra functionality." *Id*. at 630:14-15. Despite Mr. Thomas' unsupported testimony, several witnesses testified that knowledge of the inside market prices and volume is critical, including Messrs. Thomas, Brumfield, Crouch, Veselica, and Sims. *Id*. at 463:15-464:7; 468:19-469:10; 532:13-18; 544:14-20; 547:15-548:4; 1054:13-16; 1856:17-24; 1860:20-1861:24; 1206:7-13; 1214:4-10. Thus, as Dr. Mellor testified, no rational jury could ignore the inside market in the Market Panes from a user's perspective. *Id*. at 1895:23-1896:3; 1897:18-1898:2. This is especially true where the inventors used the term "price column" (*i.e.*, the entire price column) when describing the claimed static display of prices

and common static price axis. *Id*. at 1896:4-1897:21; DTX 0003 at col. 7, ll. 54-58, 65; col. 9, ll. 10-18; DTX 0004 at col. 7, ll. 35-39, 46-47; col. 8, ll. 44-51; DTX 200_0215, 220; *eSpeed*, 595 F.3d at 1353 (acknowledging use of "price column" to describe the "present invention" throughout the specification); *see also Id*. at 1354-55 (inventor used the term "price column" during prosecution to describe the invention); Tr. 1911:10-23; DTX 200_1010, 1049 (exemplary use of "price column" in prosecution history).

The inside market prices simply cannot be ignored. Indeed, at least one CQG customer was frustrated by it. PTX 188.0002 (complaint about jumpy movement in the market pane). Moreover, the Market Pane forms part of the *single* column, line, or display of prices in CQG's products. Tr. at 1953:14; 1472:3-6. Thus, automatic movement in the Market Pane is automatic movement in the column, line, or display of prices. Accordingly, TT presented insufficient evidence to support a finding that the Browse Prices Mode satisfied the Static Limitation.

### 4. Automatic Movement Out-of-the-Box and Upon Start Up Negates the Static Limitation (DOMTrader & ChartTrader).

This Court construed the static limitation to require a line or display of prices "that do not change positions unless a manual recentering or repositioning command is received." Ex. 1. This is a construction with absolute terms: there is no movement permitted, unless by a manual re-centering or re-positioning command. Yet, the uncontroverted evidence establishes that the DOMTrader and ChartTrader cannot be operated "out of the box" or on each startup in a static condition. Instead, "the DOMTrader is fundamentally designed to keep the inside market visible on the screen." Tr. 1890:16-17. Out of the box and on startup, a price is not selected. *Id*. at 20-22; 625:20-626:5. Meaning that "when [the inside market] leaves off the top [of the visible display or line of prices] . . . , it automatically recenters." *Id*. at 1890:17-19. "And . . . the same thing . . . . happen[s] at the bottom. *Id*. at 1890:22-24. When the inside market leave the bottom

of the visible display or line of prices, it automatically re-centers the inside market in the center of the price column. *Id*.

Because the Federal Circuit has held that the asserted claims require a permanently static line or display of prices, the DOMTrader and ChartTrader cannot possibly satisfy the static limitation and judgment as a matter of law in favor of CQG is appropriate. *eSpeed*, 595 F.3d at 1353-54. Moreover, for the reasons discussed *supra*, prices are not permanently static even under the "modes of operation" described by TT in each of its infringement theories, and therefore, TT has failed to offer sufficient evidence to prove infringement. Put simply, whether "out of the box" or during normal operation under any "mode," CQG's software requires that the line or display of prices move without a manual re-centering command. Accordingly, as a matter of law, judgment of non-infringement should be entered.

### D. The Jury Verdict Was Premised on Testimony that Contradicts the Claim Construction.

TT's expert's testimony regarding the static limitation violates this Court's order on claim construction. Instead of offering opinions as to whether movement was in response to a manual re-centering or re-positioning command, as is required by the binding claim construction, Mr. Thomas side-stepped that analysis and instead offered testimony regarding whether movement in CQG's accused interfaces was "predictable" or "in the control of the user." Ex. 1 (construction); Tr. at 613:20-24; 651:11-652:9 (testimony). Because the jury found infringement (Dkt. 1210 at ¶¶ 1-2), it necessarily was persuaded by and adopted Mr. Thomas' incorrect claim construction. As a matter of law, the jury was presented with insufficient evidence to support its finding of infringement. Thus, judgment of non-infringement should be entered under Rule 50(b).

**II.     There Is No Legally Sufficient Evidence to Support the Jury's Damages Award.**

A patentee who successfully proves infringement is entitled to "a reasonable royalty for the *use made of the invention* by the infringer." 35 U.S.C. § 284 (emphasis added). This statutory language is critical—damages must be tied to the value of *using* the actual *invention*.[6] This fundamental causation requirement was recognized by the Supreme Court in 1884 in *Garretson v. Clark*, 111 U.S. 120, 121 (1884), where it admonished:

> The patentee … must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; …

In the last few years, the Federal Circuit has repeatedly reinforced this fundamental causation or apportionment requirement.[7] *See, e.g., VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327-28 (Fed. Cir. 2014) (noting that as to "a multi-component product containing several non-infringing features with no relation to the patented feature," a "patentee must do more to estimate what portion of the value of that product is attributable to the patented technology."); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("[W]here multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, *and no more*.") (emphasis added); *LaserDynamics, Inc. v. Quanta Computer*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("Where small elements of multi-component products are accused of

---

[6] This statutory requirement is consistent with longstanding tort law that the damages awarded must be caused by or tied to the alleged wrong. *See Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999) ("It is axiomatic that under general principles of tort law a plaintiff may recover monetary damages 'only when a defendant breaches a duty owed to [the] plaintiff, and the breach causes cognizable legal harm to the plaintiff.'") (citation omitted). And patent infringement is simply "a commercial tort." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1578 (Fed. Cir. 1995) (Newman, J., concurring in part and dissenting in part).

[7] Tests such as Entire Market Value Rule or the "smallest salable infringing unit" are just tools for enforcing this fundamental causation requirement. *See* Farewell, Entire Market Value Rule, available at http://www.law360.com/articles/634837/farewell-entire-market-value-rule.

infringement, calculating a royalty on the entire product carries a considerable risk that the

patentee will be improperly compensated for non-infringing components of that product.");

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (rejecting 25 percent

rule because "it fails to tie a reasonable royalty base to the facts of the case at issue");

*ResQNet.com, Inc. v. Lansa, Inc.* 594 F.3d 860, 869 (Fed. Cir. 2010) ("[T]he damages inquiry

must concentrate on compensation for the economic harm *caused by* infringement of the claimed

invention. … Thus, the trial court must carefully tie proof of damages to the claimed

invention's footprint in the market place.") (emphasis added); *Lucent Techs., Inc. v. Gateway

Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) ("The first flaw … is the lack of evidence

demonstrating the patented method of the Day patent as the basis—or even a substantial basis—

of the consumer demand for Outlook.  As explained above, the only reasonable conclusion

supported by the evidence is that the infringing use of the date-picker tool in Outlook is but a

very small component of a much larger software program.  The vast majority of the features,

when used, do not infringe."); *accord Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d

279, 288 (N.D.N.Y. 2009) (Rader, J., by designation) ("Cornell did not offer a single demand

curve or any market evidence indicating that Cornell's invention drove demand for bricks.  …

Dr. Stewart did not provide any real world support for Cornell's royalty base claim.").

Not only must causation be shown, it must be shown with reliable evidence.[8]  Consistent

with the Supreme Court's 1884 admonition in *Garretson,* that damages evidence on

apportionment "must be reliable and tangible, and not conjectural or speculative," 111 U.S. at

_____

[8] Courts have not sanctioned excuses for failure to meet this threshold causation requirement. *See, e.g.*, *VirnetX*, 767 F.3d at 1329 ("VirnetX cannot simply hide behind Apple's sales model to avoid the task of apportionment."); *LaserDynamics*, 694 F.3d at 70 (holding that there is no "necessity-based exception to the entire market value rule"); *Intelligent Verification Sys., LLC v. Microsoft Corp.*, 2015 U.S. Dist. LEXIS 43042, at *26 (E.D. Va. Mar. 24, 2015) ("Regardless of whether Defendants provided usage data, it was IVS's burden to apportion the value of the patented feature to substantiate its damages claim.").

121, the Federal Circuit recently emphasized this "important evidentiary principle," which helps the "jury system reliably implement the substantive statutory requirement of apportionment of royalty damages to the invention's value." *Ericsson*, 773 F.3d at 1226.

This causation or "apportionment" concept is absolutely critical here. A longtime leader in providing charting and analytics data to traders, (Tr. 1627:4-1628:16 (Mather); Tr. 1633:22-1634:11 (Mather); Tr. 2086:17-21 (Peterson)), CQG offers a software product called Integrated Client. PTX1582; Tr. 610:19-611:3. This product includes many different features—it provides analytical data; streams news feeds; and, if enabled for a fee, permits users to trade commodities. Tr. 2429:5-2429:22, 2440:16-25 (Giffen).

During the relevant time period, traders could use various interfaces within Integrated Client to enter trades: Snap Trader; Order Ticket; two or three excel-style entry interfaces; Chart Trader; and DOMTrader.[9] PTX0031; PTX1582; Tr. 1053:9-16; Tr. 1644-45, 1653-55, 1658; Tr. 2430:2-11. Only the last two interfaces—Chart Trader and DOMTrader—were accused of having a "static" price axis or display of prices; it is undisputed that the other interfaces did not have static prices. And even within the DOMTrader interface, the dynamic mode admittedly does not infringe. Tr. 246:5-6.

Thus, it was TT's burden to prove, and the jury's duty to award, damages attributable to *use* of the claimed "static" price invention—and not to the entire Integrated Client product and its many admittedly non-infringing uses. Yet TT did not do so, and thus no reasonable jury could have awarded the damages in the verdict. And this is just one of the many fatal flaws in the damages award—and why it should be set aside.

---

[9] Chart Trader is a "special instance of DOM Trader" in chart view. PTX2876.0005.

### A. Because TT Failed To Submit Any Evidence Tying Its Claimed Damages to Use of the Invention, Damages Should Be Rejected as a Matter of Law.

TT failed to prove royalty damages from "*use made of the invention* by the infringer." 35 U.S.C. § 284 (emphasis added). Having failed to tie its damages claim to use of the claimed invention, its damages claim should be rejected as a matter of law.

#### 1. TT Did Not Prove That a Static Price Ladder Drove Demand for Use of CQG's Integrated Client Software.

At trial, TT did not offer any evidence that traders use Integrated Client software *because* two of its many order entry interfaces purportedly have a static price column. It did not introduce the testimony of any witness showing such a demand. It did not introduce any exhibits showing that traders used Integrated Client and the accused order entry interfaces *because* of a static price column. And it did not introduce any survey evidence, as TT conducted no survey.

In fact, the evidence established that factors other than a purportedly static price ladder, such as CQG's reputation and long-established charting and analytics products, drove CQG's business success and profits. Tr. 1680:3-13; Tr. 1855:2-18; Tr. 1202:1-17. Likewise, the testimony at trial showed that there was no interest in using Chart Trader, which purportedly embodied the patented invention. Tr. at 1564:13-15 ("[W]e didn't have any users using the Chart Trader, which was the reason why this product was eventually discontinued.").[10]

The only empirical data of consumer demand proves that the accused interfaces did not drive demand for the Integrated Client software. As Mr. Peterson testified at trial, only 6.3 percent of trades entered by CQG's top 20 traders entered trades in an accused order entry

---

[10] Likewise, the evidence showed that in the commercial embodiment, factors other than a static price ladder drove demand for the xTrader. For example, over time, sales of xTrader (which embodied the asserted patents) diminished while sales of xTrader Pro (which included many additional un-patented features (DTX 2310)) increased over time. DTX2309.

interface, (Tr. 2080:17-2081:3), demonstrating not only a lack of demand for the patented invention, but substantial noninfringing alternatives.

Absent any evidence that the claimed invention drove demand for Integrated Client, TT was not entitled to seek—as it did—damages for mere enablement of Integrated Client or trades made in *any* Integrated Client order entry interface, regardless of whether it had a static price column. *See supra* at 33-35; *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 288 (N.D.N.Y. 2009) (Rader, J., by designation) (granting Rule 50(b) motion on damages and reducing damages as a matter of law where plaintiff did not provide evidence "linking demand for the claimed invention").

### 1. The Jury's Verdict Conflicts with the Court's Finding of Substantial Noninfringing Uses.

In dismissing TT's contributory infringement claim, the Court correctly found that the Integrated Client product has substantial noninfringing uses. Dkt. 1207; *see also* Tr. 2528:10-15 ("[T]he Court notes that contributory infringement requires a product with no substantial noninfringing uses. And this Court finds based on testimony to the contrary that was presented, that that motion is granted"). Given the software's substantial non-infringing uses, it was incumbent on TT to tie its damages base to use of the infringing features, not to *any* trades placed in *any* of over a half-dozen order entry interfaces. *See supra* at 33-35.

There was a simple way for TT to do so—to base its royalty demand on orders filled through interfaces with a static price column. This could only have resulted in a royalty base of 53,433,564 million trades—*at most*. *See* § II.C.2. and CHART 2 *infra*. But instead, TT claimed a royalty base on *any and all* transactions filled through Integrated Client, regardless of which order entry interface was used. In doing so, TT failed to tie its damages claim to use of its claimed invention which required a static price axis. This failure to apportion the royalty base

without satisfying the entire market value rule (which would have required nonexistent evidence that the DOMTrader drove demand for the entire Integrated Client product) renders TT's damages award legally unsustainable.

### 2. TT Offered No Evidence That Any Trader Ever Manipulated the DOMTrader Order Entry Interface.

After TT paid a handsome sum for the favorable testimony of former CQG employee Jason Virgil, who made more for helping TT's counsel than he made as an actor last year (Compare Ex. 5 (Virgil Dep. Tr.) at 11:25-12:4 (less than $10,000 as an actor) to *id.* at 46:19-47:13, 51:7-51:10, 52:6-52:9 (in excess of $25,000 for this matter)), Mr. Virgil made no appearance at trial. Nor did Luke Goodwillie, the trader who supposedly used the DOMTrader order entry interface in a manipulated matter. Ex. 6 (Goodwillie Decl.) at ¶ 7. Indeed, TT introduced no evidence at trial—*none*—that any person (other than TT's own employee and experts) ever manipulated the DOMTrader to create a static price column. *See supra* at 24-25.

Thus, regardless of whether the evidence supports a finding of infringement under this theory—and it does not—TT cannot show the necessary use of the claimed invention. And TT is only entitled to a "royalty for the *use made of the invention*." 35 U.S.C. § 284 (emphasis added). Having failed to show that anyone ever used the Integrated Client product with a manipulated DOMTrader order entry interface, as a matter of law, TT is not entitled to damages corresponding to the infringing software versions.

### B. The Jury's Royalty Base Reflects Errors Resulting From Incorrect Analysis, Double-Counting, and Faulty Math Based on TT's Changed Damages Claim Without the Benefit of Expert Testimony.

The evidence TT offered at trial to establish a reasonable royalty—its many settlement licenses—required calculating a royalty base on filled transactions. *See, e.*g., PTX1334.0003, PTX1335. 0003, PTX1338.0006; PTX1344.0005; PTX748.0002; PTX1351.0007. And both

damages experts calculated royalties based on filled transactions. Tr. 2035:8-2041:12, 2159:15-19, 2124:10-16 (Peterson); Tr. 1060:4-16, PTX 2665.0004 (Sims). The problem is that TT's damages claim calculated royalties based on any transactions filled through Integrated Client—*whether or not* entered through the Chart Trader or DOMTrader interfaces. This failure to apportion should preclude TT's damages claim as a matter of law. *See supra* at 33-35. But if the damages award is not set aside as a matter of law, the jury's damages award should be remitted based on fundamental errors in the jury's calculations.

Unlike the determination of a royalty *rate*, which is based on a hypothetical negotiation that never occurred, the royalty *base* in this case must be based on historical transaction data. There are no shades of gray on this issue; a damages award must be supported by the evidence admitted at trial.

As explained below, based on the bedrock requirement of tying damages to *use* of the *claimed* invention, the only royalty base supported by evidence at trial is 21,975,904 filled transactions in the "price selection mode." PTX2665.0001 ("Transactions Summary: Fills Resulting from Orders Entered Directly in Accused Interfaces").

Although it is clear the jury tried to tie the base to actual use of the claimed invention, it failed to do so—largely due to changed circumstances after elimination of the doctrine of equivalents and a misleading TT demonstrative. Thus, this Court can and should correct the damages award to reflect a proper royalty base.

### 1. The Jury's Damages Calculation.

At least two things are clear from the jury's verdict: (1) the jury awarded damages for the two infringement theories that remained in the case ("Browse Prices" and "No Market Pane") after the Court eliminated the third theory (price hover / price hold) when it excluded the doctrine of equivalents and (2) the jury rejected TT's "applicable trade" theory, and instead

divided TT's claimed royalty base (386,813,507 for futures transactions and 4,389,683 for non-derivative transactions) by 3.34 to limit the royalty base to filled trades.

- TT's demonstrative sent to the jury claimed 4,389,683 non-derivative transactions for both infringement theories (Dkt. 1204 at 4)



- TT damages expert Raymond Sims testified that the multiplier from total filled trades using an accused interface (198.5 million) to his total royalty base (662.9 million) is 3.34, a number he simply backed into by dividing his base by the number of filled orders in an accused interface.

- 4,389,683 non-derivative transactions (shown in TT's demonstrative) divided by 3.34 is 1,314,276 transactions—the *exact* royalty base found by the jury for non-derivative transactions

114,001,136     royalty base
(number of futures transactions)

1,314,276     royalty base
(number of non-derivative transactions)

Dkt 1210 (Verdict) at ¶ 7.

Although not as mathematically precise, the jury's verdict on futures' or derivatives' transactions also divided the royalty base by approximately 3.34. Dividing 386,813,507 transactions (according to TT's double-counting demonstrative)[11] by 3.34 equals 115,812,427

---

[11] As explained below, the inclusion of ChartTrader trades results in double counting when using TT's royalty base. The Integrated Client software includes both DOMTrader and ChartTrader.

transactions, slightly more than the 114,001,136 transactions in the verdict.[12]

Unfortunately, the jury did not have the benefit of expert damages testimony after the doctrine of equivalents theory was removed from the case, to explain that the 3.34 divisor was no longer valid, and it was misled by a misleading TT slide double-counting DOM Trader and Chart Trader trades at the conclusion of trial with no foundation.[13]

### 2. After the Court Eliminated the Doctrine of Equivalents from the Case, the 3.34 Ratio Used by the Jury Became an Invalid Data Point.

Mr. Sims testified on March 3, ten days before the Court eliminated the doctrine of equivalents from the case (Dkt. 1175), which excluded the price hover (or "price hold") transactions from the reasonable royalty calculation. During his testimony, Mr. Sims advocated a royalty base of 662,914,201 futures transactions (Tr. 839:8-12 (referring to PTX5804)), which included 464,316,699 trades that were *not* entered in an excused interface (Tr. 2022:22-24, 2032:4-7, 2036:10-2037:9). Indeed, Mr. Sims admitted that, while he used 662.9 million transactions as his royalty base for futures transactions, most of those transactions "weren't entered in a particular accused interface." Tr. 899:16-24. According to Mr. Sims, of the 662.9 million transactions, only 198,597,502 (*i.e.*, 662,914,201 *minus* 464,316,699)[14] transactions "were the filled orders that used the accused interfaces." Tr. 899:25-900:2; Tr. 897:11-14

---

[12] Working backwards to understand a verdict—even if the math is not precise—is permissible. *See Lucent*, 580 F.3d at 1336 ("[W]orking the math backwards strongly suggests that the jury must have used some calculation of a rate applied to the entire market value of the software. See Microsoft Response and Reply Br. 47 ('Applying Lucent's 8% rate to all of Microsoft's sales and half of Dell's, using a weighted average of 85% OEM prices and 15% retail prices, yields damages of $358,835,648 —extremely close to the jury's award.'").

[13] In fact, the 340,721,128 applicable trades divided by the 53,433,564 direct fills results in a ratio of 6.37, not 3.34. Had the jury known this, and divided by 6.37, they would have properly arrived at a royalty base of orders filled in an accused interface.

[14] Actually, as CQG damages expert Mark Peterson explained, the total number of transactions entered in an accused manner is much lower – *i.e.*, 178,053,764. Tr. 2032:1-3, 2039:3-2040:19. The testimony is undisputed, but it is not important for the discussion here.

(referring to PTX5854) ("the 198.597 million filled orders, those are the orders that were filled in the accused interface"); Tr. 898:2-3, 12-13; *see also* PTX5858.[15]

Significantly, the total base of 662.9 million transactions stems from all three theories of infringement, including the eliminated "price hover" or "price hold" theory. Tr. 901:18-903:17 (discussing PTX5855). Based on Mr. Sims's testimony and demonstratives, the overlapping bases[16] for the three theories of infringement were as follows:

| Chart 1: | | |
|---|---|---|
| Browse Prices: | No Market Pane: | Price Hold: |
| 84,082,773 | 340,721,128 | 644,288,208 |

Tr. 902:18-903:17 (discussing PTX5855).[17]

Since the Court later eliminated the price hold theory under its collateral estoppel ruling, TT presented to the jury in closing argument a new base of 340,721,128 transactions (Tr. 2594:14-16), which stemmed from the over-lapping bases for the remaining two theories of infringement—*i.e.*, Browse Prices and No Market Pane (*see* PTX5855; Tr. 903:18-904:21). The jury also received for its deliberations TT's demonstrative containing the new base of 340.7 million transactions. Dkt. 1204 at 4.

In addition to showing how the 662.9 million transactions fell into the different infringement theories, Mr. Sims also showed how the 198,597,502 filled orders fell into the different infringement theories:

---

[15] PTX5858 is titled: "Transactions Summary: Fills Resulting from Orders Entered Directly in Accused Interfaces." To arrive at 198,597,502 filled orders, add the following number from PTX5858: 56,489 + 197,045,689 + 1,495,324.

[16] *See* Tr. 904:12-21 (Sims's explanation as to how the bases overlap and the individual components are not to be counted twice).

[17] Demonstrative PTX5855 notes that these numbers exclude 18,441,041. *See also* Tr. 902:9-17.

| | CHART 2: | |
|---|---|---|
| Browse Prices: | No Market Pane: | Price Hold: |
| 21,843,696 | 53,301,349 | 197,045,689 |

Tr. 908:12-14; PTX5858.[18]

Mr. Sims justified using 662.9 million as his base for futures transactions – instead of the 198.5 million filled orders in an accused interface – by applying the so-called applicable trade theory. Tr. 899:13-24. According to Mr. Sims, the applicable trade theory accounts not only filled orders, but also placed, canceled, and modified orders. Tr. 896:4-17, 893:3-19.

To demonstrate to the jury that 662.9 million was a reasonable base under the applicable trade theory stemming from 198.5 million filled orders, Mr. Sims claimed that the multiple from 198.5 million to 662.9 million—*i.e.*, 3.34[19]—was a "conservative" "proxy" for the ratio of the number of trades that are placed, cancelled, or modified to the number of trades actually filled in an accused interface. Tr. 896:4-17, 899:25-900:7. In other words, for every trade actually filled in an accused interface, approximately 3.34 trades were placed, cancelled, or modified.

It is critical to recognize that the 3.34 "proxy" has no practical use for any other purpose in the case. It is simply a number that Sims *backed into* by dividing his *total* base of 662.9 million by the *total* number of filled orders in an accused interface, 198.5 million. Tr. 900:2-4 ("the multiple that we're basically using as the proxy is the total divided by that 198 million, which is 3.34"). Of course, one could reverse the calculation by taking the *total* filled orders of 198.5 million, multiplying that number by 3.34, and arriving at Sims's *total* base of 662.9 million transactions.

---

[18] Demonstrative PTX5858 notes that these numbers exclude 1,495,324 orders.

[19] Here is the calculation: $662,914,201 \div 198,597,502 = 3.34$. Tr. 900:2-4; PTX5854.

Because Sims simply backed into 3.34 by dividing the two totals, 3.34 cannot be used with any overlapping subset of the total numbers to figure out either the filled orders or the applicable trade base. To demonstrate, dividing the base of 84,082,773 for the Browse Prices infringement theory by 3.34, yields a total of 25,174,482. But that result does not yield the accurate number of filled orders under the Browse Prices theory, which is 21,843,696. *See* CHART 2. Similarly, dividing the base of 340,721,128 for the No Market Pane infringement theory (*see* CHART 1) by 3.34—which is what the jury apparently attempted to do—yields a base of 102,012,313. Again, however, 102 million is not actual number of filled trades under the No Market Pane infringement theory; 102 million is almost double the actual number of 53.3 million. *See* CHART 2.

Moreover, the 3.34 divider has no application whatsoever regarding the non-derivative transactions. Sims did not demonstrate any "proxy" for the number of placed, cancelled, or modified orders to the number of filled orders for the non-derivative trades.

Obviously, the jury attempted to award royalty damages based on transactions filled in accused interfaces, not under the applicable trade theory. The jury divided the total non-derivative transactions of 4,389,683 from TT's damages slide *by 3.34* to arrive at a royalty base of 1,314,276 on the verdict form. The jury attempted the same calculation for the futures transactions. But as explained above, using the 3.34 divider to arrive at total filled orders from total entered order would have worked in only one instance—when the total base for futures transactions was exactly 662,914,201. Since the Court correctly excluded the doctrine of equivalents from the case, TT was forced to present to the jury in closing argument a new base of 340.7 million. But TT did not explain to the jury that the 3.34 divider would not work in arriving at the actual filled trades under the Browse Prices and No Market Pane theories. And the jury

did not have the benefit of expert damages testimony after the Court eliminated the doctrine of equivalents from the case. Because the jury used a piece of evidence that no longer had any evidentiary value, its damages analysis is logically flawed, and not supported by legally sufficient evidence to support the verdict.

### 3. TT's Double-Counting Demonstrative

The jury's attempt to arrive at a reasonable royalty base was thwarted by TT's misleading demonstrative that double counted DOMTrader and ChartTrader.

After the close of evidence, TT presented the jury with a new and highly misleading demonstrative (without any foundation). Dkt. 1204 at 4. The slide suggested that the royalty base for futures should be 340,721,128 for DOMTrader trades *plus* 46,092,379 for ChartTrader trades for a *total* of 386,813,507 trades. This is the exact base that the jury used to arrive at its verdict. *See supra* at 40. But under TT's applicable trade theory, *all* trades filled in Integrated Client, including those filled through the ChartTrader interface, were already included in the base of 340,721,128 trades. *See* § C.2. *supra*; Tr. 2032:1-7, 2035:8-2037:9. Thus, the jury's verdict reflects double counting.

### C. There Is No Legally Sufficient Evidence to Support the Jury's "Minimum" Royalty Award.

The jury awarded $3,169,717 in minimum royalty payments. Dkt. 1210 at ¶ 7. But the trial testimony is very clear that the minimums sought by TT have *absolutely no relationship* to whether customers actually used the accused order entry interfaces in DOMTrader or Chart Trader. Tr. 930:10-13; *see also* 887:8-18 ("So if the number of trades for a particular trader fell below that minimum -- and in this case it would be 500 trades -- then they would be subject to the minimum. … So even if they're not used for a trade in a particular day, they would still be compensated for the fact that that system is out there and available for the trader.").

To be clear, TT demanded minimums for persons (1) who never used Integrated Client more than making just one trade but were enabled to use the software or (2) who entered orders in Integrated Client but *never* did so in accused order-entry interfaces with a static price column. Absent any connection to the award and use of the claimed static price ladder, the award of minimums cannot stand as a matter of law. *See supra* at 33-35; *see also ResQNet.com*, 594 F.3d at 869 ("Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute.").

Moreover, TT's damages expert never offered any factual basis for the $100-$150 minimum payment demanded. Mr. Sims simply multiplied the $50 minimum payment in three TT licenses (Tr. 966:23-967:13, 856:10-14) by 2 to 2.5, because the 20 to 25 cents royalty rate he urged was 2 to 2.5 times the 10-cent royalty rate in most TT licenses (Tr. 1034:4-1035:4). Mr. Sims did not and could not offer any other explanation for his multiplier, and not certainly not one tied to facts or logic. *Id.*; *see also* Tr. 967:14-968:3; 887:1-889:17. There is no evidentiary basis to simply double one form of royalty payment—paid for *non*-use—with another form of royalty payment based on filled transactions. TT's damages claim rested on nothing more than Mr. Sims' unsubstantiated and illogical multiplication.

"When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (finding that expert testimony was not sufficient to defeat JMOL because expert's opinion was not based on sufficient facts to support jury verdict); *accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (finding Federal Rules of

Evidence do not require admission of "'opinion evidence that is connected to existing data only by the ipse dixit of the expert.'").

On top of these fatal threshold flaws, TT offered no legally sufficient evidence to support even a minimum royalty payment of $50. Even if the three TT settlement licenses contemplating a $50 minimum payment were properly admitted over objection, the evidence is clear that no one ever *actually paid* a minimum royalty. Tr. 966:23-967:7; 1033:13-17 -; Tr. 1180:18-1182:17.

Absent any evidence that any licensee would or actually did make such a minimum payment, there is no legally sufficient evidence to support the jury's award. *See Minks v. Polaris Indus., Inc*., 2007 U.S. Dist. LEXIS 47220, at *6 (M.D. Fla. June 29, 2007) (denying motion to reconsider order reducing damages; "The Plaintiff's damages case was not devoid of financial information. … But Plaintiff made no effort to provide a nexus between those numbers and a reasonable royalty. The only credible evidence of a reasonable royalty was the royalty *actually paid* to Minks for the use of his patented technology. … [T]hat was the maximum royalty to which the Plaintiff was constitutionally entitled.") (emphasis added); *accord Uniloc*, 632 F.3d at 1317 ("[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case.").

D.     **There Is No Legally Sufficient Evidence to Support the Jury's Ten Cent Royalty Rate.**

After TT unsuccessfully attempted to persuade the industry exchanges to license its patents for 2.5 cents per trade (Tr. 960:5-961:1, 962:19-963:9, 2047:16-21), TT instead asserted its patents against a number of competitors, including CQG. By and large, competitors refused to license the patents—even for a mere penny per filled trade—or accepted licenses without making any actual payments for use of the patents. *See, e.g*., PTX1338 (PatSystems licensed patents); Tr. 964:9-965:6 (PatSystems paid no royalties); PTX1344 (Strategy Runner licensed

patents); Tr. 974:3-6 (Strategy Runner paid no royalties); PTX1346 (TransMarket Group settlement; no license); PTX1337 (Man Group settlement; no license); PTX1350 (Marex Trading settlement; no license); PTX1351 (Cunningham Trading license; agreeing to 2 cent royalty for non-asserted patents and refusing to license asserted patents for an additional 1 cent).

Yet still the jury arrived at a ten cents per transaction royalty rate. Dkt. 1210 at ¶ 7. But there is no legally sufficient evidence to support this royalty rate. Setting aside the inadmissibility of TT settlement agreements generally, only several a few entities ever actually purportedly paid a ten-cent royalty, such as Ninja Trader and Goldenberg Heymeyer. PTX1336; PTX1334; PTX1335; Tr. 2059:17-2062:22; 2066:18-2069:11. But these licenses were not sufficiently comparable to the hypothetical negotiation in this case to make the licenses sufficient to support the jury's verdict. Tr. 2059:17-2062:22;; 2066:18-2069:11.

Significantly, they were entered into in the coercive environment of threatened litigation (Tr. 1176:17-1178:10), not in the voluntary context contemplated by the hypothetical negotiation. *See LaserDynamics Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) ("The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia-Pacific*, the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee …."); *Paymaster Techs., Inc. v. United States*, 61 Fed. Cl. 593, 613, 2004 U.S. Claims LEXIS 211, at *68 (Fed. Cl. 2004) ("The Travelers settlement was motivated by ongoing litigation and designed to settle a lawsuit, conditions which counsel against projecting it into a hypothetical negotiation between voluntary and willing licensee and licensor.").

"[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc*, 632 F.3d at 1317. Here there is

simply no "basis in fact" supported by substantial evidence that CQG would have agreed to a ten

cent royalty rate—and given away significantly in excess of *all* its profit on order entry to TT.

### E.     The Jury's Royalty Award Cannot Be Deemed "Reasonable."

In assessing the reasonableness of a royalty, the court may consider the defendant's

actual profits relative to the damages award. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d

831, 858 (Fed. Cir. 2010) (noting "the district court found that the jury's award, while

'substantial,' was only a small fraction of Microsoft's profits from the sale of Word products");

*accord Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990) ("In determining the

result of such a hypothetical negotiation, the district court may consider the infringer's

anticipated profits, as indicated by evidence of actual profits.").

It is unreasonable to assume that the infringer "would be willing to pay 100% of his

[anticipated] profits to the patentee in exchange for a license." *Zegers v. Zegers*, 458 F.2d 726,

728 n.8 (7th Cir. 1972); *see also Century Wrecker Corp. v. E.R. Buske Mfg. Co.*, 898 F. Supp.

1334, 1337-38 (N.D. Iowa 1995) ("implicit in the 'reasonable royalty' methodology that the

infringer would be left with a reasonable profit"); *W.L. Gore & Assocs., Inc. v. Int'l Med.

Prosthetics Research Assocs., Inc.*, 1990 U.S. Dist. LEXIS 15497, at *59 (D. Ariz. 1990) ("In a

free market, a willing licensee would not agree to a royalty that exceeded anticipated profits.").

But that unreasonableness is precisely what the jury's damages award requires here.

To put the "reasonableness" of the jury's damages award in perspective here, unrefuted

evidence shows that the damages award represents almost eight times *all* profits that CQG has

*ever* made on its order entry business (which includes non-accused interfaces as well). For the

first ten years of offering order entry, CQG lost money as it invested approximately $30 million

into developing its order entry tools. Tr. at 1677:3-18. It was not until 2013 that CQG first

reached a break-even point with its order entry business, making approximately $2 million over the two-year period of 2013-2014.  *Id.*

Indeed, the jury's minimum payments total—awarding $3,169,717 for use of the Integrated Client software whether or not any order was ever entered or the accused interfaces were used for order entry—represents over 150 percent of CQG's profits on its entire order entry business.  Such a royalty award cannot be deemed reasonable under any circumstances.

In a hypothetical negotiation, no party would have agreed to hand over *all* profits it made to use the claimed invention, and then hand over more still more money for unpatented uses of its product.  *See Grain Processing Corp. v. American Maize-Prods. Co*., 893 F. Supp. 1386, 1390 (N.D. Ind. 1995) (Easterbrook, J.) ("When negotiating for a license to use the '194 patent, AMP would not have been willing to offer its total profits as the maximum royalty, Sims observed, because AMP had other options …").  A damages award giving TT every single penny of profit that CQG has ever made on order entry interfaces (whether infringing or not) reflects legal error that should be corrected.  *See Ericsson*, 773 F.3d at 1226 ("[A] jury must ultimately 'apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features' using 'reliable and tangible' evidence. . . . The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.") (citation omitted).

**F.      The Damages Award Should Be Reduced as a Matter of Law.**

The evidence does not support the jury's damages award based on 114,001,136 futures transactions and 1,314,276 non-derivative transactions.  Dkt. 1210 at ¶ 7.  The question, then, is what royalty does the evidence support?  The undisputed evidence shows that use of an order entry interface with the *mere capability* of a static price column within the Integrated Client software (whether or not a price is selected) is limited to 53,433,564 filled transactions.

| CQGIC DomTrader and CQGT/WT DomTrader Version Range [2] | Derivatives | Non-Derivatives | Total | Basis #1: Price Selection with Market Windows | Basis #2: Price Selected and Appearance of the Market Window Disabled | Basis #3: Responsive Scale with Price Hold is Equivalent to Static (Market Mode or Market and Browse Modes) |
|---|---|---|---|---|---|---|
| 7.1817-7.3802 and 2.741-2.8137 | 56,489 | | 56,489 | 56,489 | 56,489 | |
| 7.3803-7.3833 | | | 0 | | 0 | |
| 7.3834-7.4838 and 2.931-2.9102 | 1,082,647 | | 1,082,647 | | 1,082,647 | 1,082,647 |
| 7.4843-7.8812 and 2.10.008-4.00.696 | 25,097,998 | | 25,097,998 | | 25,097,998 | 25,097,998 |
| 7.8818-8.1852 | 4,634,946 | 7 | 4,634,953 | | 4,634,953 | 4,634,953 |
| 8.1859-8.1865 | 642,062 | | 642,062 | | 642,062 | 642,062 |
| 8.1872-8.2848 | 5,355,488 | 3,422 | 5,358,910 | 5,358,910 | 5,358,910 | 5,358,910 |
| 8.2852-8.3837, 8.4801-8.4810, and 4.01.107-4.01.112 | 16,431,719 | 128,786 | 16,560,505 | 16,560,505 | 16,560,505 | 16,560,505 |
| 8.3847-8.3850, 8.4811-14.7803 and 4.01.119-5.00.302 | 143,800,829 | 1,391,002 | 145,191,831 | | | 145,191,831 |
| Total | 197,102,178 | 1,523,217 | 198,625,395 | 21,975,904 | 53,433,564 | 198,568,906 |

PTX2665.0001.

And, using the jury's royalty rates, TT has already calculated what damages should be. Aware that it was seeking grossly unreasonable damages, even before its expert was deposed, TT calculated what a more reasonable royalty damages should be here. At the request of TT's counsel, Mr. Sims calculated damages based on a ten cent royalty assuming no minimum damages under each of the three infringement theories. Tr. 1060:4-16.

| CQGIC DomTrader and CQGT/WT DomTrader Version Range [2] | Derivatives | Non-Derivatives | Total | Basis #1: Price Selection with Market Windows | Basis #2: Price Selected and Appearance of the Market Window Disabled | Basis #3: Responsive Scale with Price Hold is Equivalent to Static (Market Mode or Market and Browse Modes) |
|---|---|---|---|---|---|---|
| 7.1817-7.3802 and 2.741-2.8137 | $5,648.90 | | $5,648.90 | $5,648.90 | $5,648.90 | |
| 7.3803-7.3833 | | | | | | |
| 7.3834-7.4838 and 2.931-2.9102 | 108,264.70 | | 108,264.70 | | 108,264.70 | $108,264.70 |
| 7.4843-7.8812 and 2.10.008-4.00.696 | 2,509,799.80 | | 2,509,799.80 | | 2,509,799.80 | 2,509,799.80 |
| 7.8818-8.1852 | 463,494.60 | $7.00 | 463,501.60 | | 463,501.60 | 463,501.60 |
| 8.1859-8.1865 | 64,206.20 | | 64,206.20 | | 64,206.20 | 64,206.20 |
| 8.1872-8.2848 | 535,548.80 | 3,422.00 | 538,970.80 | 538,970.80 | 538,970.80 | 538,970.80 |
| 8.2852-8.3837, 8.4801-8.4810, and 4.01.107-4.01.112 | 1,643,171.90 | 128,786.00 | 1,771,957.90 | 1,771,957.90 | 1,771,957.90 | 1,771,957.90 |
| 8.3847-8.3850, 8.4811-14.7803 and 4.01.119-5.00.302 | 14,380,082.90 | 1,391,002.00 | 15,771,084.90 | | | 15,771,084.90 |
| Total | $19,710,217.80 | $1,523,217.00 | $21,233,434.80 | $2,316,577.60 | $5,462,349.90 | $21,227,785.90 |

PTX2665.0004.

Applying the same royalty rates used by the jury, damages for infringement based on the actual use of the claimed invention cannot exceed $2,316,577.60. Even if damages are awarded for software versions that permitted entry into the No Market Pane state (although there is no evidence showing any trader used the DOMTrader in such a state), damages could not exceed $5,462,349.90 at the royalty rates used by the jury.

Because TT failed to prove that any trader ever manipulated the market window to create a static price ladder for order entry—*viz.*, actually used the claimed invention—the maximum damages could not exceed $2,316,577.60 as a matter of law. But not even this number is supported by substantial evidence, as explained below.

TT's expert, Christopher Thomas, testified that the DOMTrader infringement only when (1) a price was selected and (2) an order was placed using single click order entry without the display of confirmation windows. Tr. 625:20-626:14; 686:4-687:7. Despite this requirement, the transaction count from the Power Pivot table, which formed the basis for Mr. Sims' testimony (*id*. at 1041:4:15), represented the transaction fill count associated with orders placed with and without a price selected and with and without the display of confirmation windows. *Id*. at 2037:2-3 (pivot table represents the number of transactions that "*may* have used the claims of the patent") (emphasis added); *id*. at 2039:3-2040:19; 2117:18-2119:25 (pivot table doesn't specify whether a confirmation window was displayed at order entry; customer experience database includes this information); *id*. at 2120:1-2121:4 (pivot table doesn't specify whether a price was selected at order entry; customer experience database includes this information); *see also* Dkt. 926 at 1 (admission by TT that the customer experience database "was the only source of data regarding specific uses of the CQG products—namely whether users had prices selected when an order was entered and the only consistent source of data on whether users had confirmations on or off when entering an order.").

The only non-speculative evidence of transactions entered while a price was selected without the display of a confirmation window *came from the Court's adverse inference instruction.* There, the Court gave the following instruction:

There was evidence that was requested form TT—from CQG by TT, and at this time you are instructed that CQG failed to preserve the information from a data set called the customer experience logs. These logs contained information about both the disabling of confirmation windows and the selection or lack of a selection of a price by users in the accused products.

Due to the failure to preserve by CQG, you *may infer that the data would have been unfavorable to CQG's positions and favorable to TT's position* regarding the disabling of confirmation windows and the selection or lack of selection of prices by users in this case.

That instruction *only goes to the customer experience logs* and the data sets surrounding that. There's a lot involved in this case, but that instruction goes to that particular evidence that was not provided. All right?

Tr. 2008:2-20 (emphasis added).

Mr. Katin testified that the customer experience database only tracked certain orders placed using the Integrated Client product (and not the Trader product). Tr. 2216:13; 2217:18. Further, while the customer experience database always tracked whether confirmation windows were displayed during order entry, it only tracked whether a price was selected during order entry starting in 2010. Id. at 2217:4-6. And even then, the customer experience database included data on only approximately 10 percent of CQG's Integrated Client customers. *Id*. at 2217:17-21.

Given the Court's instruction and the dearth of evidence regarding orders placed with price selection without the display of a confirmation window, the royalty base must be limited to 10 percent of the post-2010 fill volume when the customer experience database first started to track price selection. But neither party's damages expert testified as to fill volume by date. Instead, Mr. Sims provided volume data by version number range. Despite this shortcoming, however, Mr. Thomas' testimony included the following demonstrative correlating Integrated Client version ranges to release dates.

Summary of Infringing Products:
CQG Integrated Client with DOMTrader

Can disable Market Window by changing the .ini file

| Range No. | Release Dates | Version Range | DOMTrader Infringes Due To: | | |
|---|---|---|---|---|---|
| | | | Browse Prices Mode | Market Window Disabled Mode | Price Hold Mode |
| 1. | 08/05/04–07/08/05 | 7.1817–7.3802 | ✓ | ✓ | |
| 2. | 07/25/05–11/17/05 | 7.3803–7.3833 | ✓ | ✓ | |
| 3. | 11/30/05–09/19/06 | 7.3834–7.4838 | | ✓ | |
| 4. | 10/03/06–04/25/08 | 7.4843–7.8812 | | ✓ | |
| 5. | 05/06/08–03/31/09 | 7.8818–8.1852 | | ✓ | |
| 6. | 04/13/09–05/08/09 | 8.1859–8.1865 | | ✓ | |
| 7. | 05/12/09–11/18/09 | 8.1872–8.2848 | ✓ | ✓ | |
| 8. | 12/14/09–11/18/10 | 8.2852–8.3887, 8.4801–8.4810 | ✓ | ✓ | |
| 9. | 11/30/10–Present | 8.3847–8.3850, 8.4811–Present | | | |

PTX 5615

40

PTX5615.

This table correlates the range 8 versions (i.e., 8.2852-8.3887 and 8.4801-8.4810) to

12/14/09-11/18/10. *Id.* And this table demonstrates that the range 9 versions of Integrated

Client do not infringe under TT's Browse Prices and No Market Pane theories. Id. Because TT

was collaterally estopped from asserting a doctrine of equivalents theory based on price hold

(Dkt. 1175), the royalty base must be limited to 10% of the contract fill volume associated with

Integrated Client 8.2852-8.3887 and 8.4801-8.4810.

Turning back to the Mr. Sims' fill volume testimony, the jury heard that CQG processed

16,431,719 fills from derivatives (or futures) orders and 128,786 fills from non-derivatives

orders that were associated with this range of Integrated Client together with 4.01.107-4.01.112

(the corresponding range in Trader).[20]  PTX2665.001 (*see supra* at 51).  Taking 10 percent of this fill volume because the data CQG inadvertently did not retain in the customer experience database only represents 10 percent of the Integrated Client customer base, the highest royalty base that the jury could have accepted was:  1,643,171 derivatives and 12,878 non-derivatives fill transactions.  At the royalty rates determined by the jury, damages could not exceed (1,643,171 x $0.10) + (12,878 x $1.00), or $177,195.10.

As a matter of law, the Court should reduce damages to $177,195.10.  Moreover, because there is no basis for TT to seek any greater damages at a new trial, it is unnecessary to order a new trial to reduce the damages.  A court may reduce a damages award without a new trial when "it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there."  *Holmes v. West Palm Beach Housing Auth*., 309 F.3d 752, 756, 758 (11th Cir. 2002) (finding district court did not abuse its discretion in declining to offer the option of a new trial in lieu of remittitur given that the lost back-pay/benefits awarded is identifiable and quantifiable and as a matter of law should not have been included in the verdict).[21]

"[W]here a portion of a verdict is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount."  *Johansen v. Combustion Eng'g, Inc*., 170 F.3d 1320, 1330 (11th Cir. 1999).  Indeed, "if legal error is detected, the federal courts have the *obligation* and the power to correct the error

---

[20] Neither party distinguished volume by product, choosing instead to group Integrated Client and Trader fills together.  Thus, this number cannot be parsed any further.

[21] *See also Tronzo v. Biomet, Inc*., 236 F.3d 1342, 1351 (Fed. Cir. 2001) ("[T]he district court did not reweigh any evidence, nor did it exercise its discretion in computing the damages award. Instead, the court awarded the maximum damages possible given the lack of competent evidence in the record."); *Carter v. District of Columbia*, 795 F.2d 116, 134-135 (D.C. Cir. 1986) (when a jury's damages assessment includes an impermissible component that can be identified and calculated with precision, the district court may reduce damages); *Cornell Univ.*, 609 F. Supp. 2d at 292 (Rader, J., by designation) (multiplying jury's explicitly stated royalty rate by lower royalty base found as a matter of law).

by vacating or reversing the jury's verdict." *Id*. (emphasis added); *see also Consolidated Cos. v. Lexington Ins. Co*., 616 F.3d 422,435-436 (5th Cir. 2010) (affirming judgment reducing damages award where "*the precise amount*" of the jury's verdict showed error). The proper amount of a reduced judgment is the maximum amount sustainable by the evidence. *See D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co*., 692 F.2d 1245, 1249 (9th Cir. 1982).

The Court should reduce damages to an amount supported by both the law and evidence. There is no need for a second trial; the Court can and should calculate and award legally sustainable damages using the jury's royalty rate.

## CONCLUSION

TT failed to meet *its* burden of presenting the jury with substantial evidence to support its infringement claims. They should be dismissed as a matter of law. But if not, any damages for literal infringement should be limited to damages tied to actual use of the claimed invention.

Dated: April 20, 2015                                    Respectfully submitted,

By*:  /s/ Laura A. Wytsma*
          Adam G. Kelly
          William J. Voller III
          Christopher M. Swickhamer
          John A. Cotiguala
          LOEB & LOEB LLP
          321 North Clark, Suite 2300
          Chicago, Illinois  60654
          (312) 464-3100 Telephone

          Terry D. Garnett (*pro hac vice*)
          Laura A. Wytsma (*pro hac vice*)
          LOEB & LOEB LLP
          10100 Santa Monica Blvd., Ste. 2200
          Los Angeles, California 90067
          (310) 282-2000 Telephone

          *Attorneys for Defendants*
          *CQG, INC. and CQGT, LLC*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document has been served on all counsel of record via the Court's Case Management/Electronic Case Filing and/or electronic mail on April 20, 2015.

By:   /s/  Laura A. Wytsma
                        Laura A. Wytsma