```
 1                   IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3
     TRADING TECHNOLOGIES          )  No. 05 C 4811
 4   INTERNATIONAL, INC.,          )
                                   )
 5                    Plaintiff, )
                                   )
 6           vs.                   )  Chicago, Illinois
                                   )
 7   CQG, INC., and CQGT, LLC,   )
                                   )  February 23, 2015
 8                    Defendants.)  10:00 a.m.

 9
                              BENCH TRIAL
10                     TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE SHARON JOHNSON COLEMAN
11

12   APPEARANCES:

13   For the Plaintiff:  TRADING TECHNOLOGIES INTERNATIONAL, INC.,
                          222 South Riverside Plaza
14                        Suite 1100
                          Chicago, Illinois  60606
15                        BY:  MR. STEVEN F. BORSAND

16                        MC DONNELL, BOEHNEN, HULBERT & BERGHOFF LLP
                          300 South Wacker Drive
17                        Suite 3200
                          Chicago, Illinois  60606
18                        BY:  MR. LEIF R. SIGMOND, JR.
                               MR. S. RICHARD CARDEN
19                             MS. JENNIFER M. KURCZ
                               MR. JAMES C. GUMINA
20                             MR. MATTHEW J. SAMPSON

21


22


23                        PATRICK J. MULLEN
                          Official Court Reporter
24               219 South Dearborn Street, Room 1412,
                        Chicago, Illinois  60604
25                          (312) 435-5565
```

```
 1  APPEARANCES CONTINUED:

 2  For the Defendants:  LOEB & LOEB LLP
                         321 North Clark Street
 3                       Suite 2300
                         Chicago, Illinois  60610
 4                       BY:  MR. ADAM G. KELLY
                              MR. WILLIAM J. VOLLER
 5
                         LOEB & LOEB LLP
 6                       10100 Santa Monica Boulevard
                         Suite 2200
 7                       Los Angeles, California  90067
                         BY:  MS. LAURA A. WYTSMA
 8                            MR. TERRY D. GARNETT

 9                       KIRKLAND & ELLIS LLP
                         300 North LaSalle Street
10                       Chicago, Illinois  60654
                         BY:  MR. KENNETH R. ADAMO
11                            MR. EUGENE GORYUNOV

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            THE CLERK:  05 C 4811, Trading Technologies, Inc.

2  versus CQG.

3            THE COURT:  All right.  All parties, this isn't a

4  one-man show here.  Everybody can stand up.

5            MR. ADAMO:  Good morning, Your Honor.

6            THE COURT:  Names for the record, please, for the

7  hearing only.  Not the cast of thousands, only the ones who are

8  participating in the hearing will state your names.

9            MR. ADAMO:  Plaintiff should go first, Your Honor.

10            THE COURT:  Yes, he should.

11            MR. BORSAND:  Steve Borsand for Trading Technologies.

12  Good morning.

13            MR. ADAMO:  And Ken Adamo for CQG, Your Honor.

14            THE COURT:  All right.  Thank you, Mr. Adamo.  Are we

15  ready for the hearing?  Just before we get started, the Court

16  is just making sure that I have not missed something.  When I

17  was reviewing the many different moving parts of this case, the

18  Court was looking at the preliminary jury instructions.  On

19  page 4, I noted that CQG states the position:

20            "Because the validity of the patent is not at issue,

21  it is unnecessary to discuss the prosecution of the patent."

22            Does that affect the rest of what we do here?  Look

23  at your own page 4.  It's your own.  That's the notes I had

24  from CQG, so I just wanted to make sure that we were correct in

25  going forward.

1          MR. ADAMO:  From my view, Your Honor, yes, we're

2    definitely locked and loaded and ready to go.

3          THE COURT:  Okay.  Then why don't you take a look at

4    that.

5          MR. KELLY:  Judge, I will, and I'll get back to you

6    on that.  Thank you.

7          THE COURT:  The instructions as well as just the

8    scope of everything we're doing would seem to be sort of thrown

9    in flux if that was, indeed, the case.  I didn't think so, but

10   I thought I'd reach out there, maybe.

11         MR. ADAMO:  Certainly the issue that brings us before

12   the Court this morning, although rigorously it relates to

13   eligibility, it certainly does in the overall scope fit under

14   the broader umbrella of a validity issue.

15         THE COURT:  Right.  I just wanted to make sure what

16   you are doing today wasn't affected by what I saw as a slight

17   perhaps inconsistency on the part of what I was reading.  But

18   you can take a look at that further.

19         Mr. Adamo, please, let's go.

20         MR. ADAMO:  Your Honor, on occasion I have been

21   disinvited to parties, but not ever quite that subtle.

22         THE COURT:  All right.

23         MR. ADAMO:  If I might hand to your courtroom deputy

24   a copy of the materials we'll be using today, I provided copies

25   to your colleagues sitting to your left.

```
 1              THE COURT:  Excellent.

 2         MR. ADAMO:  And opposing counsel has copies as well.

 3              THE COURT:  All right.  Proceed.

 4         MR. ADAMO:  We're proceeding this morning, Your

 5   Honor, as I understand it based on your order which is docket

 6   entry 892, we are here for the, quote, hearing on the legal

 7   question of patent-eligibility, closed quote.

 8              By agreement and with Your Honor's permission, you

 9   indicated that we'd go for three hours maximum with a hour and

10   a half for each party maximum, and I would be able to reserve

11   time.  I would speak first and speak last.  It's my intention

12   to reserve 30 minutes.  If I don't need the hour to get where

13   I'm planning on stopping, I will stop and won't go longer than

14   30 minutes on the rebuttal.

15              I appreciate the fact that this has been briefed, and

16   this is more an opportunity to clarify anything in the briefing

17   that we've not made clear to the Court, and hopefully sometimes

18   visuals help on something that's potentially this complicated.

19              THE COURT:  The Court appreciates any assistance, and

20   that was really what I was getting at in my other comments.  If

21   you need to assist the Court who's been living with this for

22   four years, even though I'm not technical and you all have been

23   living with it longer, imagine the poor jury coming in.  That's

24   all I'm saying.

25              Proceed, counsel.
```

1          MR. ADAMO:  Well understood, and I appreciate the

2    guidance, Your Honor.

3          THE COURT:  All right.  Proceed.

4          MR. ADAMO:  Your Honor, just to set a little bit of

5    context, the Patent Act, even as revised, has certain parts and

6    pieces to it, and essentially we're dealing with the very early

7    parts of the act where the basic definitions are set out and

8    then the criteria for the finding of a patentable invention are

9    set out.  There are three that really go to basic criteria:

10   101, 102, 103.  101 deals with patentable subject matter.  102

11   and 103 deal with novelty or anticipation in the case of 102

12   and non-obviousness in the case of 103.

13         We are not here today and there's no relevance to the

14   eligibility analysis under Alice of either:  Is the claimed

15   inventions of the '132 or '304 patents novel?  Are they novel

16   or not, or are they obvious or not?  That is not relevant

17   subject matter, and we've briefed the case law that

18   demonstrates that to you.  But I just want to start there

19   because I'm afraid that TT is planning on spending from their

20   briefing a lot of time on 102 and 103.  I'm not going to spend

21   any time on it at all because it's not relevant.

22         101 is fairly straightforward.  It states what can be

23   subject to a patent or can properly give rise to a patent, but

24   there are exceptions to 101, three particularly.  They're all

25   judge-made.  As you can see, the exceptions actually go back

1  150 years or so.  The one exception that we're addressing with

2  regard to the hearing today is the abstract ideas exception.

3  Basically, the courts have said that you are not entitled to

4  claims or a patent that will improperly grab onto a major

5  abstract idea.

6         The case that everybody always talks about on this is

7  when Samuel Morrison invented the telegraph.  He put a claim

8  into his patent that is called Claim 6, and the United States

9  Supreme Court looked at that claim and basically said:  What

10  you've got here is too broad.  That is what led to the abstract

11  ideas.  You just got the general idea of communicating using

12  electricity.

13         I'm paraphrasing what they said.  We're not going

14  that broadly, and that's one of the seminal cases in this area.

15  Patent eligibility is a threshold test, and that's one of the

16  reasons why since the Alice case was decided by the Supreme

17  Court so many of your brothers and sisters at the district

18  court level have been having hearings such as we're having

19  today dealing with eligibility because this really is a basic

20  threshold issue.

21         There is some uncertainty at the moment in full

22  candor as to what the burden of proof here has to be for you to

23  render a decision that these claims of '132 or '304 are invalid

24  because they are non-eligible.  Opposing counsel has agreed in

25  their opposing brief at page 11.  While they say that they

1  believe clear and convincing evidence should be the burden,

2  they do say, quote:

3            "However, the law on this is not completely settled

4  in view of the concurrence in Microsoft versus i4i."

5            That is what I've cited at the top of this slide.

6  This is number 6, where Justices Breyer, Scalia, and Alito

7  said:  Where we're dealing with a legal question, not a factual

8  issue, not a prior art issue, the majority's saying clear and

9  convincing applies dealt with novelty and obviousness issues.

10  The concurrence is pointing out that if you're on a straight

11  legal question, you're not.  So the strict burden of proof

12  shouldn't have any application.

13            There is a concurrence by former Chief Judge Mayer of

14  the Federal Circuit in Ultramercial where he reaches the same

15  conclusion.  I will, however, say in candor, one of your

16  colleagues, Judge Hart I believe, decided this case on January

17  29th of this years, granted a Rule 12 motion, found the claims

18  subject matter was patent-ineligible, and invalidated the

19  patent, but he did so under the clear and convincing evidence

20  standard.

21            It's our submission that irrespective of which of the

22  standards you apply, the situation here supports your entering

23  an order that the claims are, in fact, patent-ineligible and

24  hence not valid.

25            Alice has two parts to it.  The first part is you

1    determine -- "you" meaning Your Honor because this is a

2    complete legal issue, a totally legal issue, and both sides

3    agree on that -- you first determine whether the claims at

4    issue are directed to a patent-ineligible concept. So here it

5    would be an abstract idea.

6            If you make that determination, then there's a second

7    part of the test, and the test essentially is what else is

8    there in the claim that would take the abstract idea and put

9    enough meat on the bones, for lack of a better way to phrase

10   it, so that even though there is an abstract idea at the base,

11   there's enough detail and non-old-style, well-known,

12   previously-used, go-load-it-on-a-computer-and-it-works type of

13   limitations. If there's enough more, then you can come to the

14   conclusion that despite the fact that it's abstract, it is

15   patent-eligible.

16           The court uses terms like "additional elements that

17   transform the nature of the claim" and uses at the bottom of

18   the slide then -- and we're on number 8 -- uses terms such as

19   "an element or combination of elements that's sufficient to

20   ensure that the patent in practice amounts to significantly

21   more" -- that is, in the original -- "than a patent upon the

22   ineligible concept itself."

23           In candor, that is all the guidance that the Supreme

24   Court gives the trial bench as to how to apply Alice. You've

25   seen it all. Alice basically took a test that was applied in

1   an earlier case called Mayo and used that as its base point,

2   but this is it.  Commentators have said this sounds like

3   Justice White's famous comment about pornography:  I'll know it

4   when I see it.

5           THE COURT:  Know it when I see it.

6           MR. ADAMO:  So the Court knows why I've set the

7   presentation today up in this fashion, I've set it up to show

8   you what your brethren at the district court level and at the

9   Federal Circuit level have done in doing these analyses.  So

10  what I've got set up here is the abstraction part of the test

11  first, so you can see what the abstract idea was that the trial

12  court found, compared to the claims, so you can see in almost

13  every case the abstraction, as you might imagine, is much more

14  succinct, much more compressed than the original claim.

15          Then after showing you a series of those cases that

16  are as close to the scenario presented by the '132 and '304

17  patents as we could find -- and there's not one that's dead on

18  factually, but there are a couple that we feel are pretty close

19  -- so that you can see how the analysis was done, and then also

20  show you the second part of the Alice test and show the

21  detailed analysis to see if that significantly more was

22  present, with the hope that these comparisons would inform your

23  decision as you're looking at the particulars here in this

24  case.

25          Now, our view and where we believe the Court should

1   come out is as summarized on slide 9.  '132 and '304 claim an

2   abstract idea.  The abstract idea is placing an order for a

3   commodity on an electronic exchange, basing that order on

4   observed market information, as well as updating the market

5   information.

6          With the abstraction being there, step 1 of Alice is

7   satisfied.  You go to part 2.  It's our position either by

8   clear and convincing or by preponderance of evidence or de novo

9   or whatever standard you feel is appropriate in a clear legal

10  issue, no facts, that there's no claim element in either the

11  '132 or the '304 claims that either individually or taken as a

12  group transform the claim into patent-eligible subject matter.

13  The claims recite conventional steps performed by a generic

14  computer at a very high level of generality.

15         Now, somewhere this morning somebody is going to

16  start talking to you about the DDR case.  I'm going to let them

17  go first for one very simple reason.  DDR is so factually

18  inapposite that we shouldn't be talking about it at all.  This

19  is their lifeline case.  This is the case they're putting all

20  their money on.

21         But what you will see in DDR when you look at those

22  claims is something markedly different than what the claims in

23  issue here relate to.  DDR really does relate to the Internet,

24  equipment used in the Internet, how the Internet operates, for

25  example, when you click on a link and then you jump to another

1    page.  This is very much grounded in computer technology.

2    That's not the case that's presented by the claims here.

3            The question that TT can't answer at the end of the

4    day is where in the claims is the showing that significantly

5    more is claimed and present over and above the abstraction.

6    They can't make that showing in our view in view of the

7    controlling precedent.

8            One of your colleagues out of Northern California,

9    Judge Donato, recently decided a case where, finding the claims

10   patent-ineligible, he made this pithy statement:  Well, you

11   know, you take a standard this or a conventional this and a

12   standard or a conventional that, you plug them all together,

13   and you're still in the town of standard.  You're still dealing

14   with conventional situations that don't satisfy the second part

15   of the Alice test.

16           Now, Your Honor, do you see these three white binders

17   on the counsel table behind me that are labeled 1 of 3, 2 of 3,

18   3 of 3?  Those are the patent owner's preliminary response

19   documents that TT filed in the United States Patent and

20   Trademark Office with respect to a CBMR business method review

21   that was granted with respect to the '132 patent.

22           That patent board, three examiners, 30 years

23   experience amongst the three of them, and we attached their

24   resumes and their bios onto our reply brief so that the Court

25   could see them.  That board held that the petition demonstrates

1   it's more likely than not -- "more likely than not," of course,

2   is preponderance of the evidence or it could be read that way

3   -- that the challenged claims are unpatentable under 101, and

4   they instituted the review for all 56 of the claims in the '132

5   patent.  They went through in detail the analysis required by

6   Alice in part 1 and part 2, and I've quoted that on slide 12 so

7   the Court can look at them later.

8         In particular, notice that they found that Claim 1 is

9   directed to the abstract idea of placing an order based on

10   observed market information as well as updating the market

11   information.  That is exactly the same finding -- excuse me --

12   that we're asking you to make verbatim.  There may be a

13   difference of one word or two, but I think it's pretty much

14   verbatim.

15         Then they went on, the board, the three-member board,

16   to do this part 2 analysis, and they said:

17         "Claim 1 does no more than simply instruct the

18   practitioner to implement the abstract idea on a GUI.  To be

19   patent-eligible, a claim cannot simply state the abstract idea

20   and add the words `apply it.'"

21         And I believe that's a quote that essentially comes

22   straight out of Alice.  You can't just state the abstract idea

23   and add the words "apply it."

24         Now I am not trying to tell Your Honor that you are

25   estopped or bound or even stare-decisised, however that should

1   come out, by what the board has found so far.

2          THE COURT:  Well, that's preliminary.

3          MR. ADAMO:  It's preliminary in the sense that it is

4   not the trial which is going to come 12 months from now.  But

5   my point is, yes, it's preliminary, but it is confirmatory of

6   the position that we are trying to demonstrate to you is

7   appropriate on the law here and on the claims that the '132

8   patent presents, and as you'll see in the papers it has overlap

9   on the '304.

10          They did request a CBMR on '304.  It was refused

11  because they didn't make an appropriate showing.  I'm not

12  exactly sure why they only put two pages into the petition.

13  I've read it, but it was not on the merits of the 101 position

14  that was taken.  The board just said:  You haven't gotten

15  enough even to get us to start, so we're simply not going to

16  look at it.

17          Now, why did I put all of this stuff on the table?

18  Well, TT took full advantage of a procedure that's part of this

19  preliminary finding, whether you're going to initiate or not,

20  to file what's called a patent owner's preliminary response.

21  That material that's on the desk here is what they filed plus a

22  bunch of videos.  So they took full advantage to rebut and to

23  try to convince the office not to initiate the procedure, and

24  they were unsuccessful.

25          Then they went in and asked for rehearing, and the

1   board said they didn't overlook patent owner's arguments

2   regarding the legislative history of section 18 of the AIA

3   which they said set a different rule for a GUI.  They went on

4   at great length in slides 13 and 14 to explain why they don't

5   believe that Claim 1 cites a novel GUI tool, so this is more

6   the second part of the Alice test.

7           Then interestingly at the last paragraph -- and I

8   believe you're going to hear for some reason an awful lot about

9   this word "technological" today which, by the way, has nothing

10  to do with the 101 analysis.  It does, however, have to do with

11  what you have to satisfy to get a CBMR.  But the board twice

12  now, on the original initiation and on reconsideration and

13  rehearing, said:  You don't have a technological invention

14  here, and because you don't have a technological invention, you

15  are subject to a CBMR.

16          So they even reached that issue on rehearing the

17  second time it's been raised.  Now, again, I am not backdooring

18  or making any attempt to try to get you to treat this as if

19  it's anything other than preliminary.  By the same token, this

20  was not unopposed.  This was not something that was done by a

21  kid right out of college sitting in the patent office.  This

22  was something that was done with full ability to take opposing

23  positions and to educate the office on these positions on this

24  101 issue, same law, same application.

25          So my suggestion is, humbly -- and I am being humble

1  about this -- I believe it is helpful to demonstrate that what

2  we are trying to show you should be your ruling has

3  confirmation by the PTAB and by 30 years worth of patent

4  examiners.

5          All right.  Let me get into the meat now.

6          THE COURT:  Move on.

7          MR. ADAMO:  Yes, ma'am.

8          THE COURT:  Thank you.

9          MR. ADAMO:  Thank you.  Just some of the background

10 from where all of this is taken.  So I've gone through the

11 power points, and we're up to the rehearing on 13 and 14.  So

12 we're now addressing some of the background.

13         The patents, both of them, '132 and '304, which as

14 Your Honor will recall have almost exactly the same

15 specification, go to some length in a section called the

16 background of the invention where they admit to all the things

17 that are conventional relating to the technology that

18 eventually they submit the claims on.

19         They go on at some length that electronic trading was

20 known before the patents were filed.  Using a GUI structure for

21 electronic trading was known beforehand, where the trading

22 screens enabled traders to enter and execute orders, obtain

23 market quotes, monitor positions.  That's slide 15, Your Honor.

24         They noted the prior art GUIs displayed bid and asks,

25 allowed the trader to enter orders.  And as we're going to see

1    in a moment, the inside market, which I'm sure you've heard

2    enough till you're blue in the face about, the inside market

3    was also something that prior art GUIs disclosed, and screens

4    that were used to trade paying attention to the inside market

5    were conventional.

6           In the patents, Figure 2 appears in both of these

7    patents.  This is slide 17.  This was in the preliminary

8    response, the three binders back here.  Mr. Brumfield told the

9    patent office that he had, in fact, used a Figure 2-type screen

10   before he had come up with the Figures 3 to 5 screen.

11          You can see how this is set up.  Best bid price, best

12   ask price, those two boxes in the top center are, in fact, the

13   inside market, and they stay in that same position.  The slide

14   at the bottom was also submitted by TT to the board as an

15   example of another type of GUI that was well-known.  So now

16   we've got columns with bid and ask, we've got locations for the

17   inside market, and all of that is in screens and GUIs that were

18   previously known.

19          Now this one, though, slide 18, which was also

20   submitted to the patent office, this one is particularly

21   interesting, and it took us quite a while to figure out how

22   that first screen worked.  This first screen has an inside

23   market.  That's your yellow box, Your Honor.  So we're on the

24   left-hand side of slide 18, and that's the inside, the inside

25   market, and that box doesn't move.  So right now you're looking

1   at a screen that's essentially in a static position.

2           Unfortunately, I don't have a video to show you of

3   this.  My understanding of how this works from reading what TT

4   sent to the patent office in the POPR is that box will stay

5   where it is, prices will change.  So that center column will,

6   in fact, move, and then the offer, the bid and ask sides, those

7   numbers will move and readjust.

8           That means you can see the market moving up and down

9   because of this vertical line and the fact that the inside

10  market position is fixed.  This is conventional, and it is

11  extremely close to Figures 3 through 5 and the claims,

12  particularly the independent claims of '132 and '304.  All of

13  this is conventional.  Why am I spending the time on this?

14  This is what the Alice analysis is all about.

15          All right.  Claim 1, the one-part analysis for the

16  claims, we focused on the independent claims for both of the

17  patents.  We have, in fact, briefed all of this all the way

18  down to the dependent claims, so I'm not going to take the

19  Court's time to show you this.

20          This same level of detail for the dependent claims is

21  in pages 16 through 20 of our opening brief, but what I'm

22  showing you on slide 20 is here's Claim 1 and I'm showing you

23  where the abstraction that we're suggesting to Your Honor is

24  what you should find, the same abstraction that the PTAB found

25  is shown on the claim.

```
 1          The observing and updating market information relates
 2 to the displaying operation which is shown in the second
 3 element of the claim below the preamble, and the placement
 4 order for a commodity on an electronic exchange based on
 5 observed information is in several different locations.  It's
 6 in the preamble.  Arguably, it's in the setting of pre-set
 7 parameter for the trade order, which the patents actually say
 8 is the clock that you turn on every day so that you can see
 9 what time it is, and in the last of the two elements,
10 displaying and selecting.  On 21, I've shown you the same thing
11 for Claim 1 of the '304 patent.
12          Now, TT has briefed very heavily the fact that I
13 haven't got any arrows drawn to every part of those claim
14 elements, but they're both method claims.  So you look for the
15 step for the operation to determine what the claim is directed
16 to, and you've got displaying, displaying, displaying,
17 displaying, setting on the '304 patent and you've got placing
18 an order, setting, displaying, displaying, and selecting on
19 Claim 1 of the '132 patent.  That is a proper abstraction
20 analysis from these two claims.
21          That gets you to the abstract idea on 22 of placing
22 an order for a commodity on an electronic exchange based on
23 observed market information as well as updating the
24 information.  I just parked some more of the conventional
25 knowledge that was in the patent of -- yes, it was in the
```

1   patent, in the patent and in some of the materials that are in

2   their brief.  Excuse me, Your Honor.  I've parked some of those

3   on the bottom of slide 22.

4         Now, TT is going to try to tell you:  Boy, they must

5   have really loaded this abstraction analysis because they

6   hardly have got any of the claim in the analysis.

7         This is a series that I'm about to show you, starting

8   at slide 23, showing how the abstraction was taken from real

9   world claims.  As you can see, here's the Alice court

10   abstraction where the abstraction is really the use of

11   intermediated settlement, and here's all the language on the

12   right-hand side from the claim that could be argued to relate

13   in some fashion to this, following as best as I could tell how

14   TT wants you to do this.

15         In Money Suite -- and now I'm on slide 24, and this

16   is a district court case -- in Money Suite, the court found as

17   the abstraction the concept of assigning prices to financial

18   products and services.  This one is getting closer to the

19   subject matter of the '132 and '304 claims.  Again, look at the

20   representative claim and you can see that the abstraction

21   really is a condensed, much condensed version of the

22   representative claim.

23         Interestingly in Money Suite, the court in Delaware

24   said -- and, unfortunately, I inadvertently clipped the end of

25   the bottom quote, but I want to read all of it to you:

1    "Using computers to apply commonplace ideas, such as
2    generating price quotes, is not a patentable invention."
3        Here's the part that I apologize.  On our editing I
4    missed this until last night.  It goes on to say:
5        "It's not a patentable invention even if the computer
6    is able to handle volumes and complexity at levels impossible
7    for humans."
8        I'm sure you're going to hear that that is exactly
9    what the devices, MD Trader for sure, but what those devices
10   are capable of doing.  They can do stuff at volumes and
11   complexity at levels impossible for humans.  Money Suite says:
12   So what.  That is not sufficient to demonstrate the presence of
13   a patent-eligible subject matter.
14       Enfish, similarly, the district court analysis on the
15   left as to what the abstract concept was when Alice 1 was
16   applied and the actual claim on the right.  Again, the
17   concepts, because it is an abstract idea, are in the nature of
18   summaries, same situation.
19       All of these cases that I'm showing you, Your Honor,
20   though I know this won't come as a surprise, starting with
21   Alice which was on slide 23 and going through the end of this
22   series, in each of these cases the court found
23   patent-ineligible subject matter and invalidated the claims.
24       Accenture Services, again, the abstract idea,
25   handling insurance-related information.  This is slide 26.

1    There's all the language in the claim that was reviewed or

2    could relate to this concept but was not necessary to

3    summarizing the abstract.

4           Cyberfone, another situation, this is a Federal

5    Circuit case, however:

6           "The idea of collecting information in classified

7    form, then separating it and transmitting it according to a

8    classification, abstract idea."

9           It's just well-established, fundamental concepts.

10   Once more, a lot in the claim, not much in the abstract idea.

11          Digitech, there the claim -- the abstract idea was

12   organizing information through mathematical correlations.  Now,

13   this one, again, is getting a little closer to '132 and '304.

14   You need an algorithm to maintain the static column that is in

15   the claims.  It's not in the steps, but is recited in the

16   claim.  You need an algorithm for the device and the systems

17   that generate that kind of a presentation, I guess, is the best

18   way to say it.

19          Content abstraction and transmission, this is now

20   slide 29.  The abstract idea here is collecting data,

21   recognizing certain data within the collected data set, and

22   storing that recognized data in a memory.  It's getting not

23   quite as close to '132 and '304, but in the same neighborhood.

24          So the abstraction that was found which we are

25   suggesting is appropriate for Your Honor and was the

1    abstraction that the board found is consistent in its

2    conciseness, and it's not wholesale throwing everything from

3    the claim into the abstract idea.  All of this precedent is

4    consistent with that analysis which, again, is offered to

5    demonstrate to Your Honor that the analysis that CQG has

6    offered here is not off in left field somewhere.

7              All right.  Now let's talk about Alice 2.  The

8    Supreme Court is very clear on this that mere recitation of a

9    generic computer can't transform a patent-eligible abstract

10   idea.  Conventional steps, not enough to supply the inventive

11   concept.  Also, generic computer implementation is not enough.

12             I would remind Your Honor -- I'm sure you've noted

13   this, but I'm going to remind you with respect again -- these

14   claims have got very little, if anything, to do with computer

15   equipment.  If you look at the preamble in Claim 1 to the '132

16   patent, it talks about a graphical user interface and a user

17   input device.  Full stop, that's it.  That's all that's in the

18   claim.  The specification goes on at great length to say you

19   can use anything that will work.  You can use something that

20   hasn't even been invented yet.  They say that in several

21   locations.

22             This is important when you start hearing about DDR

23   from them.  This is all that there is in the way of computer

24   technology in this claim.  Then they say that you can, in fact,

25   practice these methods mechanically, pen and pencil.  You don't

1   have to have a computer.  That's how broadly this specification

2   goes.  Now, the claims are narrower and the claims control, but

3   that's it as far as how much computer technology you've got in

4   here.

5          If you look at Claim 1 of the '304 patent, the only

6   thing you've got computer-wise in there is the graphical user

7   interface, the GUI.  You don't even have the mouse in there, in

8   the preamble.  Now, there is a user input -- single action of

9   user input device in the last element of Claim 1 of the '304

10  patent.  That also could be the same type of input device

11  that's in the preamble in Claim 1.

12         So in fairness, even though they're not in the same

13  place in the claim, let's say both of those claims call out a

14  graphical inter -- excuse me -- a user interface and a user

15  input device, but that's it.  They don't call out the Internet.

16  They don't call out any kind of relational database.  What you

17  see is what there is there as far as computer systems.

18         Now, on the Alice 2 side, what does the precedent

19  look like?  Several Federal Circuit cases.  Employing an

20  algorithm to manipulate existing information and to generate

21  additional information is not patent-eligible; i.e., you use an

22  algorithm to make the prices stay static and the bid and ask

23  move so that they match what's static so that you get different

24  information in the sense that the inside market will move under

25  those circumstances.  That's exactly what Digitech is saying is

1    not patent-eligible.

2            Limiting the use to a particular technological

3    environment, that's not sufficient, and I will get back to this

4    technological question that has got nothing to do with anything

5    again other than whether you have satisfied the CBMR

6    regulation.  So that's slide 32.

7            Again, the Federal Circuit, the complexity of the

8    implementing software or the detail that the specification

9    might go into, that doesn't turn the claim into something

10   that's patent-eligible.  There's no inventive concept in the

11   use of a generic scanner and a computer to perform

12   well-understood, routine, and conventional activities.  A GUI

13   and a mouse, which is all there is in either of those claims in

14   the way of computer anything, either in Claim 1 of '132 or

15   Claim 1 of '304, that fits content extraction to a T, no

16   inventive concept in the use of a generic scanner and a

17   computer.

18           I will skip past this, Your Honor.  This is just some

19   more detail about Enfish, but Enfish uses tables and lines and

20   columns and how you relate lines and columns to you.  So this

21   again, this is on slides 34 through 37.  This is one precedent

22   out of CD Cal from the end of last year where you can again see

23   the abstraction is very small, doing things in rows and columns

24   and indexing them, very similar to what the '132 or '304 method

25   calls out.  Not sufficient, it's not enough to demonstrate an

 1   inventive concept.

 2          Last change of subject, and I'm going to go through

 3   this or these fast.  So I've shown you how precedent is

 4   handled, the abstraction analysis, with the fact in many of the

 5   cases that have found patent-ineligibility the abstraction

 6   turns out to be exactly what you would expect.  It's an

 7   abstract in contrast to the claims.

 8          I then demonstrated, mainly by showing you those same

 9   cases but different parts of the analysis, that when you go to

10   the part 2 analysis of Alice, you've really got to have

11   something in the claim that's not conventional.  I showed you

12   by admission in the specification of these two patents and all

13   this stuff they showed the patent office that that one screen

14   on our slide 18 in particular as well as the Figure 2 slide are

15   extremely close, and the point is they're extremely close for

16   the purposes of doing the analysis as to what's conventional

17   and what's not conventional.  Something that's in the prior art

18   which they admitted to the patent office in the POPR is

19   conventional.

20          Now, quickly, here's where with some slides, starting

21   at 38, I've shown you what we've done in the briefing.  I

22   thought, Your Honor, that this might be, again, a little easier

23   to follow than some of the briefing.  The 20 pages, Your Honor

24   was right that it was adequate, but it didn't leave a lot of

25   room for a lot of explanation, and we didn't think you wanted a

1   10-or-15-page further argument stuck on the back of the briefs

2   as an attachment.  So we didn't do that.  We played it

3   straight.

4           This is just an attempt so that you can see a little

5   more about what we tried to write.  So here's the analysis on

6   Alice part 2 for the claims in issue on '132 and '304.  No

7   individual element transforms the claims into a patent-eligible

8   application.  You've always got a conventional step at a high

9   level of generality, setting, displaying, selecting.

10          Then starting on slide 39, we have gone through each

11  of the various elements that are called out in the claims and

12  have shown you why they are all conventional.  Now, a graphic

13  user interface is one of the few elements that relates to a

14  computer, older than the hills, and they admit it all over the

15  '132 patent.  That's slide 39.

16          Displaying physical mapping of information from an

17  exchange, they even say any technique known to those skilled in

18  the art can be used, not limited by the method used to map the

19  date.  That fits Alice and Enfish.  Organizing information

20  using tabular formats is not enough to satisfy the second part

21  of Alice.  That's slide 40.

22          Slide 41, setting parameters.  Well, the whole point

23  of electronic trading is to enter orders and set parameters.

24  That's a basic concept, and that was slide 41.

25          Okay, slide 42.  I would imagine you're going to hear

1   the most about this because this is the element that recites

2   displaying the market depth of the commodity through a dynamic

3   display of a plurality of bids and a plurality of asks, the

4   dynamic display being aligned with the static display.

5          Now, the step here is displaying.  Okay?  But let's

6   go further into the language of the claim element which, again,

7   the board did not do and did not feel was necessary to analyze

8   the abstraction for whatever it's worth to Your Honor.  What

9   this is all about is aligning the market depth of the commodity

10  next to a static display of the prices.

11         Well, Figure 2 of the patent, that figure on our

12  slide 18 that they submitted to the POPR is so close to the

13  static limitation, particularly the way that slide 18 -- yes,

14  the slide 18 representation functions, that's so close that it

15  definitely demonstrates that this static concept, even if it

16  has to be considered, falls within Enfish and Digitech Image

17  Technologies.  All it is is organizing information using

18  tabular formats, and it's using an algorithm to get that

19  tabular format.  That format is a PDC to Figure 2 conventional

20  and that left-hand side of slide 18 conventional.  If it's

21  conventional, it does not satisfy the second part of Alice.

22         43, again displaying.  Interestingly here,

23  Mr. Brumfield -- and this was in their submission to the patent

24  office -- said, you know, the core concept here is a GUI for

25  order entry along the static axis of prices.  Well, GUI is

1   conventional.  A GUI that displays all sorts of things is

2   conventional.  Figure 2 is conventional.  The left-hand slide

3   of 18 is conventional.  Where's the non-conventional stuff

4   here?

5          Interestingly on page 11 of our -- excuse me for a

6   second, Your Honor.  This is what happens when you write notes

7   at 3:00 o'clock in the morning.

8      (Brief pause.)

9          MR. ADAMO:  The patents, both the '132 and '304

10  patents -- and this is on page 11 of our opening brief where

11  they're talking about this static vertical column -- say:

12          "The patents do not" --

13          This is our brief I'm quoting to the Court now.  It's

14  about the middle of the long paragraph, quote:

15          "The patents do not assert this element as anything

16  more than conventional and, in fact, call it" -- inner quote --

17  "logical" -- close the outer quote.

18          And the citations are to Columns 7, lines 17 and 18

19  of the '132 patent, and Column 7, lines 37 and 38 of the '304

20  patent.

21          Well, boy, if from what's known this static column is

22  logical, that's pretty close to admitting it's conventional,

23  and it's in their patent.  If from what you know and what's out

24  there you say that going to that static method is logical, that

25  is very, very close to saying it's conventional.  This is their

1    language out of their patent because they were trying to write

2    wide.  This is what happens when you try to write a big, broad

3    claim and you run into an Alice-type analysis.  Everything then

4    that you've admitted in your specification as conventional

5    comes back to haunt you.  So that's slide 43.

6            44, same thing, displaying the depth, the market

7    depth.  As I said to you today, Figure 2 and the left-hand

8    slide, the green one on our -- I'm sorry -- the left-hand

9    screenshot on our slide 18, this one, same thing, same thing,

10   organizing information through mathematical correlation is

11   patent-ineligible.  That's how you're getting that data to hold

12   still in that central column while your bids and asks are

13   scrolling past.  You're using an algorithm.

14           Displaying, again, 45, conventional.

15           Selecting a particular area in the order entry region

16   and using a single action?  Mr. Brumfield in a deposition that

17   was taken in this case, my God, eleven years ago or ten years

18   ago --

19           THE COURT:  Stop.

20           MR. ADAMO:  -- nine and a half years ago, a long

21   time, wow, admitted that routing an order to the exchange with

22   a single click was not.  That's admitted in the patent.  The

23   famous single-click patent for Amazon, I believe, the

24   technology was out there.  I think it had even been issued by

25   then.

1          Then displaying the indicators, slide 47, again,

2    conventional.

3          Slide 48, elements that don't move, conventional.

4          So stepping through all the individual elements, none

5    of them satisfy Alice 2.

6          Now, I also have to demonstrate to you that taking

7    them all in combination, we don't end up with something that's

8    not conventional.  Alice is very clear about that.  You've got

9    to do both.  Well, we did both.  Not to belabor the point,

10   we've briefed this, and what we briefed is shown on 49 and 50

11   to demonstrate how the combination doesn't transform these

12   claims into patent-eligible subject matter, and I'll just leave

13   that for later on.

14         Almost done.  There's an older test, Your Honor, that

15   has been floating around Supreme Court precedent and other

16   cases which is called the machine-or-transformation test.  This

17   is still accepted by the courts as confirmation, I guess, for

18   lack of a better term.  That's probably overstating it.  Again,

19   I'm trying to be very candid with Your Honor about what all

20   this law says.

21         It can be confirmatory of the fact that Alice part 2

22   has not been satisfied.  So it's got a little more weight than

23   what the PTAB does with this preliminary finding right now, you

24   know, despite their having to review all of this stuff, and

25   this goes back to Bilski, the Supreme Court case.

1          So it's a two-part test.  Is the claim tied to a
2   particular machine or apparatus?  Well, they only got two
3   things in the claim, the GUI and the mouse, and the answer is
4   no.  If you look at what they say in the specification, the GUI
5   requires only a generic computer or an electronic terminal
6   that's able to communicate directly or indirectly with the
7   exchange.

8          Again, you know, as broad as the great outdoors, it
9   can be on any existing or future terminal.  The present
10  invention is not limited by the type of terminal device used,
11  and you're really only using the computer for its basic or most
12  basic functions.  So are either of the independent claims tied
13  to a particular machine or apparatus?  No.

14         The second part of the test, do they transform a
15  particular article into a different state or thing?  Well, no.
16  All this thing does is submit orders.  It doesn't change itself
17  because it's constantly -- whatever is being displayed on the
18  GUI, that's constantly changing, so it doesn't change itself.
19  It doesn't change the market, how the market works.  It doesn't
20  change whatever the communication system is between the device
21  that's practicing the method.

22         So you're right back in the same situation.  You
23  don't have transformation of a particular article into a
24  different state or thing.  Both halves then of the
25  machine-or-transformation test fail, and that is confirmatory

1  or supportive but not dispositive of the fact that we've also

2  shown you that the second part of Alice fails in this

3  situation.

4          I'm going to leave this last point for the briefing.

5          THE COURT:  All right.

6          MR. ADAMO:  This is:  Have we shown that the

7  dependent claims are patent-ineligible?  We did the analysis

8  using Claims 1 of each of the patents-in-suit for what I've

9  shown you so far and most of the briefing, but in our briefing

10  on pages 16 through 20 we did, in fact, go through and explain

11  at length why the dependent claims also are patent-ineligible.

12          I've summarized them on slides 55 and 56, Your Honor,

13  but this doesn't add much to the briefing.  I have some

14  additional remarks, but frankly they're just variations on the

15  theme of the briefing and you don't really want to hear that.

16          THE COURT:  I'd rather you not repeat those, right.

17          MR. ADAMO:  Your Honor, at this point I've gone for

18  about 50 minutes, I think.

19          THE COURT:  Almost exactly an hour, 55.

20          MR. ADAMO:  As I told you, that is what I have to say

21  for an initial presentation to the Court.  I do have some

22  rebuttal material that I will rise to use in my reserve time

23  if, in fact, it's covered by TT.  If it's not -- well, let me

24  do the technological point real quick.  I'm sorry.

25          THE COURT:  No problem.

1          MR. ADAMO:  I promised I would do that for you --

2          THE COURT:  No problem.  You've got time.

3          MR. ADAMO:  -- and I just realized that I haven't

4    here.  Give me a moment.

5          THE COURT:  Okay.

6       (Brief pause.)

7          MR. ADAMO:  I would imagine, again, from the

8    materials that my brother just handed me this morning as to

9    their presentation materials -- and we both agreed that we'd

10   trade this morning.  Everybody has been so busy doing other

11   things.  We just thought this morning, so we had an agreement

12   on that.  So there's no issue about that between us.

13         I would expect you're going to hear a lot about

14   whether these claims are technological or not.  That's not

15   relevant to anything we're here to do today.  Technological, as

16   I said to Your Honor earlier today, is only relevant to whether

17   or not the claims of a patent can be subjected to a CBMR

18   review.  If, in fact, the claims' subject matter is

19   technological, then you can't have a CBMR.

20         Right?  Good.  I just had to check that.

21   Mr. Goryunov is my helper on this, Your Honor.

22         So all that does if it's technological, you can't

23   have a CBMR.  The board, as I showed you earlier, has already

24   looked at the claims of the '132 patent and said on this record

25   and taking into account the patent owner's argument, the three

1   volumes over here, the 1500-something pages where they argued

2   this point, the board said that there's no solution to a

3   technical problem with a technical solution in these claims.

4           How the GUI and the interaction problems with the GUI

5   supposedly are solved, that's not rooted in computer

6   technology.  It just relates to how human beings receive and

7   interact with the information, not how a computer functions.

8   So that's got nothing to do with it being technological, even

9   in this claim subject matter, these methods and the system

10  claims.

11          And there are some other claims, and there's also

12  some media claims that have software on them, and I'm not

13  trying to cut short what the full breadth of the claims is.  I

14  don't want to give my friend too easy a time to get up and

15  start yelling that I'm lying to you.  Well, leaving things out,

16  he wouldn't say that I was lying to you.

17          The fact that claims could be considered to be

18  technological, possibly.  With regard to a 101 analysis, so

19  what.  Alice, you could argue that the claims there were

20  technological.  The court invalidated as non-eligible those

21  claims.

22          Digitech Image, you could argue are technological,

23  generating and using an improved device profile that describes

24  facial and color properties of a device.  So let's say for the

25  sake of argument that was technological, invalid, not

1  patent-eligible.

2          BuySAFE, steps for guaranteeing a party's performance

3  of its online transaction, you can argue that that's

4  technological.  Invalid, not patent-eligible.

5          And finally Enfish, the case that I had the more

6  detail in the slides on earlier which talks about storing and

7  retrieving data with the tables and the columns and all that,

8  you could argue that storing and retrieving data in a memory is

9  technological.  Invalid, not patent-eligible.

10          So I think you're going to hear a lot about this, but

11  frankly I have no idea why because it isn't relevant to

12  anything.

13          Now I thank you for your patience, Your Honor.

14          THE COURT:  All right.  I look forward to hearing you

15  respond.

16          I'm going to take a five-to-seven-minute break, and

17  then, Mr. Borsand, you'll be up.  Thank you very much.

18          MR. ADAMO:  Thank you very much, Your Honor.

19      (Recess.)

20

21

22

23

24

25

1       THE COURT:  All right.  Mr. Borsand, if you are

2   ready, we will proceed.

3       MR. BORSAND:  Good morning.

4       THE COURT:  Good morning.  You handed me something

5   too.

6       MR. BORSAND:  We gave you a binder as well.

7       THE COURT:  All right.

8       MR. BORSAND:  Everyone has copies.

9       THE COURT:  I need more paper always.  Yes.  Yes.

10  All right.  Go ahead.

11      MR. BORSAND:  Okay.  So just a quick overview of what

12  I'm going to be talking about, why our claims are directed to

13  eligible subject matter.  They're not directed to an abstract

14  idea like the purported abstract idea mentioned by Mr. Adamo.

15  They're not merely claiming trading or displaying any data --

16  is it working over there, or is it going to go out?

17      THE COURT:  No.  Yours is working.

18      MR. BORSAND:  All right.

19      THE COURT:  I want to make sure my stuff is working.

20  All right.  Go ahead.

21      MR. BORSAND:  All set.  The claims are not claiming

22  trading or displaying data on any old computer.  They don't

23  preempt any aspect of the purported abstract idea asserted by

24  CQG.  Rather, they're directed to specific features of a

25  graphical user interface, the tool, technology that improves

1   the functioning of a computer.

2       And before getting into all that, just real quick as

3   Mr. Adamo said, 101's a threshold issue.  It's basically does

4   someone have a ticket into the door of the Patent Office to be

5   considered, to see if they can get a patent.  And that's why

6   the statute says subject to the conditions of the title, which

7   include 102 and 103, dealing with whether it's inventive.  112,

8   written description.

9       Now, in the United States we have a liberal approach,

10  as explained by the Supreme Court over the years.  101's a low

11  hurdle.  But the Supreme Court's created some narrow exceptions

12  to this.  Laws of nature.  You can't patent laws of nature,

13  natural phenomenon, and abstract ideas.  And they treat all of

14  these as basically for the same reason, as they're the basic

15  fundamental building block tools of work.  So that's the idea

16  behind all these exceptions and kind of the theory behind the

17  cases.  We're looking at things that are akin to fundamental

18  truths and not being able to tie them up and patent them.

19      The overriding concern behind all of this is

20  preemption.  That's the main thing behind the handful of

21  Supreme Court cases over the last hundred years.  They're

22  worried about someone preempting use of these basic truths,

23  these basic building blocks in their entirety.  And it's been

24  emphasized over and over again by the Supreme Court, including

25  in the recent Alice opinion that kind of went back and recapped

1    all that.  And, you know, these opinions make clear that you

2    can get a patent if you're building upon or applying those

3    building blocks into something more.  Those don't pose the risk

4    of preemption.

5            Now, we're talking here about the abstract idea

6    exception, not the laws of nature or natural phenomenon.  And

7    so what is an abstract idea?  Some people have struggled with

8    this.  The Supreme Court has used words like an idea in and of

9    itself.  Something like a fundamental truth.  A basic building

10   block of human engineering.

11           Now, one thing I want to point out is some lower

12   courts since Alice and Bilski, there's been some controversy on

13   it.  Some lower courts have treated this more expansively, some

14   more narrowly.  What's an abstract idea?  What is at that bar?

15   The good news here, we're going to go through that controversy,

16   we're not even close to that in this case.  But there is that

17   controversy going in some other cases that are closer.

18           The types of abstract ideas the Supreme Courts have

19   dealt with is mathematical expressions of truth, mathematical

20   algorithms, just putting them on a computer.  Fundamental

21   economic concepts like hedging and settlement.  You know,

22   settling up accounts at the end of the day and doing them on a

23   generic computer.  And that's what Alice talks about.  The

24   latest line with Bilski and Alice is all about those two cases

25   saying that the claims were tying up a fundamental economic

1    practice.  And in the case of Alice it was intermediate

2    settlement, and again in Bilski it was hedging.

3           Now, again, there's some controversy on, well, what

4    is a fundamental economic practice?  You know, is it just a

5    textbook thing that's been in the textbook for hundreds of

6    years like was the case in the Bilski and Alice decisions?  Or

7    can it be expanded to other things like some courts have done?

8    You know, organizing human activity, or games like the case

9    about bingo.  There's people debating that, how far to go.

10   Again, good news here, that controversy not relevant here.

11          Now, another thing in this part of the opinion, you

12   know, Mr. Adamo said he gave you some quotes from Alice, and

13   that's the sum total of what Alice tells us.  Actually it tells

14   us a little bit more.  They made clear that many computer

15   implemented claims are eligible.  There's no blanket

16   prohibition against computer software patents.  In fact, they

17   warn that they we should tread carefully here.  Not treat this

18   cavalierly, because at some level every invention involves an

19   abstract idea.  And they realize that most inventions are

20   not -- are supposed to clear the 101 hurdle or there's not

21   supposed to be this high hurdle.

22          And CQG left this out of their presentation, a very

23   important part of Alice, that they specifically mention claims

24   that are directed to improving the functioning of a computer,

25   or improvements in technology meet the 101 bar.  That's

1  important because that's exactly what the claims are here.  In
2  Alice the claims were just about taking what they viewed as a
3  fundamental economic concept, settlement, and putting it on a
4  generic computer.

5        Now, one case from the Supreme Court that found
6  eligibility that's still good law is the Diehr case.  And that
7  was an example where the claims recited some mathematical axiom
8  in them, but it applied it in a technological process, and
9  those were eligible.  So that's kind of the state of the law
10  today, and the test out of Alice and some of the recent cases
11  is this part -- two part test that CQG refers to.  Are the
12  claims directed to an abstract idea?

13        We have a little bit of a difference, a big
14  difference with CQG on how to apply that test.  Their approach
15  basically would make almost every, if not every claim meet that
16  part and move on to part two.  We don't think that's correct.
17  We think part one is looking at the claim and saying, gosh, is
18  the core of this claim trying to direct tie up an abstract
19  idea, realizing that maybe tacking on generic competing
20  elements isn't enough?  And only then if it is, do you move on
21  to step two, the inventive concept part of the test.  And a
22  patent needs to fail both of these in order to be ineligible.

23        Now, our position is, and we think it's clear, that
24  our claims are eligible under both prongs.  Our patents are not
25  directed to an abstract idea.  And in any event, they clearly

42

1   claim an inventive concept.

2          The key takeaway from Alice and all of these cases
3   that are going on, putting aside the controversy about where to
4   draw the line exactly on, you know, should it just be something
5   at the level of hedging or could it be bingo.  The key takeaway
6   is you cannot patent an abstract idea in itself or putting it
7   just on any old generic computer.  That's what we're going to
8   try to show you today.  And again, I already covered this.  The
9   Supreme Courts identify things like fundamental economic
10  practices and mathematical expressions as abstract.

11         And again, if you're patenting technology, Mr. Adamo
12  says this isn't relevant -- I'm going to show it is relevant --
13  that is patentable.  In fact, that's crystal clear under the
14  law.  It's one of the few things that all of the camps on this
15  agree on.

16         Now, CQG's analysis, this is their abstract idea, the
17  purported abstract idea.  Their whole analysis is based on the
18  premise that the claims are directed to this.  I'm paraphrasing
19  a little bit.  Trading electronically and observing
20  information, displaying information, market information.  Where
21  do they get this from?  How they do create this narrative?
22  Well, they take our claims, and they hand pick a few words from
23  the claim.  Mostly from the preamble, a few in the body.
24  Ignoring almost the entirety of what's claimed.  So, in fact,
25  they ignore 98 percent of the body of the claim, which is where

43

1   all the substance and limitations of the claims are.

2           Now, this fantasy claim is only directed to the idea

3   of trading on a computer and generally displaying data on any

4   computer.  If this were the claim, there could very well be a

5   101 issue.  It would cover any type of trading screen.  It

6   would cover figure 3 of the patent, the inventive screen, the

7   one that's claimed in the invention.  It would cover figure 2,

8   which is the example of the prior art shown in the patent.  It

9   would cover order tickets.  But that's not the claim.  The

10  correct analysis is we need to look at what's really in the

11  claims.  And we need to look, by the way, at every claim.

12          Now, here the -- I'm going to show you that the -- we

13  think the independent claims are clearly eligible.  Therefore,

14  all the dependent claims are as well, because they just build

15  upon the independent claims.  But CQG bears the burden on the

16  dependent claims as well, which provide additional features.

17  And yes, they address some of them at a very high level.  They

18  did not address all of them.  In fact, they didn't even address

19  some of the dependent claims that are being asserted that, you

20  know, have been stripped down for the assertion for the trial.

21  And by not addressing those dependent claims, their position

22  fails for that reason alone.

23          But, of course, I'm going to go through the

24  independent claim, which is going to show you on the merits why

25  they're all -- they all clear the 101 bar.  And I am going to

44

1    use Claim 1 of the '304 patent as my example.  And the words

2    ignored by CQG in the body of the claim are all reciting

3    structural features and functionality of technology, a

4    graphical user interface tool that happens to be used in the

5    field of trading.  And the preamble has some language setting

6    forth that context.  And that's most of the language they cite

7    to that say the claims are directed to an abstract idea.

8            And, by the way, there's comparable -- you know, I

9    think Mr. Adamo said, gosh, these claims, I'm not ignoring it.

10   I'm highlighting the first word of each method step.  It's a

11   method step.  Well, it's important to know what the method step

12   is doing.  That's the meat of the claim.  And we also have

13   comparable computer readable medium claims that don't even have

14   method steps and just claim it more on a straightforward kind

15   of structural way.

16           THE COURT:  Now, I will say --

17           MR. BORSAND:  Yes.

18           THE COURT:  -- you have color coded to help me out.

19   Does everyone else have the same?

20           MR. BORSAND:  They should have the same exact in

21   their book.

22           THE COURT:  As long as it's color.

23           MR. BORSAND:  Yes.

24           THE COURT:  Okay.  All right.  As opposed to what's

25   on the screen.

1          MR. BORSAND:  There should be a slide before that in
2     your book and maybe it got missed, the one right before.
3          THE COURT:  No, I have 6033, but mine has color.
4          MR. BORSAND:  Oh.  Well, then there's a mixup in your
5     book.  We'll fix that.  We'll fix that, because the one it
6     should have had a slide before that.  I apologize.  Something
7     is missing in your book.
8          THE COURT:  Yes.
9          MR. BORSAND:  I will get you something right away.
10          THE COURT:  Well, it looks like it's the same number.
11          MR. BORSAND:  Yes, that's --
12          THE COURT:  And the same figures.
13          MR. BORSAND:  Then there's a mixup because --
14          THE COURT:  Just colors, and I didn't want to have
15     you --
16          MR. BORSAND:  Oh, you know what.  They all --
17          THE COURT:  -- highlighting, highlighting something
18     for me but not for anybody else.
19          MR. BORSAND:  Actually there's a series of slides
20     that all have 6033.  They build and they end in that colored
21     slide.  And so they build in the power point.  You have the end
22     of the build.  So I will make sure we'll get you the whole
23     thing after.  Okay.
24          THE COURT:  All right.  No problem.  Go ahead.
25          MR. BORSAND:  All right.  So because I see now we're

1    building here.  So I'm walking through the claim.

2              THE COURT:  Okay.  I see.

3              MR. BORSAND:  The claim refers to displaying at first

4    indicator, which we show on the figures of the patent.

5    Displaying it in a bid display region with locations

6    corresponding to a static price axis, and where that indicator

7    represents the best bid price.  Displaying a second indicator

8    in an ask display region with locations corresponding to levels

9    of the static price axis.  Again, with the second indicator

10   representing the best ask price.  Displaying those bid and ask

11   display regions in fixed relation to the static price axis,

12   such that when the inside market changes, those indicators move

13   relative to the price axis, which is shown by comparing figures

14   3 and 4 of the patent, also described in the language of the

15   patent, in the spec.

16             Displaying an order entry region with locations

17   aligned or corresponding the levels of the static price axis.

18   And each of those locations is able to receive a single action

19   command that sets a plurality of parameters, in this case price

20   and the type of order, and sends an order message to the

21   Exchange.

22             Now, CQG ignores all of these substantive

23   limitations.  These limitations in combination define a

24   specific graphical user interface tool, a GUI tool.  They also

25   define relationships between the various elements of the GUI.

1  They're not directed to an abstract idea.  They're not directed

2  to the idea of trading on any old computer or displaying market

3  data generally on any other old screen.  They're directed to a

4  new tool that didn't exist before in any format, whether

5  physically or on a computer.  And contrary to CQG, this can't

6  be done on paper.  The claim requires displaying it on a GUI,

7  updating things, sending an order message with parameters, and

8  other stuff.

9         And CQG makes much of the fact that the patent talks

10  about that the invention can be implemented on a conventional

11  computer.  That's not relevant.  Most GUIs, graphical user

12  interfaces, are implemented using conventional computers.  The

13  point is the GUI itself, what's implemented is improving the

14  functioning of the computer.  It's adding -- it's actually

15  changing it to become something else.  The law prohibits merely

16  implementing an abstract idea like hedging on a computer, not

17  implementing technology, a new GUI on a computer, which is

18  basically how it's done.  Again, improving the functioning of

19  the computer.

20         And Mr. Adamo also said our claims recite a high

21  level of generality.  And I'm going to show you later the

22  claims are not talking about a high level of generality.

23  They're very specific about the structure and makeup of the

24  GUI, and they're far more specific than claims that are found

25  to be eligible under some recent cases.

 1          Now, this claim it doesn't preempt any aspect of that
 2  purported abstract idea.  It doesn't stop someone from doing a
 3  figure 2 style screen in a patent.  It doesn't stop someone
 4  from doing an order ticket.  It only covers the specific GUI
 5  with the specific claim features.  If even one of those claim
 6  features is removed, it's not precluded by the patent.  Here's
 7  examples of -- you know, we've had in the course of this case,
 8  we've managed to see hundreds of screens out there.  Old
 9  screens, new screens.  So there's a few from the prior act not
10  affected by the patent.
11          Here's one offered today by a company called Orc
12  Software.  They settled with TT a few years back with an agreed
13  design around.  This screen does not.  It's not affected by the
14  patent.  You can enter orders and you can enter orders with
15  single click sending.
16          Bloomberg and Reuters, they have hundreds of
17  thousands of terminals around the world that people use to
18  trade.  Here's some example screens from their product that are
19  not affected by the patent.  I mean, they're bigger than TT and
20  CQG combined.  And the patent doesn't affect those screens.
21          This is my favorite one, CQG's product, even the
22  DOMTrader, the thing that's the big issue in this case, you can
23  go into a menu setting and put it in dynamic mode, and it's not
24  affected by these patents.  And that's not the only screen CQG
25  has that isn't.  They have something else.  They probably have

1    others, but they have one called the HeadsUp Trader, not

2    affected by these patents.  So there's no preemption.  Now, I'm

3    going to play a quick clip here.  CQG's expert also admits

4    there's no preemption.  Why don't you go and play that, Ryan.

5         (Whereupon, said clip was played in open court.)

6         MR. BORSAND:  This deposition was last month.  He

7    thought this was a rhetorical question.  It was obvious.  Like

8    why are you asking me this?  It is a rhetorical question.

9    These patents do not preempt trading, period.  You can tell it

10   from the face of it.  You don't need to be a rocket scientist

11   to figure that out.  We have one more clip, the same expert

12   agreeing that, you know, these claims cover a tool, not

13   trading.

14        (Whereupon, said clip was played in open court.)

15        MR. BORSAND:  Those are in response to questions from

16   CQG's lawyer.  And we have more clips from him as well.  I'm

17   not going to play them all.  But here, you know, he's admitting

18   that not only do they not preclude any type of trading, they

19   don't preclude any type of particular trading strategy like a

20   variant on buy low and sell high.  So even if someone had a new

21   innovative trading strategy to make them lots of money, it's

22   not precluded by these patents, you know.  The only thing

23   precluded is using the claimed graphical user interface tool,

24   which is akin to a device.

25             It's crystal clear, self-evident from looking at

1   these claims they do not preempt the purported abstract idea.
2   And since this is the whole point and focus of the 101
3   analysis, really that should end the inquiry -- that ends the
4   inquiry because the claims fail under part one.  They're not
5   directed to an abstract idea.  They're directed to a graphical
6   tool.  The language in the preamble about trading is there
7   merely to set context and application.
8           And, in any event, even if we were forced to look at
9   part 2, there's clearly more than enough there to meet the
10  inventive concept test.  Based on this, again, I say the
11  inquiry should be over.  We're clearly eligible.  And the rest
12  of what I'm going to cover to make the record is like gravy on
13  top of it.  I'm going to try to get through it quickly.  Okay.
14          THE COURT:  Or you can stand on your brief.
15          MR. BORSAND:  Yes, but let's go for a little bit
16  more.  I don't have a lot more.  I've got to make a record.
17          THE COURT:  Go ahead.  Your record is so made.
18          MR. BORSAND:  I know.
19          THE COURT:  All around.
20          MR. ADAMO:  I didn't believe you were going to let
21  that go, Judge.
22          THE COURT:  Go ahead.
23          MR. BORSAND:  If you recall from the tutorial, the
24  claimed invention solved a problem recognized by one of the
25  inventors with prior GUIs, that if a trader wanted to enter an

1  order at a particular price, if they wanted to do that with

2  speed without sacrificing accuracy, he needed to -- if he

3  clicked right at the time of the market change, you could get

4  the wrong price like the rug being pulled out from under him.

5  And that was because the screens like this one were such that

6  the inside market prices were changing on the screen in

7  response to each and every change in the market.

8          So you recall the claimed invention addressed this

9  problem.  It improved GUIs.  It came up with a new GUI that

10  didn't require the same sacrificing of accuracy for speed.

11  Dynamic -- we just went through the claims and what it does.

12  But if you recall, if you click at the time of the market

13  change at the level, you get -- in the order entry region, you

14  get your right price.  So it deals with improvements in speed,

15  accuracy, efficiency.  Classic engineering technical benefits.

16          You also recall there was another unexpected benefit

17  of the invention, improved visualization.  It improved the

18  performance for the user.  Basically an improvement in

19  usability.  Another classic engineering issue.

20          And right now I just want to make one point, that Mr.

21  Adamo said that wasn't exactly accurate.  I mean, it's not

22  exactly a hundred percent relevant here, but he brought up on

23  slide 18 on the left side, that green screen, if you recall.

24  I'm holding it up here so you can see.  And he said that that

25  was more like the invention -- this was for an animation that

1   was created in various tutorials.  I think it was even played

2   to Your Honor in a tutorial.

3                  THE COURT:  I got it right here.

4                  MR. BORSAND:  To illustrate a vertical version,

5   because there was some in the prior art that were just like

6   figure 2.  And actually why don't you just go play it, Ryan, if

7   you have it.

8         (Whereupon, said clip was played in open court.)

9                  MR. BORSAND:  You know, that is just a vertical

10  version of figure 2.  Not static, prices constantly changing

11  with each and every change in the inside market.  So you can go

12  back.  Next slide.

13                 Okay.  So our claims, TT's claims describe new

14  technology.  Things that deal with accuracy, efficiency, and

15  usability.  And the reason the patent was allowed over the

16  prior art wasn't because we were saying we have an invention

17  where the first person to ever do trading electronically.  That

18  wasn't the point of the patent.  The reason the patent was

19  allowed was the combination of those claimed elements we went

20  through.  Dynamic indicators, display relative to static

21  prices.  With all the requirements on the order entry regions

22  and, et cetera.  And then there's dependent claims.  These were

23  ones not addressed by CQG that deal with further features of

24  the GUI.  That's why the claims were allowed.

25                 And this area, GUIs, graphical tools is widely

1    recognized as a technological area.  Whether it be by NASA,

2    universities who give technical degrees in this.  And I've got

3    a quick little clip here from CQG's technical expert, who has a

4    Ph.D in computer engineering.  He's been spending the last 20

5    years of his life doing -- developing GUIs.  Here's him talking

6    about why this is technology.  Dr. Mellor.

7           (Whereupon, said clip was played in open court.)

8           MR. BORSAND:  Mr. Van Dusen, the other expert in this

9    area for CQG agrees.  We're talking about -- the patents are

10   talking about technology.

11          (Whereupon, said clip was played in open court.)

12          MR. BORSAND:  The Supreme Court is clear,

13   improvements in technology even if you're applying an abstract

14   idea are eligible.  Here these patents are even better because

15   they're basically just directed to a tool.  Precision, a

16   classic area of technology and engineering benefits.

17   Mr. Van Dusen again also admitted the patents are directed to a

18   trading tool.  They're not directed to the idea of just trading

19   on any old computer.

20          So the patents are very analogous to their -- by

21   being directed to the features of a graphical tool, they're

22   analogous to a device.  They're not even remotely close to

23   having a 101 issue.  And not to beat a dead horse.  I'm not

24   going to go through all this.  Every expert since the -- and

25   what is it now?  The case has been going on for over 10

1  years -- has agreed from all parties, this is not an issue in
2  dispute.
3          MR. ADAMO:  Your Honor, I realize exactly what the
4  nature of the beast is that we're doing today may not be
5  crystal clear, which is why I recited that it was a hearing on
6  these issues.
7          THE COURT:  And you --
8          MR. ADAMO:  I stated, I stated objections in our
9  briefing to what he just flashed up on the screen here.  I
10  didn't want to rise to interrupt him, but I just want to make
11  it clear anything that I have objected to in our reply briefing
12  I am not waiving the objection by not interrupting him.
13          THE COURT:  Well --
14          MR. ADAMO:  What he just flew up there is rank
15  hearsay.
16          THE COURT:  Well, Counsel, I'd also say since this is
17  a hearing, hearing standard where you have the presentation,
18  the response, reply, I've never heard objections as a rule in
19  the middle of a hearing.  And that's the way I'm going to take
20  it.  Nothing is waived.  You may be seated.  Thank you.
21          MR. ADAMO:  Thank you, Your Honor.
22          THE COURT:  Proceed, Mr. Borsand.
23          MR. ADAMO:  I won't rise again.  Thank you.
24          THE COURT:  All right.  Thank you.
25          MR. BORSAND:  The Federal Circuits looked at these

1   patents, as you know, and they've described the claims, the

2   invention as a graphical user interface with specific features.

3   One that improves accuracy and efficiency.  They actually

4   correctly describe trading as merely the environment, the

5   application in which this technology is used.  This language

6   from the Federal Circuit shows definitively that claims cannot

7   have a 101 issue even under the most stringent 101 test out

8   there.

9           Now, CQG -- I'm going to respond now to Mr. Adamo's

10  argument on this.  They say it's not relevant that the claims

11  are directed to technology.  I'm not sure where they're getting

12  this from, because nothing could be further from the truth.

13  The one thing that all camps agree on is claims directed to

14  technology or improvements in technology are eligible under

15  101.  Judge Mayer at the Federal Circuit is in one -- is in the

16  camp of wanting to have a more expansive exception.  You know,

17  tougher on 101.  His test is there's a technological arts test.

18  And he's the most extreme at the Federal Circuit on this.

19          He thinks you can't get a patent if it's claiming

20  entrepreneurial activity even if it's innovative.  It's hard to

21  know exactly what the bounds of that means.  I don't think

22  that's the law.  The Supreme Court actually rejected in both

23  Bilski and in Alice the majority of the business method

24  exclusion.  But that's his view and the view of some.  So

25  there's some controversy going on.  But our claims satisfy even

1   Judge Mayer's more strict test, because the claims are directed
2   to technology.
3          And that's why I'm saying they're so far removed from
4   the issues in these various cases cited by CQG which deal with
5   taking a fundamental economic concept or some type of economic
6   practice or something that people do in their everyday life and
7   just putting it on a generic computer.  That's not what we have
8   here.  So again, that's why we meet both -- we're eligible
9   under both prongs of the two part test.  Not directed to an
10  abstract idea, inventive concept.
11         Just noting for you that in Europe they do have a
12  different standard, a tougher bar, stricter business method ban
13  there.  Kind of like what Judge Mayer is saying in some of his
14  concurring and dissenting opinions.  There are corresponding
15  patents, the added dynamic, order entry regions was allowed
16  where there's a business method exclusion.
17         Now, on this point the main argument -- well, they
18  first say it's not relevant if it's directed to the technology,
19  and that's wrong.  And then they say, well, even if it is
20  relevant, this was already dealt with by the Patent Office, the
21  PTAB.  They said -- when they instituted the T.D. Ameritrade
22  CBMs, they said the claims did not meet the, quote,
23  technological exception.  Well, for starters as noted by Mr.
24  Adamo, it's not a binding precedent.
25         But more importantly, this argument is highly

1   misleading.  What CQG is referring to is what the PTAB said on
2   a completely different issue.  They have a jurisdictional
3   standard for determining if a patent qualifies to be put into
4   these proceedings, post-grant review proceedings called CBM
5   proceedings under Section 18 of the AIA Act.  And to be put in
6   this proceeding, the patent must qualify as a CBM.  It has
7   nothing to do with 101.  You got to -- there's a test to get
8   in.
9           And a CBM is defined very broadly as basically any
10  patent that remotely relates at all to something financial.  I
11  mean, they've taken like devices and said, because it's used in
12  a bank, you know, that meets that part of the test.  And then
13  they say there's an exception, the technological exception.
14  But they've applied that exception very narrowly.  And they've
15  made very clear it has nothing to do with 101.  In fact, the
16  statute itself says that what they're talking about in the
17  jurisdictional test even though it may be using words like
18  technological, is not related to the 101 law.  It doesn't
19  affect that.
20          And what the PTAB has been doing, the ALJs there have
21  had a practice of interpreting the technological exception for
22  this purpose very narrowly.  Way more strict than 101.
23  Basically saying if you look at the variety of cases they've
24  decided, you have to have a -- you have to invent a new
25  computer, a new piece of hardware to meet that exception and

1   get out of that proceeding.  Things in software, even though

2   they're clearly technology for purposes of a 101 analysis,

3   under controlling Supreme Court law they don't accept for this

4   point, which is a separate issue, jurisdiction of a CBM.

5          Here's some examples of things that the PTO has found

6   to not be technological under this jurisdictional test.  Things

7   that are clearly technology.  I mean, really what they're

8   pointing to is a government agency that's been interpreting

9   some regulations, has given it broad authority for a purpose

10  completely unrelated to the issue here.  It's a red herring.

11         And, by the way, that's why the PTAB instituted on

12  the '132 and T.D., they said -- they recognize, hey, these

13  claims are related to a GUI and it's software, but they cited

14  the reg and said it's not hardware.  You know, you meet our

15  jurisdiction.

16         And another thing I just want to note.  They got all

17  these binders here.  This is the response, (indicating).

18  There's a lot of exhibits in those things.  And when we

19  responded in the TT preliminary response, we only responded on

20  the -- primarily on the jurisdictional issue and not on the

21  merits and on pleading deficiencies primarily relating to 102,

22  103, 112.  So, you know, the 101 issue nothing has happened on

23  the merits yet at the PTAB.

24         Now, I'm going to talk really quickly about their

25  cases here and some of the cases in a minute.  But it always

1   bothers me a little when we go through these cases because I'm
2   like these claims here are not remotely close to these cases,
3   even the ones that are in our favor.  Okay.  They're permitting
4   claims that are so much closer to the 101 line than the claims
5   here.  Frankly the defense shouldn't even be raised with these
6   patents.  Today all sorts of tools analogous to devices are
7   being created in GUIs.

8           No one would question the patent eligibility, for
9   example, of an improvement to an instrument panel in an
10  airplane that makes it fly safer if it was implemented in an
11  analog way.  But today all new inventions in the cockpit of an
12  airplane are going to be implemented or in a car, for that
13  matter, or any appliance in graphical user interfaces.  They
14  still could probably go back, oh, maybe make this mechanically,
15  but they're not going to.  That's just the state of technology
16  today.

17          If tomorrow -- I know this is old, but if tomorrow
18  someone was the first person to invent a calculator and they
19  implemented it on a GUI, and it was the first one ever, that's
20  no less an invention that's eligible for patenting than if the
21  first time it happened was 50 years ago in a non-GUI.

22          You know, a classic -- a great example of this is
23  the, the iPod classic, right.  An innovation from Apple.  They
24  received patents on it.  It had all sorts of accolades years
25  ago.  If they were to come up with this today for the first

1    time, it would have been implemented on a GUI.  I mean, if you

2    have an example there on the screen, but here on an Android

3    phone you can create a GUI like that.  And if this was the

4    first time, it would be no less and not an abstract idea.  No

5    less a tool than it was years ago when they came up it with

6    this way.

7              Now, the same with the invention here.  It happened

8    to be implemented in a GUI because that's the state of

9    technology at the time of the invention.  It never existed

10   before, whether physically or graphically.  But if someone

11   tried to claim it as partially a physical device, maybe with

12   some displays or physical buttons, no one would even dare argue

13   101.  And the arguments being made here are no better.  CQG

14   confuses things by focusing on specific elements in isolation

15   and arguing their role.  Like, oh, look at that, a part of the

16   screen is not updating.  A part of the screen is updating.

17   There's a region for this.  There's a region for that.  They

18   break it up separate.

19             But that's -- by the way, that's no different than

20   zoning in on this iPod.  You know, gosh, it's made of metal.

21   It has old sensors, old switch, old screen.  What was

22   innovative about the iPod was the combination of the elements

23   just like what's innovative about the invention of the '132 and

24   '304 patents is the combination of the graphical elements.  And

25   what they're really making is a flawed -- it's funny.

1   Mr. Adamo started off at the beginning saying 102 and 103 is
2   not relevant.  Then a lot of his presentation sounded like a
3   102, 103 argument.  And I just want to note, there's a reason
4   why they're not asserting 102, 103 as a defense in this case,
5   because they don't have a good argument.  That argument's been
6   addressed over and over again both by the Patent Office
7   multiple times and the courts.  So -- but what they're making
8   is a flawed 102, 103 argument, not looking at the combination
9   of the elements.
10          The point of all this, the claimed invention is not
11  close to any part of the two part test.  Part one we're not
12  directed to an abstract idea.  We're directed through a tool.
13  Part 2, even if someone said you got to look at part 2 and we
14  considered whatever scintilla of an abstract idea of is
15  involved in this claim, it claims way more than enough to
16  transform it into an eligible idea, an inventive concept.
17          You know, when CQG -- I think I covered this already.
18  When they say that -- well, I talked about how it's not a good
19  argument to say, well, the patent says you can implement this
20  GUI on a conventional computer.  It's equally not a good
21  argument to say, well, the patent says you can use known
22  mapping techniques.  We're not claiming a mapping technique.
23  The patent needs to describe to the world how do you make this,
24  and using mapping techniques is a way to make it.  What we're
25  claiming is what you make, the innovative GUI.  And again, this

1  GUI is improving the functioning of the computer.  In fact,

2  even in a way changing it.

3          You know, if you think about it, the logic of CQG's

4  argument on this is that a computer related invention is only

5  eligible if you create a new computer, a new piece of hardware.

6  That is not the law.  By the way, recent new PTO guidelines on

7  this, which came out after the T.D. CBMs were instituted, they

8  show that the PTO recognizes how to deal with claims like this.

9  They say if you look at a claim and view it as a whole, it

10  clearly doesn't tie up an abstract idea.  And you don't even

11  proceed to the full analysis because the eligibility is self

12  evident.  That's what our claims are here.  We submit to you

13  the eligibility is self-evident.

14          Now, Mr. Adamo was right, I do want to talk a little

15  bit about DDR.  And so here's the DDR case.  Recent case law,

16  DDR and some courts that have followed it have clarified that

17  claims far less directed to technology, much closer to the 101

18  line are eligible.  And they made clear that CQG's arguments

19  here have no merit.

20          In that case, by the way, the claim was -- the

21  invention was going to a host website, clicking on the link of

22  a third party merchant.  So maybe you're at Amazon, and you

23  click on a third party merchant to go buy something.  And when

24  you click the hyperlink instead of sending you to that

25  merchant's site, it makes the page look similar, same looking

1   field as where you were coming from, Amazon in that case.
2   That's all the claim says.  No more particular specificity than
3   that.  Eligible.

4           You can do the same thing to DDR's claims that CQG
5   did to our claims.  Pick a few words.  You know, commerce,
6   displaying, highlight a few things.  But those DDR claims again
7   were found eligible and when the Court looked at the body of
8   the claim which recites far less specifics in terms of
9   technology or improvements than our claim here.  Again, they're
10  claiming same looking field of two web pages on a hyperlink.
11  Everything being done by DDR, conventional computers.  They
12  didn't invent a new computer, new hardware.  You know,
13  hyperlink's been around forever.  They're just saying
14  hyperlink, create the page to make it look different.

15          So under CQG's logic that because our invention is
16  using GUIs being programmed on a conventional computer, the DDR
17  claims would be invalid.  The key line from DDR is that you can
18  claim things, they're eligible if they're rooted in computer
19  technology.  And that's exactly what we have here.  Just like
20  here in DDR they cover that the claims didn't preempt any
21  abstract idea.  They even had a hard time -- by the way, in DDR
22  they had a hard time finding an abstract idea.  They started
23  off saying we're not even sure if there is one here, but just
24  in case you pass part two.  That was basically the analysis of
25  DDR.  Now --

1        THE COURT:  And you don't think it needs to be

2  particularly distinguished because of the internet facts?

3        MR. BORSAND:  No, it's the same idea.  You know,

4  whether conventional computers, internet, which is just using

5  conventional computers, same idea.

6        Now, DDR's very instructive on the cases relied on by

7  CQG.  And here's some of the biggies they rely on, and then

8  there's others that are the same ilk.  They distinguish all

9  those cases saying those deal with just taking an abstract idea

10  and putting them -- tacking on a generic computer.  That's

11  basically how they deal with all of the cases.  And they

12  make -- the takeaway from DDR is that they talk about -- this

13  is their words, do the claims clear the hurdle?  What does it

14  take to clear the 101 hurdle?

15        And the takeaway -- because, first of all, it's not a

16  super high hurdle.  It's low.  And what doesn't clear the

17  hurdle are taking an abstract idea, tacking on a generic

18  computer.  And they give examples.  Like a commonplace business

19  method, unknown business process, altering contractual

20  relations, and just doing it on a computer or the internet.

21  Some of the cases were internet.  Some were just computer.

22  They say those on one side.  What they also say is if you do

23  anything more, even it's rooted even slightly in technology,

24  and they use the words, they make the point, the claims are not

25  technologically complex, you clear the hurdle.

 1          And they have a -- I don't have this on the slide,

 2    but part of the opinion they talk about the claims there.

 3    Quote, specify how interactions with the internet are

 4    manipulated to yield the desired result, end quote.  That's

 5    even more applicable here.  TT's claims claim a tool that a

 6    user uses to get to and takes actions with and interfaces with

 7    to get to a desired result that could not be done when that

 8    interface is not on there.  It's even more so than in the DDR

 9    case.  And again, under CQG's logic the DDR claims would not be

10    eligible.

11          There's some District Court cases along the same ilk

12    I'm not going to go through.  I will say, Your Honor, the

13    Smartflash case, which was cited in our brief, it was a

14    magistrate recommendation.  Since the briefing, the judge

15    adopted it.  And if the Court wants, we have and can give you

16    copies of that adoption.  It basically just has a paragraph at

17    the beginning saying it's adopting the recommendations and then

18    their opinion follows.  And we have copies if you want.

19          THE COURT:  I can find the case.

20          MR. BORSAND:  Again, key takeaway on all the cases

21    that CQG relies on, they're talking about putting an abstract

22    idea on a generic computer.  Our claims don't do that.  We're

23    directed to a trading tool.  We are not putting an abstract

24    idea on a generic computer.  We're not preempting trading.

25    We're claiming specific features of technology that improve the

66

1   functioning of a computer.  And so this is why their case is
2   either bound to the one of these two camps.  They're either
3   entirely directed to an abstract idea with no computer or
4   putting it on a generic computer.
5          And I have a series of slides going through each of
6   them, hedging, settlement, gathering data, creating a
7   contractual relationship that people did before computers.
8   Automating it, using advertising as currency.  Looking at
9   credit card transactions that people did manually.  Now doing
10  it automated to detect fraud.  Storing data in the table.
11         Oh, this one.  Mr. Adamo showed a figure from the
12  Enfish patent and said -- showed a table and he said the table
13  kind of looks like.  To be clear, that patent -- those figures
14  weren't showing a graphical user interface that was claimed to
15  be inventive.  They were just a model, that table, to
16  illustrate how memory works inside a computer in a conventional
17  way.  But again, that was just about storing data which people
18  did before computers, and just putting it on a computer in a
19  conventional way.  Exchanging loyalty points, automating it,
20  Bingo.
21         In fact, the claims in that case they said the way --
22  it was claiming a way where you could even think it in your
23  head, and then it was just doing it on a computer.  Monitoring
24  financial transactions, budgeting, organizing photos.  You
25  know, they're all basically the same here.  Generating price

1   quotes, another one of their favorite cases.  The patent --
2   that's all the patent says, price quotes on a generic computer.
3   That's not our patent.

4          Now, again, like I said before, there's some
5   controversy about what is it?  You know, is the fundamental
6   economic practice just textbook, or could it also be Bingo?
7   We're not even in that realm.  We're so far away that that
8   issue is not at play in this case.

9          A couple quick rebuttal points here.  You know, Mr.
10  Adamo complains about us pointing to stuff that he says is
11  factual, but yet their opening brief points -- even today
12  inventor testimony, they talk about their views, inaccurate as
13  they are, of the prior art repeatedly.  So they're talking out
14  of both sides of their mouth on that.  And there are in the 101
15  analysis, which is a legal issue, some underlying factual
16  issues like, you know, is it conventional?  Is it technology?
17  The Courts have recognized that.

18         Here I think the good news is there's no genuine
19  issue of material fact on any point.  And like I said around 20
20  minutes ago, the fact that the claims don't preempt is so
21  self-evident that none of that really matters is gravy.

22         And finally last two slides.  The petitions -- last
23  three slides.  So they make a lot that the PTAB said it's more
24  likely than not on the '132.  But again, almost all
25  petitions -- they're very liberal on that standard.  And it's

1   very important to note that the statute that they're operating
2   under for institution decision, which is not the merits,
3   instructs them to assume that everything alleged by the
4   petitioner is true and is not rebutted.  It's like the reverse
5   of a summary judgment standard.
6           So you can imagine, T.D. was telling the PTAB in
7   their petition the same things that CQG is saying.  These
8   claims just patent trading on any generic computer.  That's the
9   contention.  And the PTAB takes those as true at this point.
10  They don't deal with the merits till later.  In fact, we never
11  responded on the merits to this, and we will be dealing with
12  the merits later maybe with them.  And again, I already told
13  you the jurisdictional issue is different than 101.
14          As a side note, these institutions occurred before
15  DDR, before the guidelines at the Patent Office when the whole
16  Patent Office was in a holding pattern, which is an important
17  context.  And it's a sum up slide.  I've been through this.
18  This is why we think we're eligible under 101.
19          THE COURT:  Thank you very much, Counsel.
20          MR. BORSAND:  Thanks.
21          THE COURT:  All right.  And what are you going to
22  need?  About 20, 20 minutes or so?  20, 25 minutes.
23          MR. ADAMO:  Unless Your Honor and your reporter want
24  to take a break, I'm good to go now.  But 20 minutes --
25          THE COURT:  I'm just going to get some water, and

1    I'll be right back out.  No problem.

2              MR. ADAMO:  Yes, 20 -- 20, 25 minutes.

3              THE COURT:  Okay.  About two minutes.  I just need

4    some water.  Thank you.

5              MR. ADAMO:  Sure.  Yes, ma'am.  Thank you.

6         (Short break taken.)

7              THE COURT:  Mr. Adamo.

8              MR. ADAMO:  Your Honor, with a shotgun argument,

9    unfortunately the rebuttal tends to be shotgun in response, so

10   I'll try to keep this as organized as I can in response to the

11   various points that you have heard, and I'll save the DDR part

12   for last.

13             I'm not sure which Patent Office we've been talking

14   about CBMRs in, but it's sure as heck not the United States

15   Patent and Trademark Office.  And it's not what happened in the

16   proceedings that led to the initiation of the CBMR on 101

17   grounds with respect to the '132 patent.  I've been listening

18   to this, and I've been trying to figure out where this is all

19   coming from, and frankly I'm bemused.

20             As far as I'm aware, there is no jurisdictional 101

21   analysis that's different from the 101 analysis that leads to

22   CBMR eligibility.  But be that as it may, let's assume for the

23   sake of argument that there was such a thing, which there

24   isn't.  The Patent Office, the PTAB Board in initiating the

25   '132 found that both of those tests, to the extent there are

1  two, were satisfied.  The PTAB found that the invention was not

2  technological, as I pointed out to Your Honor earlier today on

3  the slides where the -- what the PTAB had found is set out in

4  black and white.  And I'll leave that for the Court and your

5  staff to look at that.

6          And they found that there was 101 patent

7  ineligibility.  So even assuming that TT is right and there are

8  two separate tests, the Board has found that both have been

9  satisfied.  So this is a distinction without a difference.  And

10 this is getting us back again to this technological point.

11 There is no technological point other than in the context of

12 satisfying the requirements for a CBMR.

13         The case on their slide 58 that they cited you for

14 this argument that a technological invention is the law, it's a

15 dissent from Judge Mayer.  The last time I looked, even in the

16 Federal Circuit dissents don't trump the majority opinion in a

17 case.  Let alone do they trump other opinions of this Court

18 with respect to 101 analysis.

19         Timing.  On slide 57 a big point was made regarding

20 Trading Technology and the Federal Circuit's supposedly finding

21 that the software that was claimed was a GUI.  I'm always a

22 little hesitant, Your Honor, when I see a very important quote

23 where there's ellipsis between the words the patent's claimed

24 software and then we go on I'm not sure how much further away

25 or in what context to start talking about the software's

1     graphical user interface includes a dynamic display.  Well,

2     that's very interesting, but that's not Claim 1 of the '132

3     patent and it's not Claim 1 of the '304 patent, whatever this

4     analysis was.

5            More importantly, this is pre-Alice by four years.

6     So I'm not sure what the Federal Circuit did here.  But

7     whatever they did, they didn't apply the Alice test because the

8     law was not out there at that point.  So I don't know what

9     precedential value or what value this adds to what Your Honor

10     has to consider.  I don't particularly see it.

11            We got a long presentation of nothing but lawyer

12     argument on preemption.  There is no second test or measuring

13     of the degree of preemption, if I'm following my brother

14     correctly in what he's arguing.  The Alice test is everything.

15     If you fail Alice, you're done.  We don't then have a second

16     test, which looks to see how much preemption there might be.

17     Is there some weasel room around the claims.  That's simply,

18     that's simply not, not the way it works.  Alice is based on

19     preemption.  But the test does not mean that you follow it

20     around.  It's not, it's not circular.  You don't -- you do the

21     Alice test.  If you fail the Alice test, you're done.  You

22     don't do the Alice test and then add part 3, which says, okay.

23     Now, let's look and see exactly how much is preempted.

24            Counsel spent a reasonable amount of time taking the

25     claims of the '132 patent I guess and the '304 patent, that

1  build that he had where you didn't have the color slide and
2  only because of how it was built up.  And he's comparing that
3  to the preferred embodiments, which are figures 3, 4, and 5.  I
4  have no idea what that could possibly be probative to.
5          THE COURT:  Let me go back, just make sure.  '132 and
6  the '304?
7          MR. ADAMO:  Yes, ma'am.
8          THE COURT:  Okay.
9          MR. ADAMO:  I'm sorry.  Did I misspeak?
10         THE COURT:  Yes.  But that's okay.  As long as I -- I
11 just need to make sure for me.
12         MR. ADAMO:  No.  My apologies.
13         THE COURT:  No.  No.  Go ahead.
14         MR. ADAMO:  I should slow down.
15         THE COURT:  Go ahead.
16         MR. ADAMO:  I'm cognizant of the fact it's been a
17 long morning, and I know the Court has a lot to do.
18         THE COURT:  No.  No.  No.  Go ahead.  I just wanted
19 to make sure I wasn't missing something.  Go ahead.
20         MR. ADAMO:  No.  So he put up a slide where he was
21 looking at the claims trying to go down further into the
22 language of the claims, which I knew he would do, which is why
23 I showed you how the analysis was done by the Court in question
24 in all those other cases so you'd have a benchmark.  And then
25 he started comparing the claim terms to the preferred

1   embodiments, figures 3 through 5, without using any of the
2   Markman construction that this Court's predecessor had given in
3   the case.  And he tried to argue that part of the preamble
4   wasn't controlling.

5          Well, my understanding of the Markman is the Markman
6   says the preamble is controlling.  So I'm not sure where he was
7   going with all of that either.  You don't compare to determine
8   the level of abstraction that's correct the claim terms to the
9   preferred embodiments.  You look at the claim terms, and you
10  make your decision based on the claim terms.  You don't start
11  looking at preferred embodiments.  Preferred embodiments -- and
12  Your Honor knows the Markman rules, preferred embodiments,
13  everybody's always complaining that we don't look at the
14  preferred embodiments.  That they don't limit anything.  And
15  that's absolutely true.

16         The preemption comparisons to MD Trader and
17  everything else, same thing.  It's attorney argument, and it's
18  not, it's not relevant to anything.

19         Ignoring obviousness and novelty, and we really
20  weren't doing that.  He makes an interesting point.  He points
21  out that to determine conventional -- the conventionality of
22  claim language when you're doing an analysis under Alice, yes,
23  you do have to look at what was known and conventional, but not
24  in the prior art sense.  You're not doing a prior art analysis.
25  And he ran past that as if doing the conventionality test

1    perforce brings in 102 and 103.  It doesn't.

2              And I would suggest even though this is pre-Alice,

3    this is good law cited in Alice, Parker versus Flook.  It's

4    U.S. Supreme Court 437 U.S. 584 to 588.  Section 101 does not

5    involve the familiar issues of novelty and obviousness that

6    routinely arises under Sections 102 and 103.  The law couldn't

7    be any clearer on that.  The fact that conventionality means

8    you've got to look at what was conventional at the time of the

9    invention is not the same thing as a 102, 103 analysis.

10             Claim 1 of '132 and Claim 1 of '304 don't claim a

11   GUI.  They may describe in terms of GUI in the preamble, which

12   as you'll recall, we saw in those two places.  But they don't

13   claim a GUI.  And we got shot past those claims very quickly

14   with the argument being, oh, well, it claims a GUI.  It claims

15   a GUI.  Well, on its face it does talk about a graphical user

16   interface.  But it doesn't set out and claim the parameters of

17   the graphical user interface.

18             Now, again, in fairness, there is claim language that

19   my colleague shot past for some reason in some of the other

20   claims that talk about a computer.  It's basically a medium.

21   They're called Beauregard claims.  You can have a disk that's

22   got certain software on them.  There are a couple of claims in

23   these, in these two patents that are Beauregard type claims

24   that look like they're an attempt to claim a GUI, but they're

25   not written that way.

75

1    So absent a claim to a GUI, all this argument that
2    it's a GUI, it's a GUI, it's a GUI, don't have any effect on
3    what's actually claimed.  What's actually claimed is a method
4    that uses a GUI, yes.  But it doesn't recite a specific GUI,
5    and it doesn't claim a specific GUI.  Absent that, any
6    assumption that the claims were examined for the particular
7    structure of the static line versus what we otherwise showed
8    you earlier today was done implicitly or otherwise, is, you
9    know, just not correct.
10   My slide 18, could we have that back just for a
11   second.  The left-hand side, Your Honor, you saw an alternate
12   explanation this morning as to what that slide was.  But it was
13   up and down so fast that you couldn't really follow it.  And I
14   guess if I were TT, I'd put it up and down pretty fast as well,
15   because it operated exactly the way I described it to you,
16   which is not surprising because earlier, chronologically
17   earlier -- and this must have been -- let me make sure I have
18   the right -- yes.
19   In a presentation that Mr. Borsand gave to this Court
20   on February 19th, 2014 in TT versus GL Trade SA.  It's case 05
21   C 4120.  On pages 12 and 13 he's talking about how that
22   thing -- how that thing runs.  And in that place he makes the
23   point that there is a fixed location for the market.  That
24   yellow box is fixed, but things are otherwise oriented
25   vertically.

1      So the way I explained to this Court how that works,

2   that left screen on 18, which is admitted prior art to the POPR

3   was correct.  And he shot it up and shot it down so fast that

4   you didn't get a chance to watch it.  I would suggest that if

5   your staff or someone wants to take a look at it, you will find

6   that I was as accurate as I could see from the information

7   available to me as how -- as to how that worked.

8      All right.  Let's talk about DDR.  Could I have 57,

9   please.  And then we'll end up going back to the PTAB point,

10  Your Honor, seeing we've spent so much time on incorrect

11  explanations of how the PTAB works on CBMRs.

12     The DDR Holdings case really isn't the lifeline that

13  TT thinks it is.  This is essentially what it does:  This is a

14  problem that is presented strictly by the use of internet

15  technology, and more to the point, worldwide web enabled

16  internet technology, which now is everything.  There was a time

17  before the web was invented when you had the bulky old way, but

18  now the web effectively governs everything that you or I might

19  do on a computer.

20     And here's the problem that's being solved:  This is

21  a screen shot.  On the left you can see Google and an Amazon

22  ad.  And when you click as you normally would with your left

23  click on your mouse on a hyperlink, which is what's in that

24  Amazon ad piece, you'll immediately go to the linked website.

25  So you come off Google, and bam, you're on to, you're on to

1  Amazon.  This was viewed as a problem, because you did not
2  necessarily want as being the first site, the host site, you
3  didn't want all your visitor traffic to automatically and
4  forever go off to wherever the link was.  Many people said I'd
5  like them to stay.

6         This is right down in the guts of the computer.  This
7  is the internet.  This is the web.  This is how this whole
8  thing works.  So this is absolutely computer focused
9  information.  This isn't a GUI and a mouse.  And you'll see in
10  a moment in the claims, this is the, this is the internet.  So
11  here's the problem:  I don't want what happens automatically on
12  the web to happen any longer.  I don't want to click on the
13  first site and get immediately hauled over to a new site, and
14  there's nothing I can do about it.  That's the problem that
15  they tried to solve.

16         So they solved it.  They came up with technology,
17  software as well as how the links worked that combined visual
18  images, elements of the host website.  In this instance, and
19  you're seeing the figure 19, the illustration, Culinary Cafe
20  would have been the host website with the content of a third
21  party merchant, which is the Fancy Foods Gourmet Club.  So you
22  can see -- and I'm actually going to use this laser gizmo.

23         This portion of the web page, upper left, at the head
24  of the column headed recipes, and in the center where you can
25  see the word Culinary Cafe, those are style visual elements of

1   the Culinary Cafe site, which is where you would have started.

2   If you look all the way up to the top line, you can see the

3   Culinary Cafe is where this link began using the browser, the

4   Microsoft Internet Explorer browser.

5          But when you clicked, you didn't lose all of the

6   Culinary Cafe information.  A merged website, I'm trying to

7   think of the right way to do it, is generated by the software,

8   by the computer that has elements of both the host and the

9   third party.  And this is what the -- this is what the

10  invention was.

11         So what was the abstract idea?  They said -- the

12  Circuit said, well, it's making two web pages look the same.

13  And they upheld the claims because it did not recite a

14  fundamental or economic or longstanding commercial practice or

15  processing business information.  It was rooted in computer

16  technology.  The computer technology being an outsource

17  provider serving web pages offering commercial opportunities.

18  Right up here at the top, Your Honor.

19         And then if you step through this claim, you find

20  servers and you find source pages and you find retrieval.  You

21  find something that absolutely is up to its eyeballs in a

22  computer network and a computer system.  And that's what leads

23  to the further comments of the claims address the problem of

24  retaining website visitors that conventionally if they follow

25  the routine conventionally function of the hypernet -- I'm

1   sorry.  Interlink hypernet -- hyperlink, I'm going too fast --

2   internet hyperlink protocol, you'd be bounced away from the

3   host to the advertiser.  And the claims here specifically show

4   how interactions with the internet are manipulated to yield a

5   desired result.  A result that overrides the routine and

6   conventional sequence of events ordinarily triggered by the

7   link or a hyperlink.

8          You couldn't get any more computer based, computer

9   world, post the internet than the situation that DDR discloses.

10  It is completely different than the circumstance presented by

11  the '132 and '304 claims for that reason.  This really is a

12  much different situation where you are, in fact, having an

13  effect on the system.  You are, in fact, having an effect on

14  the processor.  You are, in fact, having an effect on the

15  software.  You are changing up all of this, which is exactly

16  what you don't do with the '132 and '304 claims, which are

17  directed to same old, same old.  Use any GUI, use any computer.

18  We don't change up how the exchanges work.  That stuff is all

19  left the way it was.

20         Now, yes, there is language that cautions, however,

21  which I don't think we saw earlier in DDR.  That says not all

22  claims purporting to address internet centric challenges are

23  eligible for a patent, and cites Ultramercial, which counsel

24  cited for an opposing view earlier on.  That said you don't

25  automatically find yourself by DDR only getting analyses under

1    Alice, which Ultramercial is, that finds claims patent
2    ineligible.  You get them wherever the claims, in fact, in
3    fact, satisfy step one.  And they only avoid step two if they
4    look like the claims that you see in DDR.

5            I'm not debating, Your Honor, that this is -- this
6    area is a little -- I'll say it more strongly than that.
7    Your Honor can tell, which is why I put the claims up for you
8    and showed you how other courts have done the analyses rather
9    than showed you screen shots of little icons, which is what my
10   colleague did when he said, oh, this doesn't match, this
11   doesn't match, this doesn't match.  I took your time, and I
12   thank you for giving it to me, to show you exactly how these
13   analyses have been done in other cases.

14           I don't debate that this is not -- that this is easy.
15   I don't debate that at all.  But under the circumstances
16   presented by these claims and how they were written and what TT
17   has said about them in various places and with the test that
18   we've shown you, this really does satisfy Alice.  And there's
19   no way, no case that you've been shown that says we only fail
20   Alice when it's something that's old that otherwise was being
21   used in another place.

22           Interestingly, and this will be my last point, in
23   their reply brief on page 4 where the point is the claim
24   solution -- here we're talking about the claim solution in DDR
25   is necessarily rooted in computer technology in order to

1    overcome a problem specifically arising in the realm of
2    computer networks.  I wrote a little note in here where I've
3    got down here, TT, see reply brief page 4, has admitted that
4    the '132 and '304 inventions are not rooted in computer
5    technology.
6         As they assert that, quote, the claim tool is
7    implemented graphically -- and then I put brackets because this
8    was implicit, on a computer, merely because of the state of
9    technology today.  It would be possible to implement a
10   comparable tool mechanically, mechanically.  Well, if the
11   comparable tool could be implemented mechanically, '132 and
12   '304 are not rooted in computer technology.  You couldn't get
13   any further away than a mechanical solution in contrast to
14   something that would be related to the internet or arising
15   specifically in the realm of computer networks.
16        So this is on page 4 of their reply brief.  They
17   said, the claim tool is implemented -- or I should say their
18   opposition brief.  The claim tool is implemented graphically on
19   a computer, I added the on a computer, merely because of the
20   state of technology today.  It would be possible to implement a
21   comparable tool mechanically -- no.  I apologize.  Here's the
22   correct citation.  It's Exhibit 4 at 24 and 30 in their CBMR
23   submission, POPR.  My apologies, Your Honor.  I'm just -- I'm
24   trying to get everybody out of here, and I'm just going way too
25   fast.  So that's the cite.  Exhibit 4 in the POPR materials at

1  24 and 30, and that's part of the patent owner's preliminary

2  response.

3          THE COURT:  Anything further, Counsel?

4          MR. ADAMO:  I just -- if I might have one.

5          THE COURT:  You may.

6      (Brief pause.)

7          MR. ADAMO:  Oh.  I -- to the extent that I

8  inadvertently left out, Alice talks about improving the

9  functioning of a computer itself, I apologize, if I did.  And I

10  don't doubt if my brother says that I did.  But I would expect

11  it's because these claims '132 and '304 don't do anything with

12  respect to improving the function of the computer itself.

13  There isn't even a computer recited.  It's just not there.  I

14  thank you very much for your time and your --

15          THE COURT:  Mr. Borsand.

16          MR. ADAMO:  -- attention.

17          MR. BORSAND:  No.

18          THE COURT:  Nothing else.  All right.

19          MR. ADAMO:  Thank you very much, Your Honor.

20          THE COURT:  Thank you very much.

21          MR. ADAMO:  Oh, I'm sorry.  Mr. Kelly wanted me to

22  ask you is it the Court's intention to possibly have a session

23  with counsel this afternoon?

24          THE COURT:  Yes.

25          MR. ADAMO:  I understand your jury charge is going to

 1  come back and --

 2          THE COURT:  Yes.

 3          MR. ADAMO:  So he just asked me to ask you.

 4          THE COURT:  Yes.  Yes.  That's the next step.  First

 5  of all, thank you for the arguments.

 6          MR. ADAMO:  Thank you, Your Honor.

 7          THE COURT:  Well presented both in writing and today.

 8  The Court appreciates them.  And I will get a ruling out with

 9  all haste.  As to the rest of our preparations for the trial,

10  the Court does need to meet with counsel for at least I would

11  say an hour, at least this afternoon to go over the statement

12  of the case, which just letting you know, it's my statement of

13  the case.  So all the red lining, it's not going to make a

14  difference.  I'm going to say what I want to say.  All right.

15  On the statement of the case.

16          MR. ADAMO:  Can we take a vote at how many people are

17  surprised at that result.

18          THE COURT:  The statement of the case.  Preliminary

19  jury instructions.  The questionnaire, the jury, we'll be going

20  over those definitely.  You can also bring up other brief

21  matters that we need to.  But those are the most important off

22  the bat.  And we also will have some other matters, but we're

23  definitely going to get to those this afternoon.  And it's

24  12:30.  I'm looking at around 2.

25          MR. SIGMOND:  Sounds good, Your Honor.

1    MR. KELLY:  That's good.

2    THE COURT:  That gives people enough time to eat

3    something and, you know, get ready to freeze coming back over

4    here again.  All right.  If there's nothing else, I'll see you

5    at 2.

6    MR. SIGMOND:  Thank you, Your Honor.

7    MR. ADAMO:  Thank you.

8    THE COURT:  All right.  Thank you very much everyone.

9                    CERTIFICATE

10    I HEREBY CERTIFY that the foregoing is a true,

11   correct and complete transcript of the proceedings had at the

12   hearing of the aforementioned cause on the day and date hereof.

13

14   _/s/TRACEY D. McCULLOUGH_                    _February 24, 2015_

15   Official Court Reporter                    Date
     United States District Court
16   Northern District of Illinois
     Eastern Division

17

18

19

20

21

22

23

24

25